No. 25-_____

In the
# United States Court of Appeals
### for the Fifth Circuit



U.S. COURT OF APPEALS
RECEIVED
Feb. 14, 2025
FIFTH CIRCUIT

AIRLINES FOR AMERICA, AMERICAN AIRLINES, INC., DELTA AIR LINES, INC.,
JETBLUE AIRWAYS CORPORATION, SOUTHWEST AIRLINES CO.,
AND UNITED AIRLINES, INC.,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

On Petition for Review of a Final Rule of the
United States Department of Transportation

## PETITION FOR REVIEW

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

**No. 25-\_\_\_\_**, *Airlines for America et al. v. United States Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are so the judges of this Court may evaluate possible disqualification or recusal.

## I.    Petitioners

Petitioner Airlines for America has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner American Airlines, Inc., is a wholly owned subsidiary of American Airlines Group Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner Delta Air Lines, Inc., is a publicly held corporation. It has no parent corporation, and The Vanguard Group owns 10% or more of its stock. No other publicly held corporation holds 10% or more of Delta Air Lines, Inc.'s stock.

Petitioner JetBlue Airways Corporation is a publicly held corporation. It has no parent corporation, and Blackrock, Inc., holds 10% or more of

JetBlue Airways Corporation stock. No other publicly held corporation holds 10% or more of JetBlue Airways Corporation's stock.

Petitioner Southwest Airlines Co. is a publicly traded entity and is traded on the New York Stock Exchange as LUV. It has no parent corporation, and The Vanguard Group and Capital World Investors each own 10% or more of its stock. No other publicly held corporation holds 10% or more of Southwest Airlines Co.'s stock, and there is no other entity related to, or affiliated with, Southwest Airlines Co. that has a pecuniary interest in the outcome of the case.

Petitioner United Airlines, Inc., is a wholly owned subsidiary of United Airlines Holdings Inc. No other publicly held corporation holds 10% or more of United Airlines, Inc.'s stock.

## II. Respondent

The United States Department of Transportation is an agency of the federal government.

## III. Interested parties

### A. Counsel for Petitioners

Counsel for Petitioners in the litigation are Shay Dvoretzky, Parker Rider-Longmaid, Kyser Blakely, Jeremy Patashnik, and Hanaa Khan, all of Skadden, Arps, Slate, Meagher & Flom LLP.

**B.     Opposing counsel**

Opposing counsel in the litigation are:

- Judith S. Kaleta, Deputy General Counsel, U.S. Department of Transportation

- Attorneys for the government have not yet appeared.

**C.     Other interested parties**

To counsel's knowledge, there are no additional firms or persons with

an interest in the outcome of the litigation.

Dated: February 14, 2025               */s/ Shay Dvoretzky*
                                       Shay Dvoretzky

                                       *Counsel for Petitioners*

# PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 46110(a) and Federal Rule of Appellate Procedure 15(a), Petitioners Airlines for America, American Airlines, Inc., Delta Air Lines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and United Airlines, Inc.—collectively, the Airlines—hereby petition this Court for review of a Department of Transportation (DOT) regulation, *Ensuring Safe Accommodations for Air Travelers with Disabilities Using Wheelchairs*, 89 Fed. Reg. 102,398 (Dec. 17, 2024) (the Rule). A copy of the Rule is attached as Exhibit A.

As the Airlines will explain, the Court should "hold unlawful and set aside" the Rule, in whole or in part, because provisions of the Rule exceed DOT's statutory authority and the Rule violates the Administrative Procedure Act (APA). 5 U.S.C. § 706(2). The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory … authority"; or "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D). The Rule does not satisfy these requirements and thus is unlawful.

Petitioners have timely filed this petition on February 14, 2025, within 60 days after DOT issued the Rule on December 17, 2024. *See* 49 U.S.C. § 46110(a). Venue is proper in this Court, because Petitioners American Airlines and Southwest Airlines have their principal places of business within this Circuit. *See id.* To the Airlines' knowledge, as of filing this petition, no other petition for review of the Rule has been filed.

Dated: February 14, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 15(c), I hereby certify that on February 14, 2025, I caused the foregoing Petition for Review to be served upon the Office of the General Counsel of the U.S. Department of Transportation via email and Federal Express at the following address:

Office of the General Counsel
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dated: February 14, 2025

*/s/ Shay Dvoretzky*
Shay Dvoretzky

*Counsel for Petitioners*

**EXHIBIT A**



## DEPARTMENT OF TRANSPORTATION

**Office of the Secretary**

**14 CFR Part 382**

**[Docket No. DOT–OST–2022–0144]**

**RIN 2105–AF14**

**Ensuring Safe Accommodations for Air Travelers With Disabilities Using Wheelchairs**

**AGENCY:** Office of the Secretary (OST), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The U.S. Department of Transportation (DOT or the Department) is issuing a final rule to strengthen its regulation implementing the Air Carrier Access Act (ACAA) and to address the serious problems that individuals with disabilities using wheelchairs and scooters face when traveling by air that impact their safety and dignity, including mishandled wheelchairs and scooters and improper transfers to and from aircraft seats, aisle chairs, and personal wheelchairs. This final rule also carries out certain rulemaking provisions required by the FAA Reauthorization Act of 2024.

**DATES:** This rule is effective January 16, 2025.

**FOR FURTHER INFORMATION CONTACT:** Christopher Miller, Vinh Nguyen, Robert Gorman, or Blane Workie, Office of Aviation Consumer Protection, U.S. Department of Transportation, 1200 New Jersey Ave. SE, Washington, DC 20590, 202–366–9342 (phone), 202–366–7152 (fax), *christopher.miller1@dot.gov,* *vinh.nguyen@dot.gov,* *robert.gorman@dot.gov,* or *blane.workie@dot.gov* (email).

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of the Regulatory Action

The purpose of this final rule is to increase access to safe and dignified air travel for individuals with disabilities. The Department is committed to ensuring that our air transportation system is safe and accessible for all. Air travel connects individuals to family and friends, jobs, and vital services, and it opens the door to opportunity. However, air travel can be especially difficult for individuals who use wheelchairs or scooters and rely on disability-related physical assistance and services provided by U.S. and foreign air carriers[1] ("carriers" or

"airlines") and their contractors. Damaged and delayed personal wheelchairs and assistive devices and untimely and unsafe assistance provided by airlines can lead to serious life disruptions such as loss of mobility independence, personal injury, lost opportunities and wages, and other significant harms. Some wheelchair users even avoid flying altogether because of these risks.

### B. Statutory Authority

The Air Carrier Access Act, 49 U.S.C. 41705, prohibits discrimination because of disability in airline service by U.S. and foreign air carriers. When it enacted the ACAA, Congress directed the Department "to promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers." Public Law 99–435, section 3, 100 Stat. 1080, 1080 (1986). The Department responded by issuing a final rule that required carriers to provide nondiscriminatory service to individuals with disabilities.[2] The Department has continually updated these regulations pursuant to the ACAA, Congressional mandate,[3] and with the Department's rulemaking authority under 49 U.S.C. 40113, which states that the Department may take action that it considers necessary to carry out its statutory duties, including prescribing regulations.[4] The Department considers the mishandling of wheelchairs, scooters, and assistive devices, and unsafe, undignified, and untimely wheelchair assistance, to constitute discrimination on the basis of disability.[5] Those actions impose burdens on passengers with disabilities that they do not impose on passengers without disabilities. Those actions also deny passengers full and equal access to carriers' services.

To the extent that violations of the ACAA and part 382 occur in interstate

any other arrangement, to engage in air transportation." 14 CFR 382.3.

[2] *See* 55 FR 8008 (Mar. 6, 1990).

[3] *See, e.g.,* Nondiscrimination on the Basis of Disability in Air Travel, 73 FR 27614 (May 13, 2008) (revised part 382 to comply with Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, which, among other things, amended the ACAA to include foreign carriers in the prohibition against discriminating against qualified individuals with disabilities).

[4] *See, e.g.,* Accessible Lavatories on Single Aisle Aircraft, 88 FR 50020 (Aug. 1, 2023); Traveling by Air with Service Animals, 85 FR 79742 (Dec. 10, 2020); and Accessibility of websites and Automated Kiosks at U.S. Airports, 78 FR 67882 (Nov. 12, 2013).

[5] *See, e.g.,* United Airlines, Inc., Order 2016–1–3 (Jan. 15, 2016); US Airways, Inc., Order 2013–11–4 (Nov. 4, 2013); American Airlines, Inc, Order 2003–3–1 (Mar. 4, 2003); and Northwest Airlines, Inc., Order 2002–2–11 (Feb. 11, 2002).

air transportation, the incidents are also violations of 49 U.S.C. 41702, which requires air carriers to provide safe and adequate interstate air transportation. The Department has long recognized section 41702 may be used to ensure "safe and adequate" service in a civil rights context.[6] The Department has also previously found that violations of the ACAA and 14 CFR part 382 are unfair practices under 49 U.S.C. 41712.[7] A practice is unfair if it (1) causes or is likely to cause substantial injury to consumers, (2) cannot be reasonably avoided by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition.[8]

Additionally, section 440 of the FAA Reauthorization Act of 2018[9] ("2018 FAA Act") directs the Department to review, and if necessary revise, applicable regulations to ensure that passengers with disabilities receive dignified, timely, and effective assistance at airports and onboard aircraft from trained personnel. It also directs the Department to ensure that airline personnel who provide physical assistance to passengers with disabilities receive annual training that includes, as appropriate, hands-on instructions and the appropriate use of relevant equipment.[10]

The FAA Reauthorization Act of 2024[11] ("2024 FAA Act") contains multiple accessibility measures to improve travel for passengers who use wheelchairs. Section 542 of the 2024 FAA Act directs the Department to issue a rulemaking to develop requirements for minimum training standards for airline personnel or contractors who assist wheelchair users who board or deplane using an aisle chair or other boarding devices. Section 543 directs the Department to issue a rulemaking to develop requirements for minimum training standards for airline personnel or contractors related to stowage of wheelchairs and scooters used by passengers with disabilities on aircraft.

[6] *See e.g.,* Frontier Airlines, Inc., Order 2017–7–8 (July 21, 2017); United Airlines, Inc., Order 2016–1–3 (Jan. 15, 2016); U.S. Airways, Inc., Order 2003–3–19 (Mar. 26, 2003); American Airlines, Inc., Order 2003–3–1 (Mar. 4, 2003).

[7] *See e.g.,* American Airlines, Inc., Order 2024–10–15 (Oct. 23, 2024); Allegiant Air, LLC, Order 2018–4–8 (Apr. 13, 2018); American Airlines, Inc., Order 2013–12–4 (Dec. 6, 2013); JetBlue Airways Corp., Order 2010–12–17 (Dec. 13, 2010).

[8] 14 CFR 399.79(b).

[9] The FAA Reauthorization Act of 2018, Public Law 115–254, Sec. 440 (Oct. 5, 2018).

[10] The Department notes that the 2018 FAA Act also increased the civil penalties related to harm to passengers with disabilities and required the Department to develop the Airline Passengers with Disabilities Bill of Rights.

[11] The FAA Reauthorization Act of 2024, Public Law 118–63, Sec. 544 (May 16, 2024).

[1] "Carrier" is defined as "a U.S. citizen ("U.S. carrier") or foreign citizen ("foreign carrier") that undertakes, directly or indirectly, or by a lease or

Section 544 directs the Department to issue a rule directing carriers to publish information relating to aircraft cargo hold dimensions, in order to better inform passengers about the limitations of an aircraft's ability to accommodate assistive devices. This section of the Act also requires carriers to offer a refund to individuals for fares, fees, and taxes paid for a flight that cannot accommodate the passenger's assistive device.[12]

*C. Background*

The Department has long been concerned about the safe and dignified treatment of passengers with disabilities, including passengers who use wheelchairs, scooters, and other assistive devices. Disability rights advocates have raised concerns to the Department regarding unsafe, inadequate, and undignified assistance that individuals with mobility disabilities receive from airlines when flying. These concerns have primarily focused on delayed and damaged personal wheelchairs or scooters, unsafe transfers to and from wheelchairs and aircraft seats, and lack of prompt wheelchair assistance at the airport. Advocates have also maintained that damage to passengers' personal wheelchairs or scooters can result from insufficient training.

Today, passengers who use wheelchair cannot travel in their own wheelchairs and must surrender their wheelchairs to an airline for stowage prior to travel. This means passengers must rely on airline staff and contractors to properly handle a wheelchair or scooter and return it in a timely manner in the condition it was received. The advocates have stressed to the Department that, when an individual's wheelchair or scooter is delayed or damaged by an airline, the individual's mobility, health, and freedom are impacted until the device can be returned, repaired, or replaced. Advocates note that wheelchairs are often custom fitted to meet the needs and shape of each user. Spending time in an ill-fitting chair can cause serious injury, such as pressure sores, and even death because of a subsequent infection. Further, loaner devices may lack the customized assistive technology that helps the individual communicate or breathe and have inadequate functions

that limit mobility. A disability organization also asserted that, according to its survey, the top reason individuals with mobility disabilities avoid travel is because of concerns about wheelchair damage.[13]

On March 24, 2022, the Department held a Public Meeting on Air Travel by Persons Who Use Wheelchairs. Hundreds of individuals participated in the meeting and submitted written comments to the meeting's docket. The Department heard firsthand stories from passengers whose lives and health were seriously impacted by unsafe assistance and mishandling of their wheelchairs or scooters.[14] Commenters also discussed the need for enhanced training for personnel and contractors providing physical assistance to individuals with disabilities and handling wheelchairs. The Department addressed these issues in its Notice of Proposed Rulemaking (NPRM) on Ensuring Safe Accommodations for Air Travelers with Disabilities Using Wheelchairs, which was published in the **Federal Register** on March 12, 2024.[15]

More specifically, in the NPRM, the Department proposed various measures to improve the air travel environment for individuals with disabilities. First, we proposed to codify our longstanding interpretation of the ACAA that assistance to individuals with disabilities must be provided in a safe and dignified manner. Second, we proposed that assistance must be prompt, with promptness to be determined based on the totality of the

circumstances except when physical assistance is needed to disembark the aircraft. Third, we proposed that any mishandling of passengers' wheelchairs or other assistive devices is a *per se* violation of the ACAA, subjecting an airline to a separate penalty. Fourth, we proposed to define "mishandling" as "lost, delayed, damaged, or pilfered," consistent with existing DOT rules on baggage mishandling.[16] Fifth, we proposed that when a wheelchair or scooter is mishandled, airlines must immediately notify a passenger of the right to file a claim with the airline, to receive a loaner wheelchair, to choose a preferred vendor for repairs or replacement, and to discuss with a Complaints Resolution Official (CRO). Sixth, we proposed to require airlines to timely notify passengers when wheelchairs or scooters are loaded and unloaded, and when the wheelchair does not fit on an aircraft. Seventh, we proposed to require airlines to transport a delayed wheelchair to a passenger's final destination within 24 hours by whatever means possible. Eighth, we proposed that if a wheelchair or scooter is mishandled, airlines must provide the choice of repairing/replacing the device itself or allowing the passenger to arrange for repairs/replacements through the passenger's preferred vendor. Ninth, we proposed that airlines must provide and pay for loaner wheelchairs after airline mishandlings, and that airlines must consult with the passenger to ensure that the loaner wheelchair meets the passenger's functional and safety-related needs to the maximum extent possible. Tenth, we proposed that airlines provide annual training, including hands-on training, of airline employees and contractors who physically assist passengers with mobility disabilities or handle passengers' wheelchairs or scooters. We also included a proposed definition of "hands-on training," and proposed to require that airlines consult with disability advocacy organizations when developing and changing their training programs. Finally, we proposed an expanded rollout of on-board wheelchairs (OBWs) with improved safety and accessibility features.

We also sought comment on additional topics, including but not limited to: (1) whether other types of status notifications about checked wheelchairs and scooters should be required of airlines (*e.g.,* notification regarding stowage location of the passenger's wheelchair or scooter on the

---

[12] The Department's Office of Aviation Consumer Protection has for many years interpreted 49 U.S.C. 41712 and 41705 as requiring carriers provide prompt refunds when a passenger does not take a flight because the flight does not accommodate the passenger's assistive device such as a wheelchair. The 2024 FAA Act codifies the Department's longstanding interpretation.

[13] Paralyzed Veterans of America's (PVA) informal online survey, titled *The ACAA Survey,* and its results were published in September 2022 and can be accessed online at *https://pva.org/wp-content/uploads/2022/09/2022-ACAA-Survey-Results-FINAL.pdf.*

[14] Many of the participants expressed concern about the October 2021 death of disability activist Engracia Figueroa, several months after an incident involving damage to her wheelchair. Following this incident, in September 2023, the Department entered into an agreement with United Airlines. Under the Agreement, United will: (1) roll out a flight filter on its booking engine to make it easier for passengers who use wheelchairs to find flights where their wheelchairs can fit and be safely transported; (2) refund the fare difference for passengers using the flight filter when the passenger's preferred flight cannot accommodate their wheelchair and the flight that they travel on with their wheelchair is more expensive; (3) conduct a pilot program to explore whether additional equipment, such as a medical wheelchair or other form of moveable or non-moveable chair, can be utilized to safely accommodate passengers waiting for loaner wheelchairs; and (4) seek feedback from each passenger who checks a wheelchair for transport in the aircraft cargo compartment. See *https://www.transportation.gov/airconsumer/DOT-United-Airlines-Agreement-Improve-Wheelchair-Access-PDF.*

[15] Ensuring Safe Accommodations for Air Travelers With Disabilities Using Wheelchairs, 89 FR 17766 (Mar. 12, 2024).

[16] See 14 CFR 234.6 (requiring airlines to annually report mishandling of wheelchairs and scooters).

flight); (2) whether airlines should be required to provide dimensions of their cargo compartments prior to travel for passengers with wheelchairs or scooters; (3) whether airlines should be required to provide safe and adequate seating accommodations at the airport while passengers wait for delayed wheelchairs or loaner wheelchairs; (4) whether airlines should be required to reimburse passengers for consequential costs from delayed wheelchairs; (5) whether airlines should be required to use durable medical equipment (DME) suppliers to carry out repairs; (6) whether airlines should be required to provide passengers a specified period to ensure that the repairs to wheelchairs or scooters carried out by the airline are adequate; (7) whether airlines should be required to offer minor/temporary wheelchair repairs at the airport to enable passengers to leave the airport with their personal wheelchair and seek a full repair at a more convenient date; (8) whether airlines should be required to reimburse passengers for consequential costs due to inadequate loaners that restrict their mobility or independence; (9) whether airlines should be required to designate wheelchair experts and transfer experts to be consulted in the event that a complex issue or problem arises while handling a passenger's personal wheelchair or while physically assisting a passenger with a disability; (10) whether to require airlines to expand the size of lavatories on twin-aisle aircraft; and (11) whether airlines should be required to reimburse the difference between the fare on a flight a wheelchair user took, and the fare on a flight that the wheelchair or scooter user would have taken if his or her wheelchair or scooter had been able to fit in the cabin or cargo compartment of the aircraft.

The comment period for the NPRM was originally scheduled to close on May 13, 2024. Airlines for America (A4A), the International Air Transport Association (IATA), the National Air Carriers Association (NACA), the Regional Airline Association (RAA), and the Airline Service Providers Association (ASPA) (collectively, the Associations) asked for a 90-day extension of time to file comments. The Department extended the comment period for 30 days, to June 12, 2024.[17] The Department also responded to a series of questions posed by the Associations and placed those responses in the rulemaking docket.[18]

The Department received 1,897 comments from individuals [19] and 73 comments from stakeholder organizations. Of the stakeholder organization comments, 40 were from disability rights organizations, 14 were from airlines and airline associations, and 19 were from other organizations representing airports, flight attendants, aircraft manufacturers, labor unions, medical personnel, and others.

To broadly summarize, disability rights organizations generally supported the rulemaking and welcomed DOT's action in this area. On some topics, advocates were split on whether DOT's proposals were appropriate or whether they should be strengthened, particularly on the topic of training. Airlines often indicated that they supported the underlying goals of the Department's proposal but argued that DOT's underlying assumptions may be flawed and that its economic analysis may not fully capture the costs of the rule. Airlines often suggested amendments stating that they were necessary to prevent passengers from having unrealistic expectations about the services and accommodations that airlines can offer and provide. Individual commenters overwhelmingly supported the rulemaking. A fuller analysis of the comments received is set forth in the discussion of each topic below.

*D. Summary of Major Provisions*

The compliance date for these provisions is January 16, 2025, unless otherwise stated.
**BILLING CODE P**

---

[17] See 89 FR 38852 (May 8, 2024).

[18] The questions and the Department's responses are available at *https://www.regulations.gov/ document/DOT-OST-2022-0144-1318.*

[19] This total includes approximately 1,055 form letters.

| SUBJECT | FINAL RULE |
|---|---|
| **Safe and Dignified Assistance** | Clarifies that safe and dignified assistance to individuals with disabilities is required when providing required accommodations. See § 382.11(b).<br><br>Defines *safe* to mean assistance provided to individuals with disabilities that does not put them at heightened risk of bodily injury, which may include loss or damage to wheelchairs and other assistive devices that result in bodily injury. See § 382.3.<br><br>Defines *dignified* to mean assistance provided in a manner that respects a passenger's independence, autonomy, and privacy, which includes but is not limited to: airline personnel providing transfer assistance in a manner that ensures the passenger's clothing is not removed; airline personnel not unduly delaying requests for access to a restroom such that the individual soils himself or herself; and, to the maximum extent possible, airline personnel communicating directly with the individual with disability (e.g., rather than his or her companion or another individual) when the individual with disability is interacting with them. See § 382.3. |
| **Prompt Enplaning, Deplaning, and Connecting Assistance** | Clarifies that prompt enplaning, deplaning, and connecting assistance is required, including moving within the airport terminal. See § 382.89(a).<br><br>Determines prompt based on the totality of circumstances, except when physical assistance is needed to disembark the aircraft, in which case prompt means that:<br>(1) personnel and boarding wheelchair must be available to deplane the passenger when the last passenger who did not request deplaning assistance departs the aircraft; and<br>(2) the passenger's personal wheelchair or scooter must be available as close as possible to the door of the aircraft to the maximum extent possible, except: (a) where this practice would be inconsistent with Federal regulations governing transportation security or the transportation of hazardous materials, (b) or when the passenger requests the wheelchair or scooter be returned at a location other than the door of the aircraft. If the passenger requests the wheelchair or scooter be returned at a location other than the door of the aircraft, an airport wheelchair must be available for the passenger's use.<br><br>See § 382.89(b) and (c). |
| **Rebuttable Presumption of a Violation** | Defines *mishandled* to mean lost, delayed, damaged, or pilfered (i.e., stolen). See § 382.3.<br><br>Clarifies that airlines must return checked wheelchairs and other assistive devices to the passenger in the condition in which they are received. Specifies that whenever a passenger's checked wheelchair or other assistive device that was in the airline's custody is not returned to the passenger in the same condition it was received, there is a rebuttable |

| | |
|---|---|
| | presumption that the airline mishandled the passenger's wheelchair or other assistive device in violation of the ACAA. Specifies what an airline must demonstrate to overcome the presumption of a violation. See § 382.130(a). |
| **Passenger Notifications** | <u>Required Information Prior to Departure</u><br>• Requires airlines to notify passengers in writing when they are checking their wheelchairs or scooters that if their wheelchair or scooter is mishandled, they have the right to contact a CRO and a right to file a claim with the airline. Airlines must inform passengers how to contact the CRO. See § 382.125(e).<br>• Requires airlines to notify passengers whether their wheelchairs or scooters have been loaded onto their flights (including whether their device could not fit on the passenger's scheduled flight because of its size or weight) before the aircraft cabin door closes. See § 382.125(f)(1). Compliance date is on or after December 17, 2025.<br><br><u>Required Information Upon Arrival</u><br>• Requires airlines to notify passengers, before the passengers deplane, when their wheelchairs or scooters have been unloaded from the cargo compartment of their flights. See § 382.125(f)(3). Compliance date is on or after December 17, 2025.<br><br><u>Required Information After Wheelchair or Scooter is Mishandled</u><br>• Requires airlines to notify in writing passengers whose wheelchairs or scooters have been mishandled of their rights: (1) to file a claim with the airline, (2) to receive a loaner wheelchair from the airline with certain customizations, (3) to choose a preferred vendor, if desired, for device repairs or replacement, and (4) to have a CRO available and be provided information on how to contact the CRO. See § 382.130(b). Compliance date is on or after March 17, 2025.<br>• Requires airlines to provide status update notifications to passengers on their delayed wheelchairs or scooters when there is a status change. See § 382.130(c)(3).<br><br>Requires all notifications to be accessible. See §§ 382.125(e) and (f)(4) and 382.130. |
| **Publication of Information Related to Aircraft Cargo Holds** | Requires airlines to publish in a prominent and easily accessible place on their public websites, information describing the relevant dimensions and other characteristics of the cargo holds of all aircraft types operated by the airline, including the dimensions of the cargo hold entry. See § 382.41(b). |
| **Prompt Return of Delayed Wheelchairs or Scooters** | Requires airlines to transport a delayed wheelchair or scooter to the passenger's final destination within 24 hours of the passenger's arrival for domestic flights and short international flights (12 hours or less in duration) and within 30 hours of the passenger's arrival for long international flights (more than 12 hours in duration). Airlines must |

| | transport the device by whatever means are available to do so safely. See § 382.130(c)(1). Requires airlines to provide the passenger a choice between picking up the delayed wheelchair or scooter at his or her destination airport or having the wheelchair or scooter delivered to a reasonable location requested by the passenger, such as the passenger's home or hotel. See § 382.130(c)(2). Specifies that the delay starts when a passenger arrives at his/her destination but his/her personal wheelchair or scooter does not and the delay ends when a passenger either picks up the delayed wheelchair or scooter at his or her destination airport or the delayed wheelchair or scooter is delivered by the airline to the passenger at a reasonable location such as the passenger's home or hotel. See § 382.130(c)(2). Compliance date is June 16, 2025. |
|---|---|
| **Reimbursement for Accessible Ground Transportation** | Requires airlines to reimburse passengers for the cost(s) of any transportation to or from the airport that the passenger incurred as a direct result of the passenger's wheelchair or scooter being delayed by the airline. Airlines may require passengers to submit documentation that substantiates the cost(s), such as receipts or invoices. See § 382.130(c)(5). |
| **Prompt Repair or Replacement of Damaged Wheelchairs or Scooters** | Following a wheelchair or scooter mishandling, requires airlines to: (a) Provide the passenger a reasonable timeframe to inspect the wheelchair or scooter and to file a claim with the carrier for the mishandling; (b) Offer the passenger options, on or after March 17, 2025, of: (a) the carrier handling the prompt repair or replacement of the device, with a device of equivalent or greater function and safety, and paying the associated costs; or (b) the passenger arranging for the repair or replacement of the device, with a device of equivalent or greater function and safety, through his or her preferred vendor with the carrier having the responsibility to transport the device to the passenger's preferred vendor and to pay the vendor directly for the repairs or replacement; and (c) Promptly review claims received within a reasonable time of the repaired wheelchair or scooter being returned to the passenger alleging that the provided repairs were not sufficient. See § 382.130(d). Clarifies that the Montreal Convention will apply for wheelchair or scooter mishandlings on international flights. See § 382.130(f). |
| **Loaner Wheelchair or Scooter Accommodations** | Requires airlines to provide and pay for loaner wheelchairs or scooters while individuals with disabilities are waiting on returns, repairs, or replacements for their mishandled devices. See § 382.130(e). |

| | Requires airlines to consult with the individual receiving the loaner wheelchair or scooter to ensure that the loaner wheelchair or scooter fits the passenger's functional needs, as much as possible, and safety-related needs. See § 382.130(e). |
| --- | --- |
| | If the loaner wheelchair or scooter offered by the airline does not meet the passenger's functional and safety-related needs as well as the passenger's existing device, requires the airline to allow the passenger to find and secure an alternative loaner wheelchair or scooter that is better than the one offered. Airlines must reimburse the passenger for the cost of that loaner within 30 days of the passenger's request. Airlines may require the passenger to provide documentation substantiating the cost, such as receipts or invoices, to receive the reimbursement. See § 382.130(e). |
| **Reimbursement of Fare Difference** | Requires airlines to reimburse the difference between the fare on a flight a passenger who uses a wheelchair or scooter took and the fare on a flight that the wheelchair or scooter user would have taken if his or her wheelchair or scooter had been able to fit in the cabin or cargo compartment of the aircraft. Fare difference requirement is limited to flights that occur on the same day, on the same airline, and between the same origin and destination. |
| | Requires airlines to disclose on their websites the documentation needed to support a reimbursement claim. See § 382.132. |
| | Compliance date is March 17, 2025. |
| **Rebooking Requirements** | Requires airlines to offer to disembark passengers and rebook them on the next available flight of the same carrier or a partner carrier at no additional cost when passengers' wheelchairs or scooters are not loaded on their scheduled flights, for whatever reason. See § 382.125(f)(2). |
| | Requires airlines to also offer free rebooking on the next available flight of the same carrier or a partner carrier when the airline becomes aware that a passenger's personal wheelchair or scooter does not fit on the passenger's scheduled flight. See § 382.125(f)(2). |
| **Seating Accommodations at the Airport** | Requires airlines to establish and provide, after consultation with disability rights organizations, safe and adequate seating accommodation(s) to be used by a person with a disability when waiting for a delayed personal wheelchair or scooter or waiting for a loaner wheelchair or scooter after a passenger's wheelchair or scooter is mishandled by the carrier and cannot be promptly returned. See § 382.130(c)(4). |
| | Compliance date is December 17, 2025. |

| **Enhanced Training for Certain Airline Personnel and Contractors** | Requires annual training, including hands-on training, of airline employees and contractors who physically assist passengers with mobility disabilities or handle passengers' wheelchairs or scooters. As part of the required training, employees and contractors must be able to successfully demonstrate their knowledge (e.g., competency assessments or certification exams). See § 382.141(a). |
| | Defines *hands-on training* to mean in-person training that is received by an employee or contractor where the employee or contractor can learn and practice real-life scenarios in a safe and controlled environment without the possibility of real-life consequences to passengers with disabilities and with the use of a suitable life-sized model or equipment, as appropriate. See § 382.3. |
| | Requires all airline employees and contractors who provide physical assistance to persons with mobility disabilities or handle the transport of wheelchairs or scooters to be trained as specified in this final rule by June 17, 2026. |
| **New Improved Standards for On-Board Wheelchairs (OBW)** | Requires new improved performance standards for OBWs on twin-aisle aircraft and purchases of OBWs for use on aircraft with more than 60 seats after October 2, 2026, consistent with standards for OBWs on single-aisle aircraft with 125 or more seats. See § 382.65(h). |
| | Requires all OBWs for use on aircraft with more than 60 seats to meet the Department's new improved standards by October 2, 2031. |

*E. Costs and Benefits*

The final rule will increase access to safe and dignified air travel for individuals with disabilities, particularly individuals who use a wheelchair or scooter. Expected benefits, which are not quantified, include: reducing fatal and non-fatal injuries sustained by individuals with disabilities and reducing embarrassing and demeaning experiences from inadequate assistance. Expected costs to industry, which are also not quantified, may include increasing staffing levels and administrative costs, among other things.

The final rule will also reduce the frequency and severity of mishandled wheelchairs and scooters and the harmful impacts that result from the mishandling of wheelchairs and scooters. The quantified benefits to individuals with disabilities are estimated to be approximately $11.1 million annually (discounted at 2%). The quantified cost to industry of the provisions involving the handling of wheelchairs and scooters, including

enhanced training requirements, are estimated to be approximately $14.7 million annually (discounted at 2%).

In addition, the final rule expands the use of OBWs with improved safety and accessibility features. Expected benefits, which are not quantified, include increasing the safety and comfort of individuals with disabilities. The quantified cost to carriers of the enhanced OBW provisions are expected to be approximately $900,000 annually (discounted at 2%).

**II. Discussion**

*A. Assistance to Individuals With Disabilities*

1. Safe and Dignified Assistance

*The NPRM:* In the NPRM, the Department proposed to explicitly include in the rule text that any assistance or accommodation required by the Department's disability regulation must be provided to individuals with disabilities in a safe and dignified manner. The Department also sought comment on whether the terms "safe" and "dignified" were

easily understood by carriers and the public. The Department also asked whether part 382 should include definitions for "safe" and "dignified" and if so, what should the Department consider when drafting definitions for those terms.

*Comments Received:* Individuals with disabilities and disability rights organizations generally supported the Department's proposal. At the same time, many disability rights organizations commented that the terms "safe" and "dignified" are not clearly understood by airlines and public. Most of the disability rights organizations that commented on this issue agreed that part 382 should include a definition for the term "safe." Multiple disability rights organizations, including Paralyzed Veterans of America (PVA),[20] the Christopher and Dana Reeves Foundation, the Amputee Coalition, and the National Multiple Sclerosis Society, stated that "safe assistance" be defined as "free from the risk of bodily injury or

---

[20] PVA's comment was co-signed by more than fifty other disability rights organizations.

death and the freedom from the risk of loss or damage to any assistive device." The United States Gender and Disability Justice Alliance and the Ability Center of Greater Toledo stated that the Department should collaborate and work with the disability community and individuals who use wheelchairs in developing a definition of "safe."

However, disability rights organizations split on whether the term "dignified" should be defined in part 382. Some disability rights organizations, such as PVA, the Christopher and Dana Reeves Foundation, the National Multiple Sclerosis Society, and the Arc, commented that "dignified" should not be defined in part 382. PVA asserted that dignity is not a singular concept, but includes civil rights, human rights, recognition, and non-discrimination, that any definition would fail to capture the breadth of what dignity encompasses, and that specifically defining dignity would only result in narrowing the carrier's obligations and passenger protections.

A number of other disability rights organizations, such as the American Association of People with Disabilities, the Rare Disease Diversity Coalition, the Amputee Coalition, and the United States Gender and Disability Justice Alliance, commented that the Department should define the term "dignified." The Amputee Coalition stated that failing to define dignity, or at the very least provide guidance on what it means to treat someone in a dignified manner, leaves it to case law to determine what dignity is or is not. Disability Rights Maryland commented that the definition of "dignified" should include the following: highlighting and respecting the personhood and privacy of passengers with disabilities; listening and following the instructions of passengers with disabilities; and treating passengers' equipment, such as medical equipment, mobility aids, and assistive technology, with the same level of care as the crew would give to passengers. North Dakota Protection & Advocacy Project stated that "dignified" could be defined as "assistance that follows protocols and procedures to ensure that passengers are assisted in a respectful manner that meets their needs in the least intrusive way possible." The Rare Disease Diversity Coalition commented that "dignified" means: respecting the inherent worth and autonomy of passengers with disabilities throughout their travel experience; providing assistance in a manner that preserves the individual's privacy and independence; communicating, understanding, and

responding to the unique needs of passengers with disabilities without condescension or undue attention; and creating an environment where passengers feel respected and valued.

Alternatively, Disability Rights California commented that the phrase "safe and dignified" should be a combination definition that includes the following: every human being has the right to be treated humanely, and respectfully, without the risk of harming physical and mental health; airlines must provide equitable, protected, physical and mental wellbeing in all aspects of air travel; and passengers with disabilities should have freedom from uncertainty, instability, or risk of harm to self or property.

A majority of airline industry stakeholders generally supported the Department's proposal. A4A and IATA commented that they agree with the premise that airlines should provide safe and dignified assistance to passengers with disabilities and the general intent and objective of the Department's proposal. However, similar to disability advocates, there is a split amongst the airline industry stakeholders on whether the terms "safe" and "dignified" should be defined in part 382. A majority of the airline industry stakeholders that commented on this issue, including A4A, IATA, NACA, and RAA, stated that it is not necessary or prudent for the Department to further define what constitutes "safe" or "dignified" in part 382. NACA explained that given the variability of passengers, their disabilities, and the operating environment, a more prescriptive definition of "safe and dignified" would be difficult to preemptively define. A4A and IATA asserted that leaving the definitions open and flexible allows airlines to better accommodate each individual and their unique disability.

A4A and IATA argued further that the Department should explicitly recognize that the requirement for safe and dignified assistance is based on the totality of circumstances. They also commented that the regulation should state that a carrier's refusal to provide assistance because the airline believes such assistance cannot be performed in a safe and dignified manner does not constitute a violation of part 382. They explained that airlines have responsibility for and are the experts in flight safety, including the safety of passengers with disabilities, and therefore, it is an airline's proper safety determination as to whether it can safely carry the passenger and/or their mobility aid. A4A and IATA asserted that passengers do not have the

knowledge or expertise to override an airline's safety-based decision and that an airline's determination of appropriate flight safety requirements takes precedence over a passenger's non-expert opinion on such safety requirements. A4A and IATA argued further that an airline's flight safety determination that may prevent a service or accommodation from being provided cannot be considered a failure to provide a service in a dignified manner and should be presumed to be dignified because the airline put the safety of the passenger with disabilities first.

A few airline industry stakeholders, such as Spirit Airlines (Spirit), Allegiant Air (Allegiant), Transportes Aéreos Portugueses, S.A. (TAP) and Neos S.P.A., commented that the Department should define the terms "safe" and "dignified." TAP stated that these terms are currently not defined, vague, and could lead to unwarranted liability for airlines. Allegiant asserted that without clearly actionable standards, frontline representatives and customers are placed in an untenable position. Spirit stated that the Department should clarify the term "dignified" or remove the term altogether. Neos S.P.A. suggested that "safe" should encompass all actions that prevent physical harm to passengers, and "dignified" should ensure that interactions respect the individual's autonomy and privacy.

*DOT Response:* After carefully considering the comments, the Department has decided to explicitly include in the rule text, as proposed, that any assistance or accommodation required by the Department's disability regulation must be provided to individuals with disabilities in a safe and dignified manner. Including this language in part 382 clarifies and emphasizes the importance of passengers with disabilities receiving assistance in a safe and dignified manner.

In addition, the Department has determined that it is appropriate to provide definitions of "safe" and "dignified" in part 382. We agree with the commenters that stated that these terms may not be clearly understood by airlines and public and that providing definitions in part 382 will help passengers with disabilities to better understand their rights and airlines to better understand their obligation to passengers with disabilities. This final rule defines "safe" as assistance provided to individuals with disabilities that does not put them at heightened risk of bodily injury, which may include loss or damage to wheelchairs and other assistive devices that result in bodily

injury. In other words, disability-related assistance would be considered unsafe, and therefore a violation of part 382 and the ACAA, if the assistance is provided in a manner that increases the likelihood of bodily injury to the passenger with a disability. It would also be considered unsafe if a passenger with a disability experiences bodily injury due to the airline losing or damaging the passenger's wheelchair or other assistive device. For example, an airline is providing unsafe assistance if an airline returns a damaged wheelchair and the wheelchair malfunctions and as a result the passenger is injured.[21] The Department notes that airlines are already required to inform passengers with a disability of the right to contact a CRO and how to contact a CRO if they complain or raise a concern with airline personnel about disability accommodations or services and the airline personnel do not immediately resolve the issue to the customer's satisfaction or provide a requested accommodation.[22] This includes complaints or concerns raised about inadequate disability accommodation or service resulting in bodily injury due to improper wheelchair assistance or mishandled wheelchairs. Passengers with disabilities do not need to specifically request a CRO; airlines must provide this information to passengers with disabilities any time they express dissatisfaction with a disability-related service.

This final rule defines "dignified" as assistance provided in a manner that respects a passenger's independence, autonomy, and privacy, which includes but is not limited to: airline personnel providing transfer assistance in a manner that ensures the passenger's clothing is not removed; airline personnel not unduly delaying requests for access to a restroom such that the individual soils himself or herself; and, to the maximum extent possible, airline personnel communicating with the individual with a disability rather than his or her companion when the individual with a disability is interacting with them. The Department recognizes that some commenters are concerned that defining "dignity" may result in narrowing airlines' obligations and passengers' protections. However, we agree with the commenters that asserted that leaving the term undefined will result in confusion and different interpretation by the public and airlines. The final rule's definition of "dignity" highlights that airlines should respect a

passenger's independence, autonomy, and privacy, which numerous commenters stated are essential civil and human rights. The Department is also including in the definition of "dignity" a few illustrative examples to further assist the public and airlines to understand what it means to assist in a manner that respects a passenger's independence, autonomy, and privacy. The Department notes that dignified assistance is not limited to only these examples and that there are many different situations and scenarios that can qualify as dignified assistance. The definition of dignity is intended to provide a general framework of the meaning of dignity while still leaving the term broad and flexible.

The Department has concerns with A4A and IATA's suggestion that part 382 should be amended to state that a carrier's refusal to assist a person with a disability because the airline believes such assistance cannot be performed in a safe and dignified manner does not constitute a violation of part 382. The inclusion of this type of language in part 382 would make it significantly easier for airlines to deny services and accommodations to any passenger with a disability under the pretext of "safety." It would also make it much harder for the Department to hold airlines accountable for denying services and accommodations to passengers with disabilities. We note further that part 382 already provides instances in which airlines may limit or deny services and accommodations due to safety and security concerns. These safety and security concerns must be reasonable and specific. For example, § 382.19 states that carriers may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government. Airlines may not limit or deny services and accommodations based on a general unsupported belief that the assistance cannot be provided in a safe and dignified manner.

## 2. Prompt Enplaning, Deplaning, and Connecting Assistance

*The NPRM:* The NPRM proposed to clarify that all boarding, deplaning, and connecting assistance provided, including moving within the airport terminal (*e.g.,* moving from the main entrance through the airport to the gate for a departing flight, or from the gate to the terminal entrance, or moving between gates to make a connection), must be carried out by airlines in a

"prompt" manner. The Department also proposed to codify its longstanding practice of considering the totality of circumstances when evaluating whether assistance was provided in a prompt manner except when deplaning assistance by aisle chair is needed. In addition, the Department proposed to codify the Department's longstanding interpretation that for deplaning assistance by aisle chair, "prompt" means that personnel and boarding chairs must be available to deplane the passenger no later than as soon as other passengers have left the aircraft except where this practice would be inconsistent with Federal regulations or when the passenger requests the wheelchair be returned at a location other than the door of the aircraft. In situations where the exceptions do apply, the Department's proposed definition of prompt requires an airport wheelchair be available as close as possible to the door of the aircraft. The Department noted that airlines are already required to timely return the passenger's personal wheelchair as close as possible to the door of the aircraft, to the maximum extent possible, so that passengers may use their own equipment except: where this practice would be inconsistent with Federal regulations governing transportation security or the transportation of hazardous materials; or when the passenger requests the wheelchair be returned at a location other than the door of the aircraft.[23]

*Comments Received:* Disability rights organizations, individuals with disabilities, and airline industry stakeholders generally support the concept that boarding, deplaning, and connecting assistance should be carried out by airlines in a "prompt" manner. However, stakeholders who commented on this proposal split on how "prompt" should be defined.

With respect to assistance with enplaning, moving through the airport, connecting, and deplaning without an aisle chair, a number of disability rights organizations, such as PVA, the Christopher & Dana Reeve Foundation, and the Arc, supported the Department codifying its longstanding practice of considering the totality of circumstances when evaluating whether assistance was provided in a prompt manner when deplaning assistance by aisle chair is not needed. However, they also believed that the Department must clarify that prompt assistance extends to those who wish to preboard and need aisle chair assistance to do so. PVA stated that passengers who wish to preboard have

---

[21] See American Airlines, Inc., Order 2013–12–4 (Dec. 6, 2024).

[22] See 14 CFR 382.151(c).

[23] See 14 CFR 382.125(c).

been required to wait at the gate or on the jetbridge while other passengers boarded because the equipment or the proper number of trained attendants were not available. PVA explained further that these passengers were then boarded, transferred, and dropped in front of other passengers. PVA suggested that for enplaning assistance by aisle chair, "prompt" should mean that the requested enplaning equipment is in working order and a sufficient number of attendants (*i.e.,* two or more) are available at the time the flight begins the preboarding process.

Several disability rights organizations, such as the Colorado Cross-Disability Coalition, the Ability Center of Greater Toledo, and Disability Rights Maryland, disagreed with the Department's proposal to consider "the totality of the circumstances" when evaluating whether assistance was provided in a prompt manner and asserted that the Department should establish specific timelines in which assistance should be provided to passengers with disabilities. Disability Rights Maryland commented that the "totality of the circumstances" standard is too vague and makes it difficult to enforce the regulations when a passenger is harmed by an airline. Indiana Disability Rights stated that airlines will use the "totality of the circumstances" standard as a broad loophole to avoid providing prompt assistance. Colorado Cross-Disability Coalition and Disability Rights Maryland commented that assistance with moving from terminal entrance through airport should be available within 5 minutes of request, if pre-arranged, and within 15 minutes, if not pre-arranged, assistance to make a connection should be available within 10 minutes of landing or more quickly if there is a tight connection or late arrival of the first plane, and assistance with deplaning should be available immediately after the last person without a disability has exited, meaning the aisle chair and staff are waiting and the personal wheelchair is at the door without damage. American Association of People with Disabilities (AAPD) stated that "prompt" should be defined as airline or third-party contractors who assist passengers who use wheelchairs must be available to assist said passengers within 15 minutes of check-in at the ticket counter.

All the airline industry stakeholders who commented on this issue supported the Department codifying its longstanding practice of considering the totality of circumstances when evaluating whether assistance was provided in a prompt manner. A4A and IATA pointed out that the Department's

ACAA Advisory Committee, which included experts selected from the disability community and industry stakeholders, recommended that the Department continue to use the totality of the circumstances standard to determine if enplaning, deplaning, and connecting assistance is prompt.[24] A4A and IATA strongly urged the Department to give significant weight to the Advisory Committee's recommendation. In addition, the International Airlines Group (IAG) stated that there are many factors beyond the control of the airline which can impact the provision of this assistance including late notification of a change in parking stand by the airport operator, mass disruption events affecting a whole airport as well as high levels of un-notified requests for assistance by customers. A4A, IATA, and NACA explained further that air transportation occurs in a complex environment in which airlines face significant operational and technical challenges, that this environment can make it extremely difficult to meet specific time standards, and that it would be patently unfair to hold the airline liable for failing to meet a specific time standard when the cause is beyond the airline's control.

With respect to deplaning assistance by aisle chair, several disability rights organizations, such as PVA, the Christopher & Dana Reeve Foundation, and the Arc, generally agreed with the Department's proposal that "prompt" should mean that personnel and boarding chairs must be available to deplane the passenger no later than as soon as other passengers have left the aircraft. However, they suggested that the Department should specifically require airlines to have at least two trained employees or contractors available to provide transfer assistance. A few disability rights organizations disagreed with the Department's proposed definition of "prompt" for deplaning assistance by aisle chair. Disability Rights Maryland commented that personal and boarding chairs should be available as soon as the first passengers are exiting the plane and that passengers who use aisle chairs should be asked whether they prefer to exit the plane first or last. Additionally, Fat Legal Advocacy, Rights, and Education commented that passengers with disabilities should be able to deplane in row order in the same way that able-bodied passengers deplane.

Several airline industry stakeholders, such as Allegiant, IAG, TAP, Neos S.P.A, and Japan Airlines, supported the Department's proposal that "prompt" for deplaning assistance by aisle chair means that personnel and boarding chairs must be available to deplane the passenger no later than as soon as other passengers have left the aircraft. However, other airline industry stakeholders, such as A4A, IATA, and NACA, asserted the proposed meaning of "prompt" for deplaning assistance by aisle chair should only apply to instances in which passengers have given advance notice to airlines that they need deplaning assistance by aisle chair. NACA stated that an airline cannot be expected to have personnel and equipment positioned in accordance with the proposed standard if a passenger does not inform the airline that they need deplaning assistance by aisle chair. A4A and IATA suggested that the regulatory text should be revised to state the following: "Prompt assistance for a person who uses a boarding chair (*i.e.,* aisle chair) in deplaning means personnel and boarding chair must be available to deplane the passenger, who has given advance notice of such need consistent with applicable regulation or no later than boarding the aircraft, when the last passenger who did not request deplaning assistance departs the aircraft." A4A and IATA asserted that if the Department does not incorporate the language related to passenger advance notification, then airlines would be in the difficult and costly position of pre-staging personnel and equipment at every flight they operate and for multiple passengers onboard the aircraft, often with no need or purpose and at an increased indirect cost to all customers, including passengers with disabilities who do not require such services.

In addition, A4A and IATA disagreed with the Department's proposal that "prompt" for deplaning assistance by aisle chair also means that the passenger's personal wheelchair must be ready and available as close as possible to the door of the aircraft, to the maximum extent possible. They asserted that this proposal improperly prioritizes rapid handling of personal mobility aids for immediate availability at the aircraft cabin door over ensuring proper handling of the mobility aid to prevent damage and avoid injury of airline employees. They further argued that this proposal does not consider real and unavoidable scenarios that prevent or significantly impede compliance.

*DOT Response:* The Department has decided to codify as proposed its

---

[24] "Final Report: Air Carrier Access Act Committee Recommendation" (February 4, 2022), available at *https://www.regulations.gov/document/ DOT-OST-2018-0204-0040.*

practice of considering the "totality of circumstances" when evaluating whether assistance, except for deplaning assistance by aisle chair, was provided in a prompt manner. Requiring assistance to be provided within a specific time frame, as suggested by some commenters, rather than having a more general requirement for promptness based on the totality of circumstances, is impractical given the wide variety of factors that could affect when the assistance is provided such as the number of assistance requests for a given flight, the airport layout, and whether advance notice was provided to the airline by the passenger. By using the "totality of circumstances" standard to determine if the assistance is prompt, the Department is imposing a reasonable performance standard on carriers without creating unnecessarily rigid timing requirements which, in some situations, carriers operating in the best of faith are unable to meet. The Department also notes that the throughout the years, the use of this standard has proven to be sensible and workable; it has supported the goals of ensuring timely assistance for passengers with disabilities while also providing airlines flexibility given the different factors and circumstances that may impact assistance. Additionally, as we noted in the NPRM, the ACAA Advisory Committee which included disability rights advocates, airlines, and interested parties recommended that the Department continue to use the totality of the circumstances standard to determine if enplaning, deplaning, and connecting assistance is prompt.[25]

The Department is not adopting a separate definition of "prompt" for preboarding with an aisle chair, as suggested by PVA and other disability rights organizations, because part 382 already requires airlines to provide prompt enplaning assistance to passengers with disabilities upon request. This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs (*i.e.,* aisle chairs), and/or on-board wheelchairs, and ramps or mechanical lifts.[26] Furthermore, airlines are already required to offer preboarding to passengers with a disability who self-identify at the gate as needing additional time or assistance to board and to permit these passengers to board the plane before all other passengers, including first class passengers, elite-level passengers, members of the military, passengers with small children, etc.[27] This means that when a passenger who needs enplaning assistance requests preboarding, the airline must have the proper equipment and an adequate number of personnel prepared to assist the passenger onto the aircraft when preboarding begins, and the enplaning assistance must be provided before all other passengers begin boarding the flight.

With respect to deplaning assistance by aisle chair, the Department is codifying its longstanding interpretation that "prompt" means that personnel and boarding chairs must be available to deplane the passenger no later than as soon as other passengers who did not request deplaning assistance have left the aircraft. To be prompt, the passenger's personal wheelchair must also be ready and available as close as possible to the door of the aircraft, to the maximum extent possible, except where this practice would be inconsistent with Federal regulations governing transportation security or the transportation of hazardous materials or when the passenger requests the wheelchair be returned at a location other than the door of the aircraft. This is consistent with the existing requirement in 14 CFR 382.125(c) for airlines to timely return the passenger's personal wheelchair as close as possible to the door of the aircraft, to the maximum extent possible, so that passengers may use their own equipment except: where this practice would be inconsistent with Federal regulations governing security or the transportation of hazardous materials or when the passenger requests the wheelchair be returned at a location other than the door of the aircraft. The Department believes this standard for determining "prompt" deplaning assistance by aisle chair balances the safety and dignity of passengers who require deplaning assistance and airlines' operational considerations. We also note that the ACAA Advisory Committee recommended that the Department codify this timeliness standard,[28] which was described in the Preamble of the 2008 final rule.[29]

The Department is not adopting in this final rule the suggestion by airline associations to amend the regulation to require prompt deplaning by aisle chair only for those passengers who provide advance notice to airlines. The Department disagrees with comments that if passengers do not inform airlines that they need deplaning assistance by aisle chair, then airlines cannot have necessary personnel and equipment positioned to provide the assistance. Practically speaking, in nearly all situations, a passenger who requires deplaning by aisle chair will have received enplaning assistance with an aisle chair at the origination airport. Therefore, the airline will have known well before the flight arrives at the destination airport that there is a passenger onboard the flight that requires deplaning assistance by aisle chair, and the airline should be able to deploy the necessary equipment and personnel to meet that flight when it arrives at its destination.

The Department also disagrees with A4A's and IATA's comment that "prompt" for deplaning assistance by aisle chair should not include the requirement that the passenger's personal wheelchair be ready and available as close as possible to the door of the aircraft, to the maximum extent possible. As we explained in the NPRM, the inclusion of "to the maximum extent possible" is intended to address situations where it may not be possible to bring passengers' wheelchairs to the door of the aircraft. For example, depending on the connection time and the airport layout, it may be necessary to transfer the wheelchair directly to the next flight. However, this does not mean that airlines can simply decide that it is too much work to provide passengers their own wheelchairs at the gate. The Department believes that this requirement, as written, maximizes passengers' autonomy, safety, and independence while also providing sufficient flexibility to airlines.

## B. Handling Requirements for Assistive Devices

### 1. Rebuttable Presumption of a Violation

*The NPRM:* The NPRM proposed to define "mishandled" as it relates to wheelchairs or other assistive devices to mean lost, delayed, damaged, or pilfered (*i.e.,* stolen). The NPRM also proposed to clarify that any mishandling of a passenger's checked wheelchair or other assistive device is a *per se*[30] violation of the ACAA. Under the proposal, any checked wheelchair or other assistive device that is lost, delayed, damaged, or pilfered (*i.e.,* stolen) while under the custody and control of an airline would be considered a violation of the ACAA and part 382 regardless of the circumstances surrounding the event. The Department sought comments on whether it is reasonable to consider any

---

[25] *Id.* at 13.
[26] See 14 CFR 382.95.

[27] See 14 CFR 382.93.
[28] "Final Report: Air Carrier Access Act Committee Recommendation" at 13.
[29] See 73 FR 27614, 27620 (May 13, 2008).

[30] "*Per se*" is a Latin phrase that means "by itself" or "inherently."

mishandling of a wheelchair or other assistive device a *per se* violation of the ACAA.

*Comments Received:* With respect to defining the term ''mishandled'' as it relates to wheelchairs or other assistive devices, most disability rights organizations who commented on this issue agree with the Department's proposal to define ''mishandled'' to mean lost, delayed, damaged, or pilfered (*i.e.,* stolen). Some disability rights organizations, such as PVA, the Christopher & Dana Reeve Foundation, and the National Multiple Sclerosis Society, stated that the Department should also make the terms ''lost,'' ''delayed,'' and ''in the custody of the carrier'' consistent with the Department's 2018 technical guidance for reporting mishandled wheelchairs and scooters.[31] Similarly, the airline industry stakeholders that commented on this issue generally support the Department's proposed definition of ''mishandled.'' However, A4A and IATA suggested that mishandled should mean ''lost, delayed, damaged or pilfered by a direct act of the airline or its agents.''

With respect to the proposal to clarify that any mishandling of a passenger's checked wheelchair or other assistive device is a *per se* violation, all disability rights organizations and individuals with disabilities that commented on this issue strongly supported adopting this proposal as written. PVA and the Christopher & Dana Reeve Foundation commented that this clarification is consistent with airlines' current practices because airlines already regularly acknowledge an ACAA violation when a mobility device was not returned to the passenger in the same condition in which it was surrendered. Indiana Disability Rights asserted that the common law principle *res ipsa loquitur* [32] suggests that any mishandling of passengers' assistive devices, while in the airlines' custody, involves negligence by airline staff; but for airline staff negligence, passenger devices would not be mishandled.

All the airline industry stakeholders who commented on this issue strongly oppose the Department's proposal to clarify that any mishandling of a passenger's checked wheelchair or other assistive device is a *per se* violation of the ACAA. NACA commented that imposing strict liability on airlines

would be inappropriate for all mobility aid handling circumstances, particularly in those circumstances that are beyond the control of the airline. NACA stated that airlines should not be held liable for mobility aids that were damaged or experiencing operational problems prior to the airline receiving them or for mobility aids that were damaged by ''acts of God.'' NACA further asserted that some passengers will inevitably take advantage of the Department's strict liability and submit claims for damage that occurred before the airline received the mobility aid for stowage.

Avianca Carriers commented that finding a *per se* violation of part 382 without regard to the circumstances surrounding the mishandling or the contributing factors of entities outside of the carrier's control is punitive and, ultimately, will increase costs for passengers and carriers.

Multiple airline industry stakeholders, such as Neos S.P.A., Finnair, and NACA, asserted that the Department should evaluate the mishandlings of passengers' checked wheelchairs or other assistive devices on a case-by-case basis to allow airlines to defend themselves. Finnair explained that imposing a strict liability standard on airlines for the mishandling of wheelchairs and assistive devices seems inequitable as there are many reasons beyond the airline's control that could damage a passenger's wheelchair. Finnair asserted that the Department should consider the facts and circumstances surrounding each situation and weigh the factors that contributed to the mishandling that were within the carrier's control against those that were not.

A4A and IATA asserted that the Department lacks the authority to impose *per se* liability for any mishandling of a passenger checked wheelchair or other assistive devices because it would violate airlines' constitutional due process rights. A4A and IATA stated that the irrebuttable presumption that the airline is responsible for all mishandling of a checked wheelchair or other devices under all circumstances is unfounded and violates the airlines' rights to defend themselves against false allegations or acts that occurred due to events beyond their control. A4A and IATA explained that under both constitutional and Administrative Procedure Act principles, a Federal agency cannot override the fundamental rights of airlines to defend themselves from liability for events and circumstances that are beyond their control. A4A and IATA suggested that the liability for mishandling should be

a rebuttable violation of the ACAA and limited to acts that are within the airline's direct control.

*DOT Response:* The Department has carefully considered this issue and is adopting the proposed definition of ''mishandled'' as it relates to wheelchairs and other assistive devices. The Department agrees with comments suggesting that the definition of ''mishandled'' should be consistent with how the Department defines ''mishandled'' in another aviation regulation related to checked baggage.[33] We believe making the definition consistent with aviation regulation related to checked luggage will reduce confusion since airlines are already applying this definition to checked luggage. As such, we will not include ''by a direct act of the airline or its agents'' in the definition, as suggested by A4A and IATA. We note that further discussion related to custody of wheelchair and other assistive devices can be found below. Accordingly, this final rule defines ''mishandled'' as ''lost, delayed, damaged, or pilfered (*i.e.,* stolen).''.

With respect to the proposal that any mishandling of a passenger's checked wheelchair or other assistive device is a *per se* violation of the ACAA, we find persuasive the comments from airline industry stakeholders that it would be unreasonable to impose on airlines a strict liability standard for wheelchairs or other assistive devices that are not timely returned in the same condition in which they were received. We agree with the comments from airline industry stakeholders that airlines should be provided an opportunity to defend themselves. We also share these commenters' view that airlines should not be found liable for mishandling wheelchairs based on false allegations and in situations where the mobility aids were damaged or experiencing operational problems prior to the airline receiving them. Negligence of the person with a disability due to improper labeling, instructions, or other factors could also be a defense to a presumption of a mishandling violation. However, we do not find persuasive the comments from airline industry stakeholders stating that airlines should not be liable for damages to wheelchairs that are due to ''acts of God'' or a third-party.[34] While ''acts of God'' or actions

[31] See the Bureau of Transportation Statistics (BTS), Office of Airline Information (OAI), Technical Reporting Directive #30—Mishandled Baggage and Wheelchairs and Scooters (October 31, 2018).

[32] ''*Res ipsa loquitur*'' is a Latin phrase that means ''the thing speaks for itself.''

[33] *See* 14 CFR 234.2.

[34] See Refunds and Other Consumer Protections, 89 FR 32760 (Apr. 26, 2024) (Department concluded that ''[b]ag delays due to third-party actions (*e.g.,* security authority or Customs holding bags, airport baggage processing system failure, or recovery bag delays due to carriers' compliance with the positive passenger-bag match requirement) are not

of a third-party are beyond the control of an airline, we believe that imposing responsibility on the airline is proper when the mishandling occurs when the device is in the airline's custody and the mishandling is through no fault of the passenger. The airline in the best position to monitor the handling of wheelchairs and other assistive devices and to adjust practices and procedures to better protect wheelchairs and other assistive devices, and imposing responsibility on the carrier is an effective method to advance the goals of the ACAA and part 382 to reduce mishandlings.

We define "custody" as the time period when a passenger has checked a wheelchair, scooter, or other assistive device with a carrier and the carrier has control of a passenger's wheelchair, scooter, or other assistive device. An airline's custody begins when the passenger hands the device to an airline's representative or agent or leaves the wheelchair, scooter, or other assistive device at a location as instructed by the airline. An airline's custody ends when the passenger, or someone acting on behalf of the passenger, or another airline takes physical possession of the wheelchair, scooter, or other assistive device. This is consistent with the Department's policy for reporting mishandled baggage and wheelchairs and scooters.[35]

As suggested by A4A and IATA, the final rule specifies that not timely returning a wheelchair or other assistive device in the condition that it was received is a rebuttable violation of the ACAA. However, the Department is not adopting the suggestion by these airline associations to limit liability to acts that are within the airline's direct control. Under this final rule, the presumption of a mishandling violation cannot be overcome by an airline asserting that the cause of the mishandling is an "act of God" or otherwise outside its control if the mishandling occurred while in its custody. The Department believes that this standard ensures that airlines are held accountable for mishandling assistive devices, particularly personal wheelchairs and scooters, which are essential to the user's independence and mobility, while ensuring that airlines can defend themselves.

---

permissible grounds for exempting the carriers from the baggage fee refund obligation because the affected bags are under carriers' custody.")

[35] See the Bureau of Transportation Statistics (BTS), Office of Airline Information (OAI), Technical Reporting Directive #30A—Mishandled Baggage and Wheelchairs and Scooters (December 21, 2018).

## 2. Passenger Notifications

*The NPRM:* In the NPRM, the Department proposed notification requirements for airlines to ensure that passengers with disabilities are aware of their rights in the event of a mishandling. More specifically, the Department proposed adding a requirement that when carriers mishandle wheelchairs or scooters, they must immediately notify passengers of their rights to: (1) file a claim with the airline; (2) receive a loaner wheelchair from the airline with customizations; (3) choose a preferred vendor, if desired, for repairs or replacement of a damaged device; and (4) to have a CRO available and be provided information on how to contact the CRO.

The Department also sought to mitigate the resulting harms on passengers with disabilities when an airline has failed to transport a wheelchair or scooter on a passenger's flight. It is for this reason that the Department proposed requiring airlines to provide timely notifications to passengers with disabilities when their wheelchairs or scooters have been loaded on and off the cargo compartment of their flights and to immediately notify the passenger upon learning that his or her wheelchair or scooter does not fit on the aircraft. The Department did not propose a particular communication method for the notification(s), leaving the airlines with the flexibility to determine what would work best for them.

In the NPRM, the Department also requested comment on airlines ensuring consumers have accurate and up-to-date information regarding their checked wheelchairs and scooters. The Department asked whether airlines should be required to provide status updates to passengers with disabilities about their checked wheelchairs and scooters (*e.g.,* the stowage location of the passenger's wheelchair or scooter on the flight) and whether the proposed requirements should be extended beyond wheelchairs and scooters to apply to other types of checked assistive devices.

*Comments Received:* Disability rights organizations agree with the Department's proposal that carriers notify passengers of their rights and options when checked wheelchairs or scooters are mishandled. Some disability rights organizations, such as PVA, the Amputee Coalition, and the National Multiple Sclerosis Society, suggested that the Department should also include requirements that the passenger may file a claim, and carriers must accept a claim, within fifteen days

after the passenger's arrival or return of the assistive device, whichever is later. Furthermore, a few disability rights organizations, such as PVA, the Christopher & Dana Reeve Foundation, and the Amputee Coalition, commented that the Department should require airlines to provide an option for a passenger to file a claim in an accessible manner that does not require the passenger to return to the airport.

Disability rights organizations also expressed support for the Department's proposal on required notifications to passengers with disabilities when their wheelchairs or scooters are loaded onto and off their flights. These organizations stated that they believe that passengers with disabilities need to know if, and when, their mobility aids have been loaded and offloaded from aircraft so they can track these devices that are critical to their health and independence. They also stressed that these notifications must be timely and accurate and provided in an accessible format, otherwise the notifications would be useless.

Disability rights organizations had mixed opinions on communication methods for providing the stowage notifications (*e.g.,* via text message, mobile app notification, email, or verbal confirmation). PVA stated that the Department should not give carriers complete autonomy for passenger notifications and that all notifications should occur in the most prompt method that is accessible for the passenger. PVA's comment continued on to state that for loading and offloading of the passenger's mobility device, the carrier should default to a real-time accessible method of communication, such as text messages and updates on the carrier's website or mobile app. Others, including Indiana Disability Rights, recommended that airlines update passengers about the status of their wheelchairs in-person rather than through a mobile app because passengers with disabilities may not have their phones on them or available during boarding and deplaning. Some stated that the notifications should only be done by using the passenger's preferred method of communication.

Disability rights organizations' comments also urged the Department to go further than the requirements of the NPRM's proposal. For example, the Christopher and Dana Reeve Foundation recommended that airlines provide status updates for passengers' wheelchairs and scooters throughout the entire air travel experience. This would include updates each time the status changes, such as during the loading and

offloading for all flight legs and for availability at connections. PVA and Cure SMA noted that stowage notifications and stowage location information need to be provided to relevant airline personnel as well so that they also know where the passenger's wheelchair is at all times.

Airline industry stakeholders had mixed opinions on the NPRM's notification proposals. A4A and IATA commented that they generally agree with the premise that passengers should be notified of a mobility aid mishandling and their rights when it happens. However, they suggested that the timing of the notification should occur upon the airline becoming aware of the mishandling. They further suggested that the Department should permit airlines to also include restrictions in the notification, such as limitations of rights when a passenger knowingly agrees to travel separately from their mobility aid because of late gate arrival; limitations of rights for pre-existing damage; and limitations of rights when the mishandling was not caused by an act of the airline.

A4A also generally agreed that passengers should be informed of the stowage status of their wheelchairs and scooters but requested amendments to the Department's proposed rule. A4A provided several scenarios where it believes compliance with the notification requirements would not be possible, such as if the airline is not provided correct contact information for the passenger or the passenger does not have access to electronic communications. A4A commented that they do not believe the Department should impose regulatory liability for these scenarios as it could result in unreasonable actions taken by airlines to avoid regulatory violations. A4A did support the proposal's standard of "timely" notifications because this flexibility will avoid imposing unfair liability on airlines for unrealistic timelines. A4A also stated that the Department's proposed regulatory language is redundant and should be limited to notifications when the wheelchair or scooter is "loaded" and "unloaded." Southwest Airlines Co. (Southwest) agreed with A4A's stance and asserted that the Department's requirements must account for operational realities, limitations of the airline's ability to communicate with its customers, and different airline business models. Southwest supported a "prompt" and "to the extent possible" standard for notifications that would allow for flexibility in differing circumstances, avoid imposing unfair

regulatory liability, and appropriately set the expectations of passengers with disabilities.

A4A also supported flexibility for airlines regarding the communication method(s) used to provide stowage notifications to passengers. A4A's comment suggests that some airlines will opt to use automated and electronic notifications, and in doing so will need to ensure that their systems, procedures, and training are updated appropriately. As such, A4A recommended that the Department give airlines a minimum of 18 months to implement the notification requirements. Southwest called for even more time for implementation and requested a minimum of 24 months to comply. For passengers who need verbal notifications, A4A stated that such requests should be made in advance or at the airport on the day of travel. Southwest on the other hand stated that verbal notifications could be problematic for the carrier due to its open seating model. Southwest asserted that discreetly informing a customer of the status of their device once onboard the aircraft will be a concern and likely impossible without at least announcing the customer's name in order to determine where they are on the aircraft.

NACA had a slightly different position. NACA stated that there is no added benefit to passengers with disabilities by knowing exactly when their wheelchairs or scooters are loaded and unloaded. NACA commented that the absence of a notice that a device was not loaded should be enough for the passenger to know that their mobility aid has been loaded on their flight. NACA asserted that costs for technology purchases and implementation and handler time will outweigh any related benefits to passengers with disabilities and will unduly burden the ultra low-cost carriers (ULCCs). Allegiant and Spirit provided similar comments and view this as an unnecessary additional requirement that will disproportionately impact smaller carriers that do not utilize sophisticated baggage tracking systems with a customer interface. Allegiant stated that carriers may choose to use in-person verbal notifications for passengers to reduce costs, which could cause embarrassment to these passengers in a public setting. Spirit noted that these notifications may cause more worry and anxiety for travelers because wheelchairs and scooters are typically loaded last.

RAA noted that its fee-for-service carriers do not have the means to directly contact their passengers and passengers would need to be notified by the mainline partners. RAA also stated

that automated communications are preferred because it can be the timeliest form of notification and most airlines already utilize technology that tracks checked baggage where passengers can follow the location.

Foreign airlines shared similar opposing views as NACA, Allegiant, and Spirit. TAP, Neos S.P.A., Japan Airlines Co., Ltd. (JAL), Finnair OYJ, and Avianca Carriers noted concerns with logistical challenges and high technology development costs associated with compliance with the NPRM's proposed requirement. Avianca Carriers also stated that the Department needs to define what is meant by "timely" notifications and that notifications should not be required if providing the notification would delay the aircraft.

Other stakeholders, including Open Doors Organization (Open Doors), were generally supportive of the requirement for airlines to provide stowage notifications to passengers with disabilities when their wheelchairs or scooters are loaded onto and unloaded from their flights. Our Lady of Lourdes Hospitality North American Volunteers suggested that airlines go beyond text notifications by also providing passengers with pictures of their stowed wheelchairs and scooters to further reduce stress for passengers.

As for the proposed requirement for airlines to immediately notify the passenger upon learning that the passenger's wheelchair or scooter does not fit on the aircraft, comments received from airlines, disability rights organizations, and others all generally support this proposal. Some disability rights organizations noted that ideally this notification should be provided to the passenger *before* boarding the aircraft. This way, the passenger could avoid any unnecessary transfers if he or she ultimately decides not to travel without their wheelchair or scooter. A disability organization commenter added that if the notification is provided *after* the passenger has boarded, then he or she must be given the option to exit the plane and have the device returned.

A4A and airline industry stakeholders noted that "immediate" notifications may not be realistic or possible in all situations. As such, they suggested using "prompt" or other standards that provide more flexibility for the airlines. A4A stated that the notification should be provided no later than when the passenger boards the aircraft or before the aircraft cabin door closes, if the passenger has already boarded the aircraft when the airline attempts to load the wheelchair or scooter in the cargo compartment. Some airlines also

stated that they may choose to give these notifications to passengers verbally, which could alleviate the need for significant technology development.

In response to the question in the NPRM on whether airlines should be required to provide other status updates to passengers with disabilities about their checked wheelchairs or scooters, disability rights organizations had various suggestions. For example, PVA's comment mentioned more frequent updates about the wheelchair's or scooter's location throughout the entire travel experience, status updates when a wheelchair or scooter is damaged, and status updates when a delayed wheelchair or scooter is returned after the passenger's arrival at his or her destination. United Spinal suggested passenger alerts when policy changes are made that affect passenger safety. Liberty Resources asked for notifications to inform passengers with short connections whether their wheelchairs or scooters will be available to them at their connecting gate. North Dakota Protection and Advocacy Project noted that knowing the exact location and status of an assistive device would be beneficial for passengers and carriers as they could be more easily located. Disability rights organizations also generally supported the idea of extending any notification requirements to cover other types of assistive devices beyond wheelchairs and scooters that passengers check in as cargo.

On the other hand, airline industry stakeholders opposed extending the scope of the status notification requirements beyond the NPRM's proposal. A4A noted that the loading and unloading of wheelchairs and scooters is an appropriate scope for passenger notifications. They stated that it would be extremely difficult and unnecessary to provide additional granularity on the loading and unloading process, especially considering variability in airline and aircraft manufacturers' loading and securement procedures, mobility aids, and cargo compartment configurations. A4A stated that this level of detail would also be more confusing for passengers than helpful without additional explanation by personnel with specialized cargo loading expertise. They also contended that the NPRM's question was overly broad and did not allow for meaningful comment on alternative requirements. They also stated that they are unaware of material stowage issues for other assistive devices and noted that airlines generally have little to no information when passengers transport other assistive devices in their checked baggage. RAA,

Southwest, and Spirit voiced similar arguments in their comments.

*DOT Response:* After careful review of the comments on this subject area, the Department is adopting modified notification requirements that airlines must provide to passengers before departure, upon arrival, and in the event a passenger's wheelchair or scooter is mishandled. These notifications must be timely, accurate, and provided in a readily accessible format for passengers with disabilities.

(i) Required Information Prior to Departure

The final rule requires airlines to provide certain notifications prior to departure to passengers who travel with their own wheelchair or scooter. The Department is declining to extend the scope of the pre-departure notification requirements to other types of checked assistive devices. Under this final rule, when passengers check their wheelchairs or scooters, airlines are required to notify passengers of their rights, including their right to file a claim with the airline and to contact a CRO should their wheelchair be mishandled. In addition, prior to the flight's departure, an airline must notify a passenger who uses a wheelchair or scooter whether his or her checked wheelchair or scooter was loaded onto the flight and if the size, weight, or other attribute of the device prevented the carrier from loading the wheelchair or scooter onto the flight. The Department continues to believe that these passenger notifications are most relevant for wheelchairs and scooters, as these larger and heavier devices are more likely to encounter stowage issues with aircraft cargo doors and cargo holds than other types of assistive devices. The Department also acknowledges that there could be significant logistical difficulties for airlines in tracking and updating passengers on other types of assistive devices that are contained in passengers' checked luggage.

The Department is requiring that the notification provided to passengers with disabilities when they check their wheelchair or scooter be in writing. However, we are providing flexibility to airlines on how to notify passengers whether their wheelchairs or scooters have been loaded onto aircraft prior to departure and if it has not been loaded, whether the wheelchair or scooter did not fit in the cargo compartment. The Department received mixed feedback from commenters on preferred communication methods (*e.g.,* text, email, mobile app notification, or verbal confirmation) for stowage notifications.

Airline comments suggested that some major airlines will invest time and money into implementing automated tracking and messaging systems. However, airlines with smaller budgets and blueprints may choose to go a different route. By not specifying how the notification is provided to passengers, the Department is enabling airlines to develop practices and procedures that are appropriate for their business models. If an airline offers multiple methods for providing such notifications, then the airline should allow for the passenger to choose his or her preferred method and should honor that choice.

The Department acknowledges the comments from airline industry stakeholders asserting that there are scenarios where airlines should not be held responsible for passengers not being notified as to whether their wheelchairs or scooters have been loaded on and off the cargo compartment of their flights. The Department agrees that, in certain limited circumstances, the lack of passenger notification is not a failure of the airline and is not a violation. For example, the Department would not find a violation if a timely notification was sent but not received because the passenger's cell phone was powered off or the passenger did not provide the airline with accurate contact information. The Department may also not find a violation if the airline provides in-person notifications but was unable locate a passenger in the airport terminal or on the aircraft to provide the notification despite making a good faith effort. The Department's Office of Aviation Consumer Protection will consider these situations on a case-by-case basis considering the totality of the circumstances, like how the Department generally analyzes other disability-related matters to determine if the law was violated.

The Department also agrees with airline industry commenters in that it is not always possible to provide immediate notifications when a passenger's wheelchair or scooter cannot be transported on a flight. Ideally, as noted by some of the comments from disability rights organizations, passengers would be informed that a wheelchair cannot fit in the aircraft cargo due to its size or weight prior to boarding the flight so passengers who use wheelchairs can avoid any unnecessary aisle chair and transfer assistance in enplaning and deplaning the aircraft. However, passengers who use wheelchairs often board a flight before other passengers, and wheelchairs and scooters are often

loaded into the cargo compartment towards the end of the loading process. Loading the wheelchairs at the end makes it easier for airlines to comply with the requirement of 14 CFR 382.125(d), which states that airlines must ensure that passengers' wheelchairs, other mobility aids, and other assistive devices are among the first items retrieved from the baggage compartment. In A4A's comment, the association recommended using the following regulatory language: ''. . . you must promptly notify the impacted passenger no later than when the passenger boards the aircraft or before the aircraft cabin door closes, if the passenger has already boarded the aircraft when the airline attempts to load the wheelchair or scooter in the cargo compartment.'' The Department believes that the standard recommended by A4A strikes an appropriate balance for when individuals with disabilities should be notified because it still provides passengers sufficient time to decide whether to deplane or continue with their original flight without their wheelchair or scooter.

However, the Department is not convinced that implementing the notification requirements regarding the stowage of wheelchair or scooters will take airlines 18 months up to two years as suggested by airline industry commenters. As stated earlier, the final rule provides airlines flexibility regarding the method used to provide notification to passengers. This means that airlines are not required to invest in technology such as a baggage tracking system with a customer interface to comply with the notification requirement though they may choose to do so. Nevertheless, in recognition of the fact that airlines will need some time to develop procedures and technology and train appropriate staff, the Department is providing airlines one year from the date of the final rule's publication in the **Federal Register** to implement the notification requirement relating to stowage of wheelchairs and scooters.

(ii) Required Information Upon Arrival

The final rule requires airlines to notify passengers upon arrival when their wheelchairs or scooters have been unloaded from the aircraft's cargo compartment. The Department is not extending the scope of this notification requirements to other types of checked assistive devices as some commenters have suggested as the Department is not aware of material stowage issues for other assistive devices. Also, the

Department is providing flexibility to airlines on how to notify passengers when their wheelchairs or scooters have been unloaded from the aircraft's cargo compartment. This is consistent with the approach that the Department is taking for pre-departure notification requirements.

Under this final rule, the notification provided to passengers regarding the unloading of a wheelchair or scooter from the cargo compartment of the aircraft must be prompt. In this situation, prompt means the notification is provided to the passenger before he or she deplanes the aircraft. The Department made this determination for several reasons. First, in another part of this final rule, the Department is codifying its longstanding interpretation that prompt deplaning assistance for individuals who use wheelchairs includes the passenger's personal wheelchair being ready and available as close as possible to the door of the aircraft except where this practice would be inconsistent with Federal regulations or when the passenger requests the wheelchair be returned at a location other than the door of the aircraft. Often, passengers who use wheelchairs do not want to deplane the aircraft until their personal wheelchair has been unloaded and they can be assured that it is waiting for them at the door of the aircraft. Second, as mentioned by Liberty Resources, PVA, and others, spending extended periods of time waiting in aisle chairs, airport wheelchairs, or airport seats may be uncomfortable or even harmful to many individuals with customized wheelchairs. Third, the Department already requires airlines to ensure that passengers' wheelchairs, other mobility aids, and other assistive devices are among the first items retrieved from the baggage compartment and wheelchairs and scooters are often the last items loaded onto the cargo compartment so they can quickly be retrieved. We note that, while this rule requires notification of the unloading of wheelchairs or scooters to be provided to passengers while they are still on the aircraft and the failure to provide such notification would subject airlines to administrative penalties, other Federal law regarding passenger behavior still requires passengers with disabilities to follow crew member instructions, including instructions to disembark an aircraft, even if an airline has failed to provide a required notification.[36] As for the

compliance period, the Department is providing airlines one year to implement notification of the unloading of wheelchairs or scooters similar to the implementation period for notification on whether a passenger's wheelchair or scooter has or has not been loaded onto the aircraft. The Department believes that one year strikes a balance between giving airlines time to develop procedures and technology and train appropriate staff and ensuring these vital notifications are provided to passengers with disabilities as soon as possible.

(iii) Required Information After Wheelchairs or Scooters Are Mishandled

The Department is adopting, as proposed, the requirement for airlines, when wheelchair or scooters are mishandled, to notify passengers in writing of their right to: (1) file a claim with the airline, (2) receive a loaner wheelchair from the airline with certain customizations, (3) choose a preferred vendor, if desired, for device repairs or replacement, and (4) have a CRO available and be provided information on how to contact the CRO. The final rule also requires airlines to provide updates to passengers who have filed claims for a delayed wheelchair or scooter when there are changes to the status of the delayed wheelch air or scooter. The Department has decided not to extend these notification requirements to other types of checked assistive devices considering these notifications are generally not relevant or beneficial to those traveling with checked assistive devices that are not wheelchairs or scooters.

Regarding the timing of the notification to passengers of their rights when a wheelchair or scooter is mishandled, the Department agrees with A4A's suggestion that the notification should occur upon the airline becoming aware of the mishandling, which can happen when an airline employee or contractor notices that the wheelchair or assistive device has been mishandled or when the passenger notifies airline personnel that his or her wheelchair or scooter has been mishandled, whichever occurs first. The Department is of the view that an extended implementation period to notify passengers of their rights when a wheelchair or scooter is mishandled is not warranted. However,

---

[36] Federal law prohibits passengers from interfering with crewmembers in the performance

of their duties onboard aircraft and failing to obey crewmembers' directions. See 14 CFR 121.580.

the Department sees benefit in aligning the time allotted for airlines to comply with the requirement to allow passengers to choose a preferred vendor for wheelchair repairs and replacements (discussed below in section II.B(6)) to this notification requirement given airlines would be notifying passengers of this right. For this reason, the Department has decided to provide airlines until March 17, 2025, to comply with this requirement.

As for the status updates to passengers who have filed mishandled wheelchair or scooter claims for delays, the Department is persuaded that status updates are necessary because passengers need transparency and accurate information on their wheelchairs and scooters when they are separated from them. As Cure SMA stated in its comment on the NPRM, "Given the importance of wheelchairs in maximizing independence and health for people living with [a neuromuscular disease], passengers must receive prompt, frequent notifications on the transport or availability of their devices, if returned after arrival. Having an estimated time of arrival (whether at the airport or another requested location) would provide peace of mind to people living with [a neuromuscular disease] who are separated from their wheelchairs and allow for advance planning." The importance of these updates was echoed by several others, including the National Multiple Sclerosis Society, the American Association of People with Disabilities, and the North Dakota Protection and Advocacy Project. Given the importance of these status update notifications for individuals with disabilities, airlines must provide updates whenever there are changes for delayed wheelchairs and scooters, including changes to the estimated time of delivery.

3. Publication of Information Related to Aircraft Cargo Holds

*The NPRM:* In the NPRM, the Department solicited comment on whether airlines should be required to provide the dimensions of aircraft cargo compartments prior to travel to any passenger who shares that he or she will be traveling with a personal wheelchair or scooter. The Department noted that airlines are already required to notify passengers, on request, of any limitations on the availability of storage facilities, in the cabin or in the cargo bay, for mobility aids or other assistive devices commonly used by passengers with a disability.

*Comments Received:* Many disability rights organizations who commented on this issue, including AARP, Cure SMA,

and Muscular Dystrophy Association (MDA), stated that airlines should be required to disclose cargo dimensions (including the door) upfront for flights so that passengers can determine whether their wheelchairs will fit and can plan accordingly before travel. AARP asserted that airlines should be required to publish in a prominent and easily accessible place on their public website any size restrictions that could cause a wheelchair not to fit on the plane. North Dakota Protection and Advocacy Project suggested that a possible solution would be for passengers to provide information about their assistive devices when booking flights, so the carrier can independently determine if adequate space is available to transport devices. Disability Rights Maryland stated that airlines should be required to provide cargo dimensions on any web page where passengers can book tickets, or when a passenger books a flight over the telephone.

While A4A did not object to the intent of providing information about aircraft cargo dimensions, it argued that the Department must follow a notice-and-comment rulemaking process to fully examine scope, costs, benefits, and limitations of such notifications. Southwest stated that the company already provides information to passengers regarding the dimensions of aircraft cargo bins and openings on its website, giving them the opportunity to make an informed decision prior to arriving at the airport. Allegiant endorsed ensuring passengers are made aware of cargo limitations prior to the loading stage.

Other stakeholder commenters, including Open Doors, mostly supported a requirement for airlines to provide dimensions of their cargo bins and cargo hold doors to passengers traveling with larger wheelchairs or scooters that could be subject to stowage issues.

*DOT Response:* Section 544(a) of the 2024 FAA Act directs the Department to require air carriers to publish in a prominent and easily accessible place on the carrier's public website information describing the dimensions and characteristics of the cargo holds of all aircraft types operated by the carrier. Section 544(a) further states that this information must include the dimensions of the cargo hold entry and allowable type of cargo and that air carriers are allowed to protect the confidentiality of any trade secret or proprietary information, as appropriate.

In this final rule, the Department is codifying section 544(a) of the 2024 FAA Act. Airlines are required to publish in a prominent and easily

accessible place on the public website of the carrier information describing the relevant dimensions and other characteristics of the cargo holds of all aircraft types operated by the air carrier, including the dimensions of the cargo hold entry, that would limit the size, weight, and allowable type of cargo. Commenters have largely supported airlines disclosing cargo dimensions to enable passengers to determine whether their wheelchairs will fit on aircraft. The Department does not believe that compliance with this aspect of the final rule will require much time or effort by the airlines. The requirement simply calls for airlines to publish data and information on their websites regarding the cargo compartments of the aircraft that they operate, and some airlines indicated that they already post this information on their public-facing websites. This important information will allow for passengers with disabilities to better assess whether their wheelchairs or scooters can be accommodated when searching for and booking flights, which in turn will prevent passengers with disabilities from being turned away at the airport on their day of travel and experiencing significant life disruptions.

4. Return of Delayed Wheelchairs and Scooters

*The NPRM:* The Department proposed that when an airline delays the return of a passenger's wheelchair or scooter, the airline would be required to transport the delayed device to the passenger's final destination within twenty-four (24) hours of the passenger's arrival at that destination by whatever means possible and to pay the associated cost. The Department explained that the 24-hour requirement was meant to strike a balance between the time required for logistical coordination by airlines and the need for passengers with disabilities to have their wheelchairs and scooters returned to them as promptly as possible. The Department also explained that "by whatever means possible" could include the carrier seeking out other commercial passenger flights or freight flights that could accommodate the device and other ground shipping options that would result in prompt delivery to the passenger. In addition, under the NPRM's proposal, the carrier would have to provide the passenger the choice of either (1) picking up the wheelchair or scooter at their final destination airport or (2) having the wheelchair or scooter delivered by the airline to another location, such as the passenger's home or hotel, based on a reasonable request. We stated that we would

consider the wheelchair or scooter to be provided to the passenger (1) when the wheelchair or scooter has arrived at the destination airport, is available for pickup, and the carrier has provided notice to the passenger of the location and availability of the wheelchair or scooter for pickup; or (2) when the wheelchair or scooter is transported to the location requested by the passenger, regardless of whether the passenger is present to take possession of the wheelchair or scooter.

*Comments Received:* The Department received many comments on its proposed requirement for the prompt return of delayed wheelchairs and scooters by airlines. Feedback was generally mixed, with some comments supporting the NPRM's proposal, some opposing the proposal, and others urging the Department to enhance or expand the proposal.

Disability rights organizations either supported the 24-hour timeline for returning wheelchairs and scooters or asked for even stricter standards. AARP asserted that personal wheelchairs are essential to safe mobility for those who use them, and no one should have to wait longer than necessary for their return. Some organizations, such as the United States Gender and Disability Justice Alliance, and some individuals with disabilities believe that 24 hours is still too long to go without their personal wheelchair or scooter. As such, these commenters recommended stricter timelines and modified standards for airlines to follow. For example, Cure SMA suggested implementing a standard that airlines be required to return a misplaced wheelchair on the next available flight, and no later than 24 hours, even if it requires the use of a different carrier.

Disability rights organizations also generally supported giving options to passengers to either pick up their delayed wheelchairs or scooters at their destination airports or have them delivered by the airline to a different location based on a reasonable request made by the passenger. Many reiterated that passengers with disabilities should never be required to travel back to the airport to pick up their delayed wheelchairs or scooters for several reasons, including limited accessible transportation options. There was also one common concern raised regarding when the Department would consider "delivery" to be completed by the airline. Specifically, several organizations including PVA and the Amputee Coalition asserted that "delivery" of the device should only be considered complete when the passenger, or an authorized party, takes

physical possession of the device from the airline. They believed that the airline's regulatory obligations should not terminate until this point because wheelchairs and scooters should not be left at a designated location without acceptance by an authorized individual.

Airline industry stakeholders believed it will be difficult to meet the 24-hour timeline proposed in the NPRM, especially for smaller airlines, remote locations, and global destinations. A4A and domestic airlines argued that even if they have a daily-service schedule to a given location with one daily flight, that flight will likely land 24 hours apart from when the passenger landed, meaning that the airline is automatically non-compliant with the proposed regulation. They added that the proposed 24-hour period doesn't consider the fact that the airline may have to deliver the wheelchair or scooter to another location off the airport requested by the passenger, and in certain markets, airlines may operate less than daily service and alternative transportation by air may be unavailable. As such, they asserted that the regulation would be unfair and unreasonable.

In lieu of the NPRM's proposal, these airline industry stakeholders recommended several different standards that they claim will allow airlines necessary flexibility in returning delayed devices to impacted passengers. Recommended standards greatly varied. A4A suggests 48 hours for delivery to the passenger's destination airport and 72 hours for delivery to a separate final location as requested by the passenger. NACA urged the Department to consider a six-day delivery standard for ULCCs since these carriers will be disproportionately impacted by the requirement because of their flight schedules. Spirit suggested that the 24-hour timeline of the NPRM's proposal should be satisfied if the airline starts the delivery process before the 24-hour period elapses and is completed in a reasonable amount of time.

Foreign airlines called for a separate standard for delayed devices on international flights. IAG requested a minimum of 48 hours. Multiple foreign airlines suggested a more lenient 96-hour standard that aligns with the regulatory approach taken by Canada. On the other hand, IATA indicated that it does not want any sort of set time standard and instead suggested that foreign airlines should be required to demonstrate that they made best efforts to deliver the delayed wheelchair or scooter in a timely manner.

Airline industry stakeholders also argued that they should not be held liable for delays and extended delays caused by circumstances outside of the airlines' control. Examples provided by A4A and IATA included: late arrival at the passenger's gate that does not give airlines adequate time to load the mobility aid safely; weather or delays caused by the Department's own air traffic control decision; and when a passenger knowingly elects to have a short connection time and has been notified that such time is inadequate for the unloading, transfer, and loading of the mobility aid. Some also took issue with the NPRM's requirement that airlines deliver delayed wheelchairs and scooters to passengers "by whatever means possible." A4A claimed that the requirement lacks consideration of safety and dignity, putting airlines in an unfair situation, conflicts with the idea of passengers making "reasonable requests" for delivery, and fails to consider the lead-time that it will take airlines to arrange for safe transport. A4A also claimed that if there are no safe transportation options available or even possible, then the airline cannot be held liable for the delivery to the passenger's requested location. RAA shared the same concerns as A4A. A4A asserted that this could include situations when the only available transport is by off-road vehicle where navigating rough terrain may result in damage to the device or where passengers on intercontinental sea voyages cannot be reached by any other mode of transport.

Lastly, airline industry stakeholders raised some concerns with the details of the two delivery options for impacted passengers. Specifically, some commenters called for clarity and limitations on what may constitute a "reasonable request by the passenger." A4A and IATA also stated that for delivery to the passenger's destination airport, the airline's obligation should be considered complete after making a reasonable attempt to notify the passenger that his or her wheelchair or scooter is available for pick up. They stated that airlines should not be kept on the hook longer if the passenger is unavailable to receive notification because of the passenger's own actions or circumstances (*e.g.,* a passenger does not have cell service or has not configured a voicemail box).

*DOT Response:* After carefully reviewing and considering the comments received, the Department is requiring carriers to transport delayed wheelchairs and scooters to impacted passengers within 24 hours of the passenger's arrival for domestic flights

and short haul international flights (12 hours or less) and within 30 hours of the passenger's arrival for long haul international flights (more than 12 hours). Under both standards, the delivery time period starts when the passenger is given the opportunity to deplane from a flight at the passenger's final destination and the passenger's personal wheelchair does not arrive with the passenger. The delay ends when the passenger either picks up the delayed wheelchair or scooter at his or her destination airport or the delayed wheelchair or scooter is delivered by the carrier to a reasonable location such as the passenger's home or hotel. Under this rule, the passenger chooses whether to pick up the wheelchair or scooter from the airport or to have wheelchair or scooter delivered to a reasonable location like his or her home or hotel. By reasonable location, the Department means a location that is near the passenger's origination or destination airport. Also, to ensure that an airline is aware that a wheelchair has been delayed and knows where to return the wheelchair, an individual with a disability should file a mishandled bag report (MBR) when their wheelchair or scooter is delayed. Through the filing of an MBR, the airline can obtain information such as the passenger's contact information and where the passenger wishes to have the wheelchair or scooter returned.

The final rule requires carriers to carry out their obligation to promptly return delayed wheelchairs or scooters to individuals with disabilities by using whatever means are available to the carriers to transport the delayed wheelchairs or scooters safely. Ideally, the delayed wheelchair or scooter would be transported on the carrier's next available flight if the wheelchair or scooter can safely fit and it would satisfy the timing requirements of the rule. However, if that is not an option carriers must ensure the prompt transport of the delayed wheelchairs or scooters through other ways, including other commercial passenger flights or freight flights that could accommodate the device and/or ground shipping options.

The Department appreciates the disability rights organizations' comments that urge the Department to take a stricter approach than the 24-hour standard proposed in the NPRM for the return of delayed wheelchairs or scooters. We understand that it is incredibly important for these delayed devices to be returned by the airlines as quickly as possible to restore the passenger's health, independence, and mobility. We also recognize the industry

comments that note potential difficulties in meeting the proposed standard for smaller airlines, remote locations, and global destinations. However, while it is true that certain carriers may not have a daily flight to a passenger's final destination, the proposed regulation intentionally provided flexibility for airlines to consider alternative options that could be used to transport the wheelchair or scooter to the passenger in a timely manner (*e.g.,* commercial flights on partner and subsidiary airlines and freight flights). For example, airlines could utilize overnight couriers to meet the deadline rather than waiting for their next available flight. For this same reason, the Department does not believe that a separate standard is needed for ULCCs even if they have lesser flight frequencies and smaller flight networks compared to the legacy carriers.

We note that under the Department's Final Rule on Refunds and Other Consumer Protections, regardless of size, airlines are required to return a checked delayed bag within 12 hours to passengers who were on domestic flights and within 15 hours to passengers who were on short haul international flights (12 hours or less). For several reasons, in this rule, the Department is instead requiring airlines deliver delayed wheelchairs and scooters within 24 hours to passengers traveling on domestic and short haul international flights. As mentioned in comments, wheelchairs and scooters can be more difficult to ship than regular checked bags and can require careful packing and loading. Wheelchairs and scooters can also be large, weigh several hundred pounds, and contain fragile parts. Additionally, as discussed in the NPRM, a given wheelchair or scooter (unlike a regular checked bag) may not fit on any flight offered by a carrier if that carrier operates a limited fleet of aircraft types. In cases where an airline has transported a passenger without his or her wheelchair or scooter, the airline must reunite that passenger with his wheelchair or scooter through any safe means including reaching outside of its own network to secure a transportation option for the wheelchair or scooter. Finally, in this rule, airlines are required to offer delivery of the wheelchair or scooter to a reasonable location requested by the passenger such as the passenger's home or hotel. This additional requirement could add time and effort for airlines when returning these delayed devices.

With respect to returning wheelchairs or scooters for passengers on long haul international flights (more than 12 hours

in duration), the Department is requiring carriers to return them to passengers within 30 hours, similar to the timeframe required of carriers returning delayed checked bag. The Department is allowing airlines more time than the proposed 24-hours to return wheelchairs or scooter for passengers on long-haul flights because choices to transport wheelchairs or scooters by other means such as on another carrier's flight or via courier services may be more limited.

The Department is not persuaded by arguments from airline industry stakeholders that they should not have responsibility for delays that are outside their control. As explained in section II(B)(1), we believe that imposing responsibility on airlines is proper when the mishandling occurs when the device is in the carrier's custody and the mishandling is through no fault of the passenger. As we discussed above, airlines are best positioned to monitor and change processes used to transport wheelchairs and scooters while under the airline's custody. Assigning responsibility to the carriers in these circumstances incentivizes them to reduce instances of all types of mishandlings. Even in situations where the passenger's actions contributed to the delay such as when a passenger arrives at a gate late and thus not giving airlines adequate time to load the wheelchair or scooter, while the delay itself may not be deemed a violation, the airline still has a responsibility to return the wheelchair or scooter promptly to the passenger.

Separately, the Department does not agree with airlines' concerns over requiring airlines to use "whatever means possible" to deliver the delayed wheelchair or scooter to the passenger. As mentioned in the NPRM, the Department expected for "whatever means possible" to include transportation options such as other commercial passenger flights or freight flights that could accommodate the device and other ground shipping options that would result in prompt delivery to the passenger. It was never the Department's intention to require an airline to undertake extreme measures, such as the examples of using an all-terrain vehicle (ATV) to transport a wheelchair to a remote forest in Alaska or flying a scooter via helicopter to a passenger that has left land on an international sea cruise, as suggested by some industry commenters. The Department agrees with A4A's comment in that safety is key for whatever transportation option is ultimately utilized by the airline to deliver the delayed wheelchair or scooter to the

passenger. As such, in the final rule, airlines are required to use "whatever means are available to safely transport the delayed wheelchair or scooter."

After considering the comments from disability rights organizations and other stakeholders, the Department has determined that the delay in delivering a wheelchair or scooter to the passenger ends when either (1) when the wheelchair or scooter is picked up by the passenger or another person authorized to act on behalf of the passenger at the destination airport, if the passenger elected for pick up; or (2) when the wheelchair or scooter has been delivered to the passenger or another person authorized to act on behalf of the passenger at a reasonable location requested by the passenger, if the passenger elected for delivery. The Department was persuaded by the many comments that urged DOT to extend airlines' delivery obligations until the point when the passenger takes back physical possession of the wheelchair or scooter from the airline. As PVA noted, these devices are essential to the passenger's health, mobility, safety, and freedom. They can also be very expensive. As such, they should not be left at a designated location without acceptance by an authorized individual. This notion applies regardless of whether the passenger has chosen to pick up the wheelchair or scooter at the airport or to have the device delivered to a separate location. The Department did not find persuasive airlines' comments that a delay should be considered to have ended if an airline makes reasonable attempts to notify passengers of pick-up availability for the delayed wheelchair or scooter.

Given that airlines will need time to establish policies, procedures, and processes and to train staff to carry out the requirement to return delayed wheelchairs and scooters within a specified time, including how to best deliver wheelchairs or scooters to passengers' requested locations, the Department is providing an implementation period of 180 days after the final rule's publication in the **Federal Register**. This 180-day timeframe also aligns with the amount of time that was provided to airlines in the Refund Rule to comply with the requirement to refund fees to passengers for significantly delayed bags.

### 5. Reimbursement Requirements for Accessible Ground Transportation

*The NPRM:* The Department sought comments and data in the NPRM regarding costs that an individual with a disability incurs because a wheelchair or scooter is delayed and whether airlines should be responsible for reimbursing individuals for those costs. The Department also asked what documentation individuals should provide to airlines to substantiate these costs and whether there should be a limit to the airlines' liability.

*Comments Received:* Disability rights organizations urged the Department to adopt a requirement for airlines to reimburse passengers with disabilities for costs associated with delayed wheelchairs. They stated that costs can include transportation to and from the airport, overnight accommodations while waiting for their delayed device, payment of a caregiver, lost wages, cost of a cancelled trip, rental wheelchairs or scooters, and other medical and healthcare expenses. Some of these commenters were fine with limiting passenger reimbursement to a "reasonable" amount while others explicitly called for no limitations on the recoverable amount. However, many mentioned that it was important that reimbursement be promptly provided by the airlines. PVA stated that the carrier must provide payment to the passenger within seven business days, similar to the period associated with the Department's recent final rule on air travel consumer refunds.

Airline industry stakeholders mostly oppose any sort of regulatory requirement in this area. However, some airline industry stakeholders, such as Allegiant and Spirit, stated that in practice they already review claims for reimbursement for costs incurred due to the delay of equipment on a case-by-case basis. Airline commenters stated that if a requirement were to move forward, it is important to airlines that any reimbursement be limited and directly connected to a delay caused by the airline. In addition, airlines want passengers to submit receipts to them for such costs and an explanation of why those costs were incurred as a direct result of the delay. A4A and IATA also argued that the Department's NPRM was unclear on what types of costs were being considered as potentially reimbursable and lacked cost-benefit analysis.

*DOT Response:* After reviewing the comments related to associated costs incurred by passengers with disabilities impacted by wheelchair or scooter delays, the Department is requiring carriers to reimburse passengers with disabilities for the cost(s) of any transportation to or from the airport that the individual incurred as a direct result of the passenger's wheelchair or scooter being delayed by the airline. The comments made clear that these transportation costs are foreseeable consequences that passengers incur almost immediately when their wheelchairs or scooters are delayed. It is the Department's understanding that often passengers with disabilities prearrange for accessible transportation to their homes and hotels upon arrival at the airport, which may then have to be cancelled if their wheelchair is significantly delayed. Passengers with disabilities may have also driven to the airport but may now need to seek out accessible transportation that can safely transport them to their final destinations given their personal wheelchair is not available. Under these circumstances, the passengers will also likely need to return to the airport to pick up their car. The Department views the requirement to reimburse these transportation costs to or from the airport incurred as a direct result of the passenger's wheelchair or scooter being delayed by the airline as a reasonable accommodation that airlines must provide to individuals with disabilities when they have delayed the return of their wheelchairs or scooters.

Under the final rule, airlines are permitted to require passengers to submit documentation that substantiates the cost(s), such as receipts or invoices, to receive the reimbursement from the airline. Reimbursement for these cost(s) must be provided to passengers within 30 days of airlines receiving a request with documentation to support the claim if documentation is required by the airline. The Department believes that granting airlines 30 days to provide reimbursements for transportation costs gives airlines a sufficient amount of time to review and verify passengers' claims and to issue the reimbursements, particularly since some airlines who already provide such reimbursements indicated that their current process is handled on a case-by-case basis. The Department is not requiring direct payment to vendors to avoid delay in the arrangement of any alternative transportation. Also, the Department expects the cost of ground transportation to be relatively low.

The Department acknowledges that disability advocates and others strongly believe that airlines need to be held liable for all consequential costs that passengers with disabilities incur as a result of delayed wheelchairs or scooters by airlines. The commenters had differing views on whether there needs to be a limit on reimbursement requirements. At the present time, however, the Department is concerned that it does not have sufficient information in this area beyond ground transportation to or from the airport. Consequently, at this time, we are not

imposing a requirement for airlines to reimburse passengers with disabilities for all consequential costs associated with delayed wheelchair or scooters. We will continue to review this issue to determine if future rulemaking proposals may be warranted.

### 6. Repair or Replacement of Lost or Damaged Wheelchairs or Scooters

*The NPRM:* In the NPRM, the Department proposed to require airlines to provide two separate options to passengers who file claims with airlines after their personal wheelchairs or scooters have been lost, damaged, or destroyed: (1) passengers can elect for carriers to handle the repair or replacement of the devices; or (2) passengers can elect to use passengers' preferred vendors to repair or replace the device. If passengers select the first option, the Department proposed to require carriers to: repair or replace the devices, depending on the severity of the damage; return the devices to passengers within a reasonable timeframe; and pay the cost of the repairs or replacement directly to the vendor(s). The Department did not define a specific "reasonable" timeframe in the NPRM. If passengers select the second option, the Department proposed to require carriers to promptly transport the wheelchairs or scooters to the passengers' preferred vendor, unless the passengers have indicated that they will arrange for the transport themselves. The carrier would be required to cover the cost of this transport and pay the wheelchair vendor directly for the cost of repairs or replacement. The Department sought comments on this point and whether direct billing to the airline may cause any unforeseen issues.

Under both proposed options, if a replacement is necessary due to the severity of the damages or because the device was lost, the replacement device must have equivalent or greater function and safety as the individual's original device.

In addition, in the NPRM, the Department sought comments and data on the following:

• Whether to use detailed timelines rather than a reasonableness standard when airlines handle wheelchair and scooter repairs and replacements;

• Whether the Department should require repairs made only by DME suppliers in the rulemaking;

• Who should be responsible for ultimately determining whether a wheelchair or scooter is "fixable";

• Whether an airline's cost for repairs and replacements should be limited to

whatever is not paid by the passenger's travel insurance;

• Whether passengers need a "testing period" to confirm whether wheelchair or scooter repairs made by the airline are adequate; and

• How "temporary wheelchair repairs" offered by airlines at the airport would work in practice.

*Comments Received:* Disability rights organizations' comments generally supported greater flexibility and options for passengers with disabilities in the repair and replacement process. MDA stated that passengers with disabilities need options, including the ability to choose their own preferred vendor for repairs, when their wheelchair or device is damaged to reduce any safety risks to the passenger and unnecessary delays. The ITEM Coalition commented that while delays may sometimes be due to circumstances beyond the carriers' control, some delays and the associated risks to passengers could be mitigated if passengers have options when their mobility device is damaged or destroyed. AARP supported the proposal's repair and replacement options because many individuals with disabilities have existing relationships with trusted providers and leveraging these existing relationships should lead to more efficient and timely repairs.

However, several disability rights organizations also want additional protections built into the final rule to improve and streamline the current repair and replacement process. For example, MDA asserted that due to a lack of standardization, the repair and replacement process can be time-consuming and frustrating, leading to a loss of independence, medical complications, and additional incurred costs for passengers living with a neuromuscular disorder. Cure SMA stated that the burden is placed solely on the passenger, who must journey to the baggage claim office, wait in line, and report the damage. Cure SMA explained that passengers who do not see damage at the airport because they cannot examine the chair they are sitting in are required to return to the airport to make a claim for repair.

Disability rights organizations offered a variety of suggestions to address some of these noted issues. The most common suggestions included extended filing periods for damage claims (*e.g.,* 14 or 15 days after the device is returned to the passenger), frequent and accurate updates provided to passengers throughout the repair or replacement process, increased airline policy transparency for repairs and replacements, and accessible claim filing options. Cure SMA recommended

that passengers be given up to 14 days to file damage claims after their flights land because, for example, electrical damage caused by a pinched wire or water damage that occurred while inflight may not set in for days.

Airline industry stakeholders' comments voiced concerns over the options proposed in the NPRM. A4A stated that as an initial matter, the Department should recognize that when airlines cause a mishandling, they already repair or replace the wheelchair or scooter and work diligently and closely with the passenger to ensure a timely remedy.

Second, A4A claimed that airlines' regulatory liability for repairs and replacements must be limited to circumstances under the airlines' control. They argued that circumstances beyond the airlines' control, such as extreme turbulence that damages a properly secured wheelchair in the cargo compartment, are not an act of discrimination for which the Department can impose strict liability. A4A stated that imposing a requirement to provide repairs and replacements in all circumstances would exceed the Department's authority.

Lastly, A4A noted that even if a passenger has a preferred vendor, airlines may have an equally qualified (or more qualified) vendor that can repair or replace the device in a faster time and in an equal manner, minimizing the costs to the airline. They also asserted that airlines would not be able to vet the passenger's chosen vendor and its work, potentially resulting in replacement of devices whenever they could actually be repaired by the airline's qualified vendor instead. A4A claimed it is unreasonable to require replacement of a device because the passenger's preferred vendor is unqualified to make a repair that others could make. They claimed that airlines' qualified vendors are also best situated to make determinations as to whether damage to a device was caused by handling during air transport or whether it was pre-existing. For these reasons, A4A strongly recommended that the Department allow airlines to select a qualified vendor, and if the airline is unable to contract with one, then the passenger may select the vendor for the repairs or replacement. NACA and RAA shared views similar to A4A.

Foreign airlines and IATA noted that the Montreal Convention already sets relevant limits on their liability for damages resulting from the destruction, loss, damage, or delay of baggage, which includes passengers' checked wheelchairs or scooters. They asserted

that the proposed rule would conflict with these limitations and should not override them. As such, foreign airlines request that the Department include a clear statement in any final rule to clarify that the Montreal Convention applies to international travel.

Other stakeholder comments were minimal on these points. Of note, Open Doors was generally fine with the repair and replacement options for passengers so long as their chosen vendor was within the airline's network or within Global Repair Group's system; however, the passenger should not be able to use a ''friend or buddy'' that does repairs as this could result in fraudulent billing to airlines.

Disability rights organizations also unanimously agreed that wheelchair and scooter repairs and replacements need to be carried out as quickly as possible to reduce any negative impacts on individuals with disabilities, such as reduced independence, safety risks, medical complications, and additional expenses. As such, several organizations objected to the ''reasonable timeframe'' standard set forth in the NPRM when the airline handles the device repair or replacement. These organizations were concerned that the proposed standard is not strong enough to ensure that repairs and replacements are completed promptly and provides airlines with too much deference.

PVA recommended that the Department consider a ''prompt'' standard for airline repairs and replacements, which means that the carrier must ensure that its contractors have a sufficient number of vendors available when needed by the passenger. PVA conceded that a strict and detailed timeline requirement would not be feasible based on the many factors that impact the timeline for a given repair or replacement. On the other hand, some disability rights organizations called for clear and set time frames. The Ability Center of Greater Toledo said that repairs and replacements should be completed ''prompt'' if completed within ten days. United Spinal went even further by offering standards for detailed steps that must be taken by the airline within the first 72 hours following a wheelchair or scooter mishandling.

From the airlines' perspective, A4A and IATA wanted the Department to retain the ''reasonable timeframe'' standard for repairs and replacements. A4A stated that timely and proper repairs and replacements is a shared interest of both passengers and airlines. A4A and IATA stated that the ''reasonable timeframe'' standard is needed because of ''the high variability

and complexity of many mobility aids.'' They commented that proper repair or replacement should be prioritized over speed and that the more complex or unique the mobility aid, the longer it legitimately takes to get repaired or replaced properly. A4A and IATA asserted that these timeliness factors are exacerbated by innumerable additional factors, many of which are beyond the control of the airline and despite the significant efforts of the airline to properly handle the mobility aid and remedy the mishandling. A4A and IATA concluded that, depending on the circumstances, it will be impossible and unfair to hold airlines to strict deadlines. All other airline commenters echoed A4A and IATA's comments.

Other stakeholders had mixed opinions on the timing requirements for airline repairs and replacements. Open Doors said that it does not believe stricter, detailed timelines should be used in the regulation given the current conditions of the industry. The American Association for Homecare (AAHomecare) recommended that DOT adopt the proposed ''reasonableness'' standard because of the many potential issues that could impact how quickly a repair or replacement can be carried out but suggested that detailed timelines could be implemented around the initiation process by the airline. On the other hand, the American Occupational Therapy Association (AOTA) called for the Department to establish a timeline for carriers to adhere to when repairing, replacing, or compensating passengers for damaged devices. Also, the National Coalition for Assistive and Rehab Technology (NCART) stated that airlines need to take full responsibility during the process until the damaged equipment is fully repaired and functional for the consumer and to provide full transparency for consumers on tracking the progress of repairs.

Under the second passenger option of the NPRM's proposal, where the passenger uses his or her preferred vendor to carry out the repairs or replacement, the proposal stated that the carrier would be required to pay the wheelchair vendor *directly* for the cost of repairs or replacement within a reasonable timeframe. Disability rights organizations voiced support for such a requirement. These commenters specifically appreciated that this would ease the burden on individuals with disabilities impacted by mishandlings, would not force them to pay the costs upfront out of their own pockets, and would expedite the repair and replacement process. In the event of a dispute, PVA recommended that disputes must be resolved between the

carriers and the vendors directly and individuals should not be required to submit additional documents to the carrier.

Airline industry stakeholders generally opposed the direct billing requirement. A4A stated that direct billing should only be required when the vendor is under contract with the airline. A4A asserted that if the vendor is not under contract with the airline, the airline may have inadequate information from the vendor for the airline to ''properly ascribe the billing to a particular claim or satisfy the requirements of the airline's insurance underwriter for sizable claims,'' which could delay the payment and the repair or replacement. A4A also argued that it is reasonable for vendors to bill customers for repairs and replacements, who then can pass the bill on to the airlines, similar to how customers are already reimbursed for hotels, meals, and ground transportation following controllable flight delays. Lastly, A4A argued that the Department should not prescribe the contractual relationship between the involved parties, giving them the flexibility to operate in a way that best suits everyone's needs and preferences.

As for the other questions posed in the NPRM, most commenters agreed that the Department should not address DME supplier requirements in a final rule. Most agreed that wheelchair and scooter repairs and replacements should be handled by qualified and certified technicians. However, they also noted issues with a contracting requirement because ''right-to-repair'' laws fall outside the scope of the rulemaking, DME suppliers may not always be readily available in all parts of the country, and individuals may prefer to work with other local repair shops or mechanics. Open Doors also noted that airlines are already utilizing DME suppliers to handle all repair needs.

The Department also asked about disputes between passengers and airlines over whether a repair or a full wheelchair or scooter replacement is necessary based on the level of damage to the wheelchair or scooter. Disability rights organization showed a strong preference to leave the final determination up to the passenger or the passenger's chosen vendor. They said that if the decision was to be left to the airline, then the passenger must be given an opportunity to appeal the airline's decision if they believe it is incorrect. PVA stated that a passenger should be able to obtain a second opinion and have the opportunity to submit any supporting documentation if he or she believes that repairs would not

return the wheelchair to the same safe condition as before the mishandling. On the other hand, airline industry stakeholders stated that the airlines' vendors are in the best position to make this determination and can also properly assess whether damage to the mobility aid would have been caused by handling during air transport or whether the damage was more likely than not to be pre-existing (*e.g.,* defective part or poor battery life). Spirit asserted that the carrier should be in control of the process because it has the motivation to accurately determine whether a wheelchair or scooter is fixable as it will ultimately impact the cost that the airline pays. Spirit also stated that it would be in a better position to arrange for a prompt assessment of any damage.

As for travel insurance coverage related to lost and damaged wheelchairs and scooters, disability rights organizations opposed any prerequisite or additional burden on individuals with disabilities. PVA stated that most domestic travelers do not purchase travel insurance, and even if they do, the policies may consider mobility aids to be baggage and only subject to limited reimbursement. PVA commented that insurance providers can also require extensive documentation, including local authority reports to substantiate the loss. PVA also stated that some policies totally exclude lost, delayed, and stolen wheelchairs from coverage. Several disability rights organizations echoed similar concerns over requiring individuals with disabilities to purchase and use travel insurance. Airline industry stakeholders, such as A4A and RAA, said that airlines' liability for mishandlings should be reduced by any amount covered by a third-party, such as insurance. They stated that if an airline assumes the full cost in the first instance, it must be able to collect any insurance funds to offset the payment amount by the airline to the passenger.

The Department also asked questions in the NPRM on a ''testing period'' to give individuals with disabilities an opportunity to test their wheelchairs and confirm whether repairs are indeed adequate once the airline has returned the device to them. Disability rights organizations unanimously supported the idea of a testing period. PVA stated that the vendor should require a reasonable timeframe for the passenger to ensure that their mobility device is in the same condition it was prior to being damaged, that any further damage caused by the carrier but discovered later can be covered by the carrier, and that the repair was properly and safely completed. Colorado Cross-Disability Coalition explained that sometimes

individuals do not know if a repair is truly completed when delivered and that a repaired wheelchair or scooter may appear working at first but then parts may come loose quickly. Commenters suggested a variety of lengths for the testing period, including 48 hours, 15 days, 28 days, and 30 days from the date the device was returned to the individual. Disability rights organizations believe that if the repair is not adequate, the individual should be able to request prompt service to fix any outstanding defect(s). North Dakota Protection and Advocacy Project explained that problems may not be immediately noticeable to the passenger, problems could arise within a few weeks or at a later date, or repairs may be adequate for only a short period of time. They asserted that the passenger should be able to report problems as they arise and require the carrier to pay for the repair if it is connected to the damage caused by the carrier.

Airline industry stakeholders commented that they generally believe that individuals should have a reasonable opportunity to inspect a repaired wheelchair or scooter upon delivery but also voiced concerns over the idea of a lengthy ''testing period.'' A4A and RAA said that their primary concern is that airlines' liability and responsibility should end once the device has been returned to the passenger because at that point the airline no longer has custody or control over the device. Both claim that airlines would then have no means to prevent further damage or to validate whether the new issues with the device are attributable to the airline's custody. IAG stated that they have seen no trend of customers returning wheelchairs to airlines for additional repairs and thus there is no need for a regulation on a testing period. As for timing, Spirit suggested that a 72-hour testing period would be enough to determine if a repair was properly completed. Allegiant on the other hand requested that the Department not enact a set time frame for a testing period as this could limit the timeliness of resolution for the passenger and create a standard where carriers may be forced to address damage that is incurred after delivery of successfully repaired equipment.

Finally, the NPRM asked about minor ''temporary wheelchair repairs'' that would be sufficient to get the passenger out the door of the airport with their personal wheelchair so that they can continue on with their journey as planned to the maximum extent possible and seek out a ''full repair'' at a later time and date. Disability rights organizations generally think that it

would be reasonable for airlines to offer these temporary repairs, either on-site at the airport or through a local vendor. Cure SMA commented that this could be accomplished by airport personnel equipped with basic supplies (*e.g.,* standard tools, zip ties, etc.) or by on-call DME vendors for emergency repairs. Others mentioned that minor repairs could include replacing lost screws, inflating tires, tightening loose bolts, and straightening out a bent component.

Airline industry stakeholders do not think that ''temporary repairs'' should be required under the Department's regulations. Similar to ''testing periods'' following repairs, some airline industry stakeholders expressed concern that wheelchairs or scooters could become further damaged after the airline has provided a minor temporary repair and returned custody to the individual, placing unfair liability on the airlines. Some commenters also mentioned that it is unreasonable and very costly to require airlines to have qualified vendors at every airport they serve that can carry out these temporary repairs at any time. A4A and IATA stated it would be an unreasonable imposition of costs for airlines to hire and have vendors staffed at every airport that they serve in their networks and at all hours, despite the relatively low numbers of damaged mobility aids and low likelihood that temporary repairs would be possible given the high complexity and variability of most mobility aids. A4A also argued that the NPRM did not provide meaningful opportunity for comment because it was too vague and lacked any impact analysis. Spirit did not find the proposal to be unreasonable.

Other stakeholders, including Open Doors, Gillette Children's Specialty Healthcare, and Able Americans of the National Center for Public Policy Research shared similar conflicting views on this topic. Open Doors asserted that it is not reasonable to ask airlines to do any temporary repairs because airlines are not in the business of fixing mobility devices and could never feasibly provide this service and requiring them to provide repairs would open them up to more liability. Open Doors added that requiring airlines to have an onsite vendor do repairs would not be viable economically given the low incidence of damage, even at a large hub airport. However, Gillette Children's Specialty Healthcare and Able Americans of the National Center for Public Policy Research stated that requiring airlines to provide temporary repairs is reasonable.

*DOT Response:* The Department has decided to adopt the proposed

requirement for airlines to provide repair and replacement options to passengers after passengers' personal wheelchairs or scooters are damaged, destroyed, or lost. In other words, passengers can elect for carriers to handle the repair or replacement of the devices, or passenger can elect to use passengers' preferred vendors to repair or replace the device. Many comments from disability rights organizations and others expressed support for providing passengers these options. The Department was not persuaded by airlines' comments asserting that they already have their own expert vendors that are best suited to meet passengers' needs. Airline commenters and others also did not provide any evidence to support their stated belief that passengers may choose illegitimate or unqualified vendors or that passengers' vendors may significantly increase costs for airlines. The Department also did not receive any evidence demonstrating that passengers and vendors are likely to fraudulently overbill airlines for repairs or replacements, as suggested by Open Doors. Rather, given the importance of having their devices returned to them quickly and in proper condition, we expect that passengers will carefully select vendors that they trust and believe capable of providing quality services to them. The Department continues to be of the view that passengers with disabilities need options and flexibility following wheelchair or scooter mishandlings to ensure that they do not endure unnecessary delays, undesirable repair and replacement processes, and additional resulting costs.

Under this final rule, when passengers elect to use their preferred vendors to repair or replace their wheelchairs or scooters, airlines must promptly transport them to the passengers' preferred vendor, unless the passenger has indicated that he or she will arrange for the transport themselves, and pay the wheelchair vendor directly for the cost of repairs or replacement. If the carrier needs specific information to properly ascribe the billing to a particular claim or satisfy the requirements of the airline's insurance underwriter for sizable claims, the carrier should work with the vendor and the passenger, as needed, to obtain this information. The Department does not expect this requirement to result in significant processing issues based on the feedback received from both airlines and disability rights organizations.

When passengers elect for carriers to handle the repair or replacement of the wheelchairs or scooters, this rule requires airlines to ensure prompt repairs and replacements of the devices. The Department recognizes that for passengers with disabilities, it is crucial that repairs and replacements, when needed, be completed as quickly as possible to prevent serious life disruptions and at times even health-related risks that occur when individuals with disabilities are separated from their personal wheelchairs or scooters for extended periods of time. The Department also recognizes that strict timelines for airlines to repair or replace wheelchairs or scooters are not workable given the many different factors that can impact the time needed for repairs and replacements. Accordingly, the Department is adopting a "prompt" standard for repairs and replacements when the passenger elects for the carrier to handle the repair or replacement of the wheelchair or scooter. Airlines should work directly with the passenger to initiate the repair/replacement process as soon as possible once a passenger has filed a claim. Airlines should also remain active and responsive, to the maximum extent possible, once the process has been initiated. The Department intends to look at the totality of the circumstance in determining whether an airline's actions are prompt.

The Department also clarifies that in the event a dispute arises over whether a damaged wheelchair or scooter can be repaired or needs to be fully replaced, a qualified vendor or technician needs to be the one making the final determination. If the passenger has elected for the carrier to handle the repair or replacement process, then the airline's contracted vendor makes the determination. If the passenger has instead elected to use his or her preferred vendor for the repair or replacement process, then that vendor makes this decision.

Regarding filing damage claims with airlines, commenters have persuaded the Department to require airlines to provide passengers a reasonable period to file claims. Comments from disability rights organizations assert that the process for filing damage claims for wheelchairs or scooters with airlines is burdensome, sometimes requiring the individual to journey to the baggage claim office, wait in lengthy lines, and report the damage while still at the airport. In addition, these organizations state that airlines often do not alert passengers when damage has occurred and/or the passenger may not realize that the wheelchair or scooter was damaged until after leaving the airport. Under the final rule, airlines are required to allow passengers a reasonable timeframe to examine their wheelchairs or scooters for damage following flights and to file a claim with the airline (if necessary). Depending on the circumstances, a reasonable timeframe to file a claim could be at least 72 hours after the flight's arrival. Airlines will have the flexibility to develop their own specific policies and practices on this issue.

As for liability limits for mishandlings on international flights, the Department agrees with the foreign airlines who commented that the Department's proposed requirement would be subject to liability limitations for international flights based on the Montreal Convention. The Montreal Convention sets limits on the liability of carriers arising from the destruction, loss, damage, or delay of baggage, including wheelchairs or scooters, during international carriage. Under the Montreal Convention, airlines must pay up to a limit of 1,288 Special Drawing Rights (SDR)[37] for an assistive device that is lost, damaged, or destroyed. The Department has clarified this point in the final rule text to prevent any confusion for industry and for travelers.

The final rule also addresses passenger claims for insufficient repairs or replacement of wheelchairs and scooters by requiring carriers review promptly claims received within a reasonable time of the wheelchair or scooter being returned to the passenger. Most commenters agree that individuals with disabilities should have a reasonable time to inspect and test their repaired wheelchairs or scooters once they've been delivered by the airline. However, there is disagreement on how long this testing period should last. Disability rights organizations want up to a month, while airlines want to limit their liability once they have relinquished custody of the device and fully turned it over to the individual. The Department understands disability rights organizations' concern that an insufficient repair may only be noticed after testing the wheelchair or scooter in a variety of different settings or environments. As FLARE mentioned, repairs may need to be tested both at home and off-road to ensure all functionality has been restored. The

---

[37] The SDR was created by the International Monetary Fund (IMF) and is defined as "equivalent to the value of a basket of world currencies. The SDR itself is not a currency but an asset that holders can exchange for currency when needed. The SDR serves as the unit of account of the IMF and other international organizations." *See https://www.imf.org/en/About/Factsheets/Sheets/2023/special-drawing-rights-sdr.* As of September 30, 2024, one SDR was roughly equivalent to $1.36 USD in value.

Department also appreciates the airlines' concerns over the possibility that damage, unrelated to the initial mishandling, could occur during this testing period and that they would have no way to control or verify this. The Department believes that this rule strikes the right balance by requiring carriers to promptly review claims received within a reasonable time of the wheelchair/scooter being returned to the passenger and if the repairs are found to be insufficient then promptly repair or replace the device. Airlines have the flexibility to set the reasonable timeframe for accepting claims alleging insufficient repairs but cannot set a timeframe that is less than 72 hours of the passenger's wheelchair or scooter being returned.

The Department is not imposing requirements in this rule in three areas where comments were sought. First, on the issue of whether the Department should require repairs made only by DME suppliers in the rulemaking, this appears to not be a problem. Based on comments received, it seems as if all repairs and replacements by airlines are already being carried out by qualified DME suppliers. Second, on whether an airline's cost for repairs and replacements should be limited to whatever is not paid by the passenger's travel insurance, the Department does not believe there is an issue that needs to be addressed at this time based on the limited comments received and will not take further action on this in the final rule. Finally, regarding temporary wheelchair repairs at airports, while the Department continues to believe that passengers with disabilities could benefit from temporary wheelchair repairs offered by airlines at the airport, we are declining to take any action on this in the final rule at this time. The Department believes that additional data and research on vendor costs, logistical issues, and scope are needed to accurately gauge the potential costs and benefits of such a requirement.

As for A4A and airlines' argument that repair and replacement liability should be limited to mishandlings due to circumstances under the control of the airline, the Department disagrees. As noted in section II (B)(1) and (4), the Department is of the view that imposing responsibility on airlines is proper when the mishandling occurs when the device is in the carrier's custody and the mishandling is through no fault of the passenger. The airline in the best position to monitor the handling of wheelchairs and other assistive device and to adjust practices and procedures to better protect wheelchairs and other assistive devices, and imposing

responsibility on carriers is an effective method to advance the goals of the ACAA and part 382 to reduce mishandlings.

The Department notes that it is providing airlines a compliance period of 90 days after the final rule's publication in the **Federal Register** to offer passengers the two repair and replacement options, discussed above. This period should give airlines enough time to determine how to best offer and carry out these options in practice (*e.g.,* how to transport wheelchairs to passengers' vendors and how to coordinate direct payments to vendors). We understand that airlines are already providing repairs and replacements through the airlines' contracted vendors today. All other regulatory requirements set forth in this section become effective 30 days after the rule's publication.

### 7. Loaner Wheelchair or Scooter Accommodations

*The NPRM:* In the NPRM, the Department proposed to require airlines to secure and pay for loaner wheelchairs and scooters for passengers with disabilities impacted by airline mishandlings. In doing so, airlines would also be required to consult with the passenger to ensure that the loaner wheelchair or scooter best meets the passenger's physical and functional needs. This would include providing, upon request, functional and safety-related customizations (*e.g.,* changing cushions; adding lumbar support seat attachment; adjusting the headrest, armrest, or footrest) on loaner wheelchairs and scooters, to the maximum extent possible.

The Department then asked a series of related questions on the costs and logistics of such a requirement. The Department also asked whether airlines should be responsible for reimbursing an individual with a disability if he or she incurs additional costs because the loaner wheelchair or scooter provided by the airline restricted his or her mobility or independence.

*Comments Received:* Disability rights organizations mostly expressed support for a requirement for airlines to provide loaner wheelchairs and reiterated the importance of safety, mobility, and independence for individuals with disabilities. MDA stated that to eliminate health and safety risks to people living with a neuromuscular disorder, loaner wheelchairs must be provided while carriers promptly and expeditiously repair or replace the individual's personal wheelchair or mobility device. The Amputee Coalition asserted that carriers should be required to provide loaner wheelchairs that meet

the functional needs of the passenger to the greatest extent possible and work with passengers to determine what customizations work best for them.

Regarding customizations for loaner wheelchairs, some disability rights organizations opined on what they believe to be necessary customization options. For example, Colorado Cross-Disability Coalition suggested that at a minimum an airline should be able to provide a power wheelchair that has sides, a back, charged batteries, and the ability to be programmed to meet the needs of the individual. The loaner company should also be willing to adjust footrests and program and move the joystick as needed. Cure SMA had similar recommendations, calling for Group 3 power wheelchairs with all four functionalities (seat elevator, tilt, recline, foot elevator) and adjustments such as seat pan, back rest, seat cushion, and arm and leg rests. However, PVA commented that it would be impossible to estimate a complete list of customizations because it will vary depending on the individual's disability and their prescriptive mobility device. Some organizations also noted that it may be difficult for airlines and their vendors to locate and fully customize loaner wheelchairs for individuals with disabilities.

Several disability rights organizations also stated that even with certain customizations, loaner wheelchairs will still not be adequate for *all* individuals with disabilities. PVA asserted that for power wheelchair users, loaner wheelchairs will likely not be able to fully provide all the same functional and safety needs as the passenger's customized wheelchair prescribed to treat their health condition. As such, these organizations called for a requirement to offer alternative accommodation options in lieu of airline-provided loaner wheelchairs. PVA stated that carriers should also have the option for the passenger to elect another accommodation that better suits their functional mobility needs and guarantees their safety, with the cost covered by the carrier, if the loaner wheelchair offered is insufficient. MDA stated that carriers should allow for passengers to rent temporary wheelchairs or elect another accommodation that better suits the person's needs. PIDS asserted that if an appropriate loaner mobility aid is not available, then personal assistance services must be readily available and provided by the airlines.

Airline industry stakeholders also voiced support for the NPRM's proposed loaner wheelchair requirement and generally agreed with

the premise. A4A, NACA, and others asserted that airlines already make efforts to work with passengers following airline mishandlings to find and provide loaner wheelchairs that best meet the passengers' personal needs. However, these commenters also strongly noted a need to limit the customization requirements given the complexity and variability of the types of customizations that may be requested by passengers. They asserted that because of this, airlines may not always be able to find an available loaner wheelchair that meets all the passenger's functional and safety-related needs. A4A strongly agreed with the Department's approach of limiting the customization requirement to "the maximum extent possible" and asked the Department to not prescribe the types of customizations that are required or the time in which such customizations be completed. Some carriers, including Spirit and Allegiant, suggested addressing this same issue by limiting the requirement to "reasonable" customization requests. Foreign carriers, such as Neos S.P.A. and Finnair, also asserted that it will be especially difficult for them to meet the customization requirements given their small presence in the United States. In addition, airline industry stakeholders argued that complying with the proposed requirement could be costly. NACA estimated that the compliance costs for one of its member airlines could be approximately $1 million per year.

Other stakeholder commenters offered mixed feedback on the NPRM's proposal. Open Doors believes that the NPRM's proposals are feasible for airlines and necessary for passenger health and safety. On the other hand, the NCART and AAHomecare mentioned concerns over logistical difficulties. NCART stated that complex rehab technology (CRT) wheelchairs should be offered as loaners but customization levels may not be feasible in terms of cost and timing. NCART noted that it may require more time for temporary replacement equipment to be configured than the actual repair would take. NCART also noted that loaner equipment appropriate to meet the individual user's medical needs will be extremely limited and that CRT suppliers cannot be expected to always have many options on-hand and available for passengers. AAHomecare voiced similar concerns over associated costs, delays in getting the loaner wheelchair to the passenger, and issues with supplier inventory expectations. AAHomecare concluded that while

customization for available loaners (if they are available with a local provider) is feasible for more standard wheelchairs, for medically complex consumers the level of customization required may not be possible or feasible from a cost/timing perspective and may take longer than repairing the original equipment.

As for the Department's question on reimbursing passengers for associated costs incurred due to inadequate loaner wheelchairs provided by airlines, disability rights organizations were in favor of adding a requirement on this. PVA stated that airlines must compensate passengers for "provable direct and consequential costs" when the provided loaner wheelchair restricts their independence or results in additional medical issues. Disability rights organizations stated that these costs could include medical services and supplies needed to supplement the loaner wheelchair, lost wages due to functional limitations, personal caregiving services (*e.g.,* assistant to help with activities of daily living), meal delivery services, accessible transportation expenses if the individual is not able to use their standard mode(s) of transportation, and other financial burdens while waiting for their wheelchairs to be repaired or replaced. Most disability rights organizations were fine with airlines requiring individuals to submit documentation to them substantiating such costs, such as receipts and invoices. Some were also fine with capping these recoverable costs. PVA and MDA suggested a "reasonable" standard for recoverable costs. However, others such as the United States Gender and Disability Justice Alliance and IDR recommended no limit on airlines' liability for reimbursement in these situations.

Airline industry stakeholders strongly oppose the Department adopting a requirement on recoverable costs for various reasons. A4A argues that the Department did not explain in the NPRM what would constitute "additional" or "associated" costs, that the public was not given a meaningful opportunity to comment on a potential proposal, and that the costs and benefits of such a proposal were not considered. Neos S.P.A. argued that the Department should not regulate this area so airlines have flexibility in determining appropriate reimbursement on a case-by-case basis based on the diverse needs of passengers. Spirit expressed concern that this could open the door for fraud and abuse as individuals could overstate the harms caused by ill-fitting loaner wheelchairs and claims that the

Department and airlines would not have a way to determine if the requested costs were appropriate and not excessive.

A4A argued if a requirement were to go forward, any reimbursement of costs must be directly attributable to the difference between the passenger's personal chair and the loaner chair. A4A asserted that "associated" costs are vague and will present challenges for airlines regarding validation, potentially leading to issues of unjustified claims or unwarranted liability. Airline commenters also stated that airlines should be able to require documentation from passengers that clearly sets forth these costs.

Other stakeholder commenters generally supported a requirement for airlines to reimburse passengers for costs incurred due to inadequate loaner wheelchairs provided by airlines. These commenters differed on liability limitations though. Open Doors stated that there should be no limit to the airlines' liability, but Gillette Children's Specialty Healthcare supported a limit to "reasonable" costs.

*DOT Response:* The Department has considered the comments received and has decided to adopt a rule requiring carriers to consult with affected passengers on a loaner wheelchair or scooter that best meets the passenger's physical and functional needs, and to pay for that loaner wheelchair or scooter, so passengers are able to safely use the loaner wheelchair or scooter while waiting for their mishandled personal devices to be returned, repaired, or replaced by the carrier. As proposed, carriers are required to provide, upon request, functional and safety-related customizations (*e.g.,* changing cushions; adding lumbar support seat attachment; adjusting the headrest, armrest, or footrest) on loaner wheelchairs and scooters, *to the maximum extent possible.* Under this final rule, if the loaner wheelchair or scooter offered by the carrier does not meet the specific needs of the passenger, then the carrier must alternatively reimburse the passenger for a different loaner wheelchair or scooter that has been found and secured by the passenger and is necessary for the passenger's safety and functionality in lieu of the loaner wheelchair or scooter offered by the airline. Airlines are permitted to require passengers to substantiate the cost to be reimbursed (*e.g.,* by providing a receipt copy).

Generally, the comments received all recognize that loaner wheelchairs and scooters are vital for passengers whose wheelchairs or scooters are delayed, damaged, or lost by airlines and provide

them the ability to continue their normal daily lives, to the maximum extent possible. Airline commenters supported the NPRM's loaner wheelchair proposal and noted that several airlines already take this step in accommodating individuals after wheelchair and scooter mishandlings. The Department agrees and is requiring that loaner wheelchairs or scooters be provided when wheelchairs or scooters are mishandled.

The Department also recognizes the concerns of airlines and representatives of medical equipment suppliers and manufacturers over loaner customizations. The Department believes that finding and securing appropriate loaner wheelchairs and scooters with full customizations may be challenging for passengers that utilize highly complex and personalized powered devices. The Department acknowledged this potential issue in the NPRM and addressed it in the proposed regulatory text by stating that the passenger's functional and safety-related needs must be met "to the maximum extent possible." The Department continues to believe that this standard is appropriate because it emphasizes the importance of loaner device safety and functionality while affording airlines leniency in circumstances that may be impossible or outside of their control. The Department is also declining to define a set list of required customizations as we understand that this may vary greatly from passenger to passenger.

We recognize that airlines cannot control the availability or actions of wheelchair repair vendors and suppliers for loaners; however, following mishandlings, airlines must make best efforts to find and secure an appropriate loaner wheelchair or scooter, even if this involves reaching out to several vendors. This should also be a collaborative process that involves the passenger so the parties can find a mutually-agreeable solution that works best for the passenger's specific needs and circumstances. For example, it could be that a passenger chooses to forgo certain loaner wheelchair customizations offered by the airline if it results in getting the loaner wheelchair to the passenger faster. The passenger's preferences are crucial.

The Department is also persuaded by the comments from disability rights organizations who explained that loaner wheelchairs and scooters offered by airlines are not a uniform solution for all individuals with varying types of disabilities. If a loaner wheelchair or scooter offered by the airline is not going to be as safe and/or functional for

an individual with a disability as the passenger's existing wheelchair or scooter, then he or she must be able to seek out reasonable alternative options that work best for them without bearing the cost. Under this rule, the carrier is responsible for the cost of a loaner wheelchair or scooter that a passenger finds that better meets the passenger's safety and functionality needs than the one offered by the carrier. The Department believes this requirement is necessary for passenger safety, dignity, and independence, and has built this into the final rule. However, the Department is declining to extend this requirement to other types of accommodations besides loaner wheelchairs or scooters. Based on the comments received, it is not clear what other accommodations would be sought out by individuals with disabilities in lieu of a loaner wheelchair or scooter. Nor was any information on associated costs provided. As such, the Department is focusing on loaner wheelchairs or scooters. To be reimbursed for the costs of these alternative loaners, airlines are permitted to require passengers to submit receipts, invoices, or similar documentation that proves the passengers' paid costs.

The Department is not requiring direct payment here by the airline to the passenger's chosen loaner vendor for a few reasons. First, we expect that the cost of loaner wheelchairs, on average, to be much less than the cost of repairs or replacements for complex devices. This means that the upfront costs incurred by individuals with disabilities is likely not as substantial. In addition, it is vital that passengers receive their loaners as quickly as possible. The Department does not want to delay this process by having individuals with disabilities wait for airlines to review and complete payment requests. The Department is requiring airlines to reimburse the passengers for the cost of the loaner wheelchair or scooter within 30 days of providing documentation to support claim.

The Department is declining to move forward with a requirement for reimbursement of costs to individuals with disabilities related to inadequate loaner wheelchairs and scooters provided by airlines that restrict mobility or independence. Commenters raised potential consequential costs ranging from meal delivery services up to weeks-worth of lost wages. The Department is unable to accurately analyze the costs and benefits of such a solution at this time without additional data. Instead, the Department has decided to address the root cause of the issue in this final rule: inadequate

loaner wheelchairs and scooters. As mentioned above, this rule provides passengers with disabilities with greater flexibility when seeking out appropriate accommodations while waiting for their wheelchairs or scooters to be returned, repaired, or replaced and will not have to bear the cost. We believe that these final rule requirements will substantially mitigate the types of associated costs discussed in disability rights organizations' comments.

### C. Reimbursement of Fare Difference and Rebooking

*The NPRM:* In the NPRM, the Department solicited comment on whether it should require U.S. and foreign air carriers to refund the difference between the fare on a flight taken by a passenger who uses a wheelchair and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. The Department also asked whether airlines should be required to refund the fare difference only if the passenger's preferred flight itinerary that cannot accommodate the wheelchair and the more expensive flight itinerary that can accommodate the wheelchair are on the same airline, have the same origin and destination, are on the same day, and have the same number of legs, stops, and connection points (if applicable). There were also questions in the NPRM on whether airlines should be permitted to require passengers to take certain steps to obtain a refund of the fare difference and what types of proof or documentation passengers who use wheelchairs should be required to submit to airlines when requesting a lower fare or seeking a reimbursement of the fare difference.

Additionally, when examining whether the Department should require carriers to refund the fare difference under these circumstances, the Department solicited comment on airlines' rebooking practices. Specifically, the Department asked whether airlines currently offer individuals with disabilities rebooking on another flight on the same airline at no additional cost when their wheelchairs or scooters cannot be carried on their originally booked flights and whether the Department should impose such a requirement. The Department also referenced a regulation by the Canadian Transportation Agency requiring carriers to advise passengers of alternative trips provided by the same carrier to the same destination and offer booking for no additional cost if a carrier is unable to transport a

passenger's mobility aid device on a flight.

*Comments Received:* All disability rights organizations and individuals with disabilities that commented on this issue strongly supported requiring U.S. and foreign air carriers to refund the difference between the fare on a flight taken by a passenger who uses a wheelchair and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. Cure SMA stated that passengers with disabilities frequently pay for more expensive flights on larger aircrafts that can accommodate their large power wheelchairs, which makes it very costly for individuals with disabilities to fly. PVA asserted that forcing a passenger to book a more expensive flight imposes an additional charge on the passenger for a service required by the ACAA. The Arc commented that airlines should refund the fare difference when the carrier is unable to transport a passenger with a disability's mobility device to avoid any additional charges to the passenger and to ensure the passenger has the same benefits as passengers without disabilities, *i.e.,* the option to choose a cheaper flight. PVA also recommended that the Department require airlines to prominently display on their websites all policies related to obtaining a refund of the difference between the fare on a flight taken by a passenger who uses a wheelchair and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. PVA stated further that transparency of all policies is essential for travelers with mobility disabilities to be notified of their rights.

Airline industry stakeholders who commented on this issue oppose requiring airlines to refund the difference between the fare on a flight taken by a passenger who uses a wheelchair and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. A4A and IATA commented that while some flights may not be able to accommodate some passengers with disabilities, an airline's operation of those flights does not constitute discrimination on the basis of disability. A4A and IATA explained that airlines provide those flights, including selection of fares and the aircraft being used, based on a myriad of other factors, including demand, frequency, capacity, and other limitations and costs (*e.g.,* fuel, crew, length of route, origin and destination airport costs, etc.), but never

based on a passenger's disability. A4A and IATA asserted that regulation of flights and applicable fares falls outside of the Department's limited authority under the ACAA and that the Department's regulation of fares would violate the Congressional deregulation of the airline industry and would also likely violate bilateral air transport agreements that prohibit the regulation of fares and require an open marketplace for air travel.

With respect to the question of whether airlines should be required to refund the fare difference only if the passenger's preferred flight that cannot accommodate the wheelchair and the more expensive flight itinerary that can accommodate the wheelchair are on the same airline, have the same origin and destination, are on the same day, and have the same number of legs, stops, and connection points (if applicable), PVA, the Amputee Coalition, and the Arc stated further that refunds cannot be limited to only when the new flight has the same origin and destination, are on the same day, and have the same number of legs, stops, and connection points. They asserted that the Department must implement broad requirements for refunds of fare differences, such as extending flight options to nearby airports. Disability Rights Maryland commented that a refunds of fare differences should be applied to flights with the same origin and destination region, regardless of additional connecting flights but that when there is no other itinerary that meets the passenger's needs, airlines should be required to provide a refund for the fare difference even when the preferred flight itinerary and more expensive flight itinerary have different dates, number of stops, or connecting points.

A4A and IATA commented further that the airline should be allowed to require documentation of the fare difference and proof of a booking if the Department imposes a requirement to reimburse passengers the fare difference. These airline associations added that unlike full refunds, a requirement to reimburse fare difference the provision of a partial refund requires material efforts by airlines to confirm the prices and difference because it is not a system that can be easily automated, especially with the continued adoption of dynamic fares. Azores Airlines SATA stated that if the Department were to implement such a requirement, the passenger must provide an invoice detailing the transportation of the chairs and routes taken.

PVA, the Amputee Coalition, and the Arc asserted that to avoid fraud, airlines can request reasonable documentation but must not impose unreasonable barriers to obtaining a refund of the fare difference. They suggested that airlines could request the passenger to provide the dimensions of their mobility device and documentation of the fare of the preferred flight they would have booked if their mobility device could be accommodated on that flight. PVA commented further that the type of documentation cannot be limited, for example, by only accepting a screen shot of the fare price. PVA explained that not all passengers book their tickets online or solely on the carrier's website, and the ability to take a screenshot of the fare may not be accessible for the passenger due to their disability or lack of electronic devices with that technology. PVA recommended that passengers should be able to submit any type of documentation to prove the fare rate, *e.g.,* providing the fare rate and the date of their search or call; printed copies of the fare rates; photos of the rates, that are not necessarily screenshots; correspondence with reservation personnel with the fare rate; or any other type of documented evidence showing the rate. PVA also recommended that the Department require airlines to prominently display on their websites all policies related to obtaining a refund of the fare difference. PVA explained that transparency of all policies is essential for travelers with mobility disabilities to be notified of their rights.

In response to the Department's request for comments on airlines' rebooking practices when passengers' wheelchairs or scooters cannot be carried on their originally booked flights, various commenters raised concerns about the lack of travel options for passengers with disabilities in these circumstances. Disability rights organizations urged the Department to strengthen its proposal by requiring airlines to offer alternative travel options to impacted passengers in these situations. Disability Rights New York stated that DOT must create guidelines for airlines to follow when wheelchairs do not fit on the traveler's aircraft. PVA asserted that until aircraft can readily accommodate power wheelchairs and scooters, carriers should be required to provide additional options to passengers. AAPD stated that these options can include deplaning and rebooking on another flight that will accommodate their wheelchair or scooter free of charge or staying on their scheduled flight with the provision of a

loaner wheelchair or scooter at the destination gate. AAPD added that the airline should also transport the passenger's mobility device to his or her destination on the next available flight that can accommodate their device.

Organizations stated that at a bare minimum though, passengers need to be given the opportunity to deplane and cancel their flight if their wheelchairs or scooters do not make it onto their flights. PIDS asserted that if the passenger is informed of the situation after boarding, then they must be given the option to exit the plane and return to their undamaged mobility device. PVA also noted that the organization is unaware of any consistent policies and practices among all carriers in these situations. MDA and the Amputee Coalition reported the same. On the other hand, United States Gender and Disability Justice Alliance asserted that passengers are currently informed by airlines when there is an issue with stowage and are given the option to continue the flight without their wheelchair or stay with their wheelchair.

From the airlines' perspective, RAA commented that when a passenger's wheelchair or scooter does not fit, the airline's customer care personnel work with the passenger to be rebooked on the next available flight on which the wheelchair or scooter would fit. Allegiant noted similar views and stated that its current policy is for a CRO to be contacted for assistance and to consult the passenger regarding possible solutions. Allegiant also stated that these instances are very rare and are more characteristic of regional carriers operating smaller aircraft.

A4A and IATA argued that a requirement to rebook a customer on a flight at a lower fare from an earlier or later flight raises serious concerns about the potential for dishonest behavior, which may rise to the level of fraud. They commented that if the Department implements this requirement, airlines should be permitted to strictly limit and condition the provision of alternative flights, as determined by the airline, but made transparent to the passenger (*e.g.,* the airline can condition that the passenger must accept and fly on the immediately previous or next flight that can accommodate the passenger's wheelchair; the airline can condition that the passenger must takes an alternative flight that minimizes the fare difference; the airline can limit the alternative travel to the same origin and destination, the same day of flight, the same number of legs, stops and connection points, and any other

reasonable condition to minimize the costs to the airline, etc.).

*DOT Response:* After carefully considering the comments, the Department has decided to adopt a final rule requiring airlines to reimburse a passenger who uses a wheelchair or scooter the difference between the fare on a flight taken by the passenger and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. The ACAA provides that airlines may not discriminate against passengers with a disability. Furthermore, 14 CFR 382.11 states that airlines must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation and exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons, among other things.[38]

We recognize that in some instances, passengers who use larger wheelchairs or scooters may only be able to select a more expensive flight because a cheaper flight option uses an aircraft that cannot accommodate their wheelchair or scooter. The Department believes that when this occurs, passengers who use larger wheelchairs or scooters are denied a benefit—the lower prices for air fare—that is available to other persons, which is discriminatory. Passengers who use larger wheelchairs or scooters should not have to pay higher prices for air fares only because their wheelchairs or scooters cannot be transported on certain flights. Accordingly, in situations where passengers who use wheelchairs or scooters cannot book their preferred flight because their wheelchairs or scooters cannot fit in the cabin or cargo compartment of the aircraft of their preferred flights, and the passengers must book more expensive flights that can accommodate their wheelchairs or scooters, airlines are required to reimburse them the difference between the more expensive flights the passengers purchased and had to take and the preferred flights that the passengers would have purchased and taken if their wheelchair or scooter had been able to fit. The Department is limiting the requirement to provide a fare reimbursement to flights that occur on the same day, on the same airline, and between the same origin and destination.

In addition, we agree with A4A and IATA that airlines should be allowed to

require certain documentation to obtain the fare reimbursement. We also agree with comments from disability rights organizations that the documentation requirement should not impose unreasonable barriers to passengers seeking the fare reimbursement and that airlines should display on their websites policies related to obtaining a refund of the fare difference. Therefore, the final rule permits airlines to require reasonable documentation from the passenger to verify: the dimensions of the passenger's wheelchair or scooter; the cost of the passenger's preferred flight that could not accommodate the passenger's wheelchair or scooter; and the cost of the more expensive flight the passenger purchased and had to take. Under this rule, an airline must provide reimbursements to passengers for fare difference occurring on the types of flights within 30 days of receiving a request and documentation that substantiates the cost(s), if such documentation is required by the airline. In addition, an airline must disclose on their website the documentation the airline requires from the passenger to support a reimbursement claim.

A4A and IATA asserted that the proposed rule would "likely violate bilateral air transport agreements that prohibit the regulation of fares and require an open marketplace for air travel." However, the commenters did not provide a rationale for this assertion, and the Department has been unable to independently identify any potential violation. We also note that no other commenter, including any U.S. air transport partner, submitted a comment making a similar assertion.

The Department believes this rule strikes a balance between providing passengers who use wheelchairs or scooters equal access to lower air fare options and not imposing unduly burdensome requirements on airlines. Providing fare reimbursements is a reasonable accommodation and less burdensome to airlines than only operating aircraft large enough to accommodate larger wheelchairs or scooters or reconfiguring aircraft to have doors and cargo space large enough to fit larger wheelchairs or scooters.

Further, this final rule requires airlines to offer passengers whose wheelchairs or scooters have not been loaded onto their scheduled flights, for whatever reason, an opportunity to disembark the aircraft and the choice of rebooking at no additional cost on the next available flight of the same carrier or on a partner carrier. In addition, airlines must offer free rebooking on the next available flight of the same carrier

---

[38] *See* 14 CFR 382.11(a)(1) and (3).

or on a partner carrier, if the passenger's wheelchair or scooter can fit on the aircraft, when an airline becomes aware that a passenger's wheelchair or scooter does not fit on the passenger's scheduled flight. We note that an airline may become aware of this issue in advance of travel, such as at the time of flight booking, or not until at the airport on the passenger's day of travel. The rebooking requirement applies in both scenarios, and the airline should reach out to the passenger as early as possible to start the process.

The Department was persuaded by the comments of PVA, AARP, AAPD, and other disability rights organizations that urged the Department to strengthen the proposed rule by requiring airlines to offer passengers with disabilities an option to disembark and rebook at no additional cost when their wheelchairs or scooters are not loaded onto aircraft. This requirement ensures that passengers with disabilities are not left stranded; instead, airlines are required to offer passengers with disabilities with options when their flight plans are disrupted because their wheelchair or scooter is not loaded onto the aircraft, whether the wheelchair or scooter is not loaded because it does not fit in the cargo compartment or for any other reason.

The Department is pleased to hear from some industry commenters that airlines already make best efforts to accommodate the passenger's needs as best as they can in these unfortunate situations. For example, RAA's comment stated that when a passenger's wheelchair or scooter does not fit in the cargo compartment, the airline's customer care personnel work with the passenger to be rebooked on the next available flight on which the wheelchair or scooter would fit. However, disability rights organizations' comments generally stated that they were not aware of any consistent policies and practices among all carriers. The Department believes that passengers with disabilities are going to benefit from this rule because, when a wheelchair or scooter is not loaded onto a passenger's scheduled flight, the rule requires all airlines that fly to, within, or from the U.S. to offer alternative travel options on that airline or its partner airlines' flights where the wheelchair or scooter will fit.

The Department recognizes that some airlines only operate one type of aircraft and may not have partner airlines. This means that if the passenger's device does not fit on the first flight of that carrier, then the carrier will most likely not be able to accommodate the passenger on a different flight operated

by that same carrier or a partner carrier. In the rule text, the Department specifies that the rebooking requirements apply if ''such an aircraft is available'' to safely accommodate the passenger's wheelchair or scooter. In these situations where it is not possible to rebook the passenger, the airline is required to offer the passenger the opportunity to deplane the aircraft (if the issue arises at the airport on the passenger's day of travel) and to fully refund the passenger the cost of any unused portion of a ticket and related paid fees for ancillary services (*e.g.,* transport of checked or carry-on baggage, access to in-flight entertainment programs or Wi-Fi, and in-flight beverages and snacks, among other things) if they choose not to travel without their device.

### D. Seating Accommodations at the Airport

*The NPRM:* In the NPRM, when discussing delayed wheelchairs and scooters, the Department specifically requested comment on whether airlines should be required to provide safe and adequate seating options at the airport while passengers wait for their delayed devices or loaner wheelchairs from the airlines. The Department also asked about what types of seating options would be appropriate, the cost, and logistics needed at airports.

*Comments Received:* The Department received many comments on whether airlines should be required to provide safe and adequate seating options to passengers with disabilities who are waiting on delayed wheelchairs or loaner wheelchairs at the airport following airline mishandlings.

Disability rights organizations strongly supported requiring airlines to provide safe and adequate seating accommodations while waiting at the airport. The Ability Center of Greater Toledo commented, ''Individuals with disabilities, like everyone else, need suitable seating not only for comfort but also to avoid worsening any discomfort or pain. When awaiting a delayed mobility device at an airport, individuals with mobility disabilities may need to sit for an extended period. Therefore, it's crucial for airports to provide designated and adaptive seating options to ensure that passengers with disabilities do not experience additional stress/harm while waiting for their essential equipment.'' [39]

Disability rights organizations offered different suggestions on what could be

provided as a safe and adequate seating option for passengers with disabilities. PVA stated that options may need to vary depending on the passenger's disability and the length of the delay. For shorter delays, PVA said that passengers should never be required to deplane the aircraft unless their mobility device is available; however, if they do deplane, then accommodations could include providing a wheelchair that the passenger can independently use; medical seat cushions; or use of an in-airport lounge area or hotel. For longer delays, PVA said that carriers must offer these accommodations and more, such as accessible transportation to the passenger's destination or another location and/or providing a loaner wheelchair. Disability Rights Maryland stated that airlines should have a variety of seating and laying options available, including chairs with adjustable arm, back, and leg rests and a variety of cushioning. On the other hand, Indiana Disability Rights stated that certain individuals may need to be accommodated on a cot or a similar surface, such as a hospital bed or Sleep Number bed.

Commenters from the healthcare sector such as Gillette Children's Specialty Healthcare suggest that a variety of options may need to be available and that medical experts should be consulted on this. Open Doors believes airlines should be required to provide air-filled cushions and memory foam pads, although this will not be a perfect solution for everyone.

Airline industry stakeholders had mixed opinions on the proposed requirement. A4A, IATA, and RAA generally agreed that airlines should provide seating options to passengers with disabilities who are waiting at the airport after their wheelchairs or scooters have been delayed or damaged by airlines. However, they stated that their concern is that airlines cannot be required to have medically tailored seating options for every form of disability and at every airport. RAA claimed that even hospitals are not held to this high of a standard. A4A and IATA also argued that seating within the airport is not always controlled by the airlines and should already meet the requirements of the Americans with Disabilities Act (ADA). Spirit agreed that this seating should be the airports' responsibility rather than the airlines.

*DOT Response:* The Department has concluded that it is necessary to adopt a requirement for airlines to provide safe and adequate seating accommodations for individuals with disabilities who are waiting for delayed

---

[39] Comment from The Ability Center of Greater Toledo, *https://www.regulations.gov/comment/ DOT-OST-2022-0144-1409.*

wheelchairs or loaner wheelchairs at the airport. Some commenters have noted passengers with disabilities are often left in aisle chairs or airport wheelchairs when waiting for a delayed wheelchair or scooter and that these chairs may be highly inadequate and may cause physical harm to certain passengers if left sitting on them for prolonged periods. At the same time, determining the best type of seating accommodations that would be safe and adequate is not easy to do. Although some disability rights organizations suggested allowing passengers with disabilities to remain in their seats on the aircraft rather than waiting at the airport terminal in an aisle chair or airport wheelchair, this is often not possible because airlines require passengers with disabilities to deplane so they can use the aircraft for other flights. Passengers are required to follow crew member instructions, including instructions to get off an aircraft.[40] Also, as pointed out by airline commenters, it is not realistic to expect airlines to establish and maintain a wide array of types of medical seating that can safely accommodate all types of needs at all the airports they serve. In this rule, rather than specifying the type of seating accommodation(s) that airlines must have, the Department is requiring airlines to consult with disability rights organizations to determine seating accommodations that work for *most* passengers with disabilities. This consultation is crucial because different individuals with disabilities have different seating needs and preferences. The Department acknowledges that the airport layout and other factors may also impact the eventual solution that is deemed appropriate. This consultation requirement is intended to ensure that seating accommodations that airlines establish adequately consider the needs of passengers with disabilities. The Department is providing carriers one year from the date of publication to implement this provision because of the time needed to consult with disability rights organizations, determine the type of seating accommodation that airline will provide, develop processes and procedures, and train staff.

*E. Enhanced Training Requirements*

*The NPRM:* In the NPRM, the Department proposed to enhance its existing training requirements for airline employees and contractors who physically assist passengers with

mobility disabilities or handle passengers' wheelchairs or scooters. The Department proposed more thorough, frequent, and hands-on training of these employees and contractors.

Specifically, for employees and contractors who provide physical assistance to passengers with mobility-related disabilities, airlines would be required to provide or ensure hands-on training covering safe and dignified physical assistance, including transfers to and from personal or airport wheelchairs, aisle chairs, and aircraft seats; proper lifting techniques to safeguard passengers; how to troubleshoot common challenges when providing physical assistance; and proper use of equipment used to physically assist passengers with disabilities. These personnel would also be required to receive other training covering collecting and sharing of passenger information needed to ensure safe, dignified, and prompt physical assistance, such as Special Service Request (SSR) codes.

For employees and contractors who handle passengers' wheelchairs and other mobility aid devices, airlines would be required to provide or ensure hands-on training covering common types of wheelchairs and other mobility aids and their features; airport and airline equipment used to load and unload wheelchairs and other mobility aids; and methods for safely moving and stowing wheelchairs, including lifting techniques, wheelchair disassembly, reconfiguration, and reassembly, and securement in the cargo compartment of the aircraft. Personnel who handle passengers' wheelchairs and other mobility aid devices would also be required to receive other training covering the collecting and sharing of information regarding a passenger's wheelchair or other mobility aid, including using any airline wheelchair handling form(s) that may exist, to ensure the safe and proper handling of such assistive devices.

Under the NPRM's proposal, "hands-on training" was defined as training that is received by an employee or contractor where the employee or contractor performs a task, function, or procedure that would be part of his or her normal duties in a controlled/simulated environment and with the use of a suitable life-sized model or equipment, as appropriate.

As for training frequency, these covered airline employees and contractors would need to be initially trained prior to assuming their duties and then retrained at least once every twelve months after assuming their duties ("refresher training").

The NPRM also included minor proposed changes to disability-related training requirements for all other personnel (*e.g.,* ticket counter agents and telephone reservation agents). These changes were primarily formatting and language changes, such as clarifying that all other personnel must receive training prior to assuming their duties and at least once every three years thereafter, to promote consistency throughout the regulation without expanding the airlines' obligations. The more substantive change was the proposed requirement for airlines to consult with disabilities rights organizations not only regarding development of their initial training programs, as required today, but also to consult with such organizations when making changes to disability training programs and related policies and procedures that are expected to have a significant impact on assistance provided to individuals with disabilities.

Finally, although not included in NPRM's proposed rule text, the Department solicited comment on whether airlines should be required to designate wheelchair experts and transfer experts who could be consulted should a complex issue or problem arise while handling a passenger's personal wheelchair or while physically assisting a passenger with a disability.

*Comments Received:* At a high level, disability rights organizations, individuals with disabilities, and other non-airline stakeholders such as healthcare representatives, DME suppliers, and labor unions strongly supported heightened training standards and requirements for airline personnel and contractors. Many stated that training is key to ensuring safe and dignified assistance to individuals with disabilities and proper handling of passengers' wheelchairs and scooters. However, several commenters argued that the Department's proposed training requirements are not strong enough to correct existing training inadequacies and suggested various ways to strengthen DOT's training.

The first major recommendation that disability rights organizations had was for the Department to move away from its existing "proficiency" standard for airline training. Disability rights organizations called for a more rigorous approach with detailed training standards, competency tests, and/or certification programs for workers. PVA recommended training to fully educate personnel, which could be accomplished "by promulgating clear training requirements that provide the competency levels needed to physically

---

[40] Federal law prohibits passengers from interfering with crewmembers in the performance of their duties onboard aircraft and failing to obey crewmembers' directions. See 14 CFR 121.580.

assist passengers, handle wheelchairs or scooters, or provide relevant assistance for passengers with disabilities in accordance with the personnel's responsibilities.'' PVA further recommended all personnel who provide physical assistance to passengers with disabilities or handle mobility devices ''must be able to successfully demonstrate to a qualified instructor that they are able to safely provide physical assistance in boarding and deplaning.'' PVA asserted that airline personnel must receive more frequent refresher trainings and reassessments to confirm competency levels are maintained. PVA's sentiment was echoed by several others, including Cure SMA, MDA, AARP, and the Christopher and Dana Reeve Foundation. Other disability rights organizations provided slightly different recommendations. For example, the United States Gender and Disability Justice Alliance suggested that training should be an ongoing process, reflecting the evolving understanding of what it means to provide true accessibility. They further suggested that training should be conducted by individuals with disabilities, physical therapists, DME manufacturers, and providers who are familiar with mobility equipment.

Disability rights organizations also recommended that the Department include additional topics to be covered by the enhanced training requirements. The most common suggested topics included effective communication techniques and listening to and respecting passengers' instructions, assisting passengers with disabilities in emergency situations, the Department's Airline Passenger with Disabilities Bill of Rights,[41] and best practices from healthcare and homecare professionals. PVA specifically recommended that effective communications training include requirements for how to take instructions from the caregiver, if the passenger is non-verbal or unable to communicate their needs to the airline.

In contrast, airline industry stakeholders pushed back on the Department's proposal. A4A called for DOT to follow the 2024 FAA Act by implementing an 18-month training cycle, recognize the realities of airlines' operations and personnel needs, and conduct a more fulsome and accurate economic analysis. ULCCs, regional carriers, and foreign airlines asserted

that DOT's current regulation is adequate, that airlines require flexibility in developing and implementing personnel training, and that the costs of enhanced training will outweigh any additional benefits. Airline industry stakeholders also commented that the scope of the Department's training proposal is too broad and needs to be specifically tailored to each employee. A4A mentioned that the scope of the enhanced training requirements should be narrowed to only focus on wheelchairs and scooters, which is the focus of the rulemaking, rather than including other mobility aids and assistive devices. NACA agreed with limiting the scope to just wheelchairs and scooters and notes that it would be unrealistic to adequately train employees on a wide variety of other mobility aids.

A4A also argued that training needs to be tailored to the respective duties of each employee and should not be based simply on the employee's job title. A4A provided the following example: ''[A] gate agent that only helps in the disassembly or reassembly of wheelchairs or scooters does not need to be trained in cargo compartment procedures, a highly specialized skillset that includes lift operation, weight and balance considerations, floor weight standards, fire suppression requirements, tie down equipment and procedures, and other factors. Requiring that a gate agent undergo such extensive training on cargo loading and unloading is excessive and unjustified by the costs and may not be permitted under some collective bargaining agreements.'' RAA stated that it is fine with the training topics proposed by the Department but also wants to ensure that airlines can tailor training to employees' specific job duties.

The Department also received feedback on the training frequency proposed in the NPRM. Most disability rights organizations seemed to agree with the Department's proposal, which called for initial training before employees and contractors assume their job duties and then refresher training each year after. PVA noted in its comment that even though disability advocates have argued for recurrent training every six months, they are willing to accept refresher training every twelve months in consideration of the eighteen-month training frequency included in the 2024 FAA Act. A few others recommended that the Department consider tying recurrent training to instances of violations related to safety and mishandlings. For example, Colorado Cross-Disability Coalition and Disability Rights

Maryland stated that if two violations (or more) occur in a month, then more frequent training should be required. A minority of disability rights organizations, including the North Dakota Protection and Advocacy Project, did not believe that training every 12 months will be sufficient.

Airline industry stakeholders had mixed opinions on training frequency. A4A recommended that the Department follow the 2024 FAA Act by setting a standard of an 18-month training cycle, which it asserts was based on significant input from the disability community and airlines. A4A stated that this frequency is critical for the continuity and efficiency of airline operations. NACA asserted the current regulatory standard of re-training every three years has been successful and should not be changed. RAA agreed with an 18-month training cycle, while foreign airlines split between 18 and 24 months. Spirit, on the other hand, was fine with annual training so long as it did not need to be provided in a hands-on format.

Other stakeholder comments on the proposed annual training requirements were also mixed. Some stated that annual training is not enough. Open Doors specifically said that transfer training needs to occur every six months.

The NPRM also included a proposed requirement for airlines to consult with disabilities rights advocacy organizations not only regarding the development of their training programs, as required today, but also to consult with such organizations when making changes to disability training programs and related policies and procedures that are expected to have a significant impact on assistance provided to individuals with disabilities. Disability rights organizations were generally in favor of this change as they maintain that they must be involved in developing, auditing, and implementing these training programs. For instance, the Rare Disease Diversity Coalition called for consultation with disability advocates and patient advocacy groups to ensure that training requirements incorporate perspectives from people with disabilities. However, PVA noted that the proposed regulatory language does not require consultation with organizations that represent mobility device users and does not ensure continuous engagement and accountability from airlines.

Airline industry stakeholders had few comments on the aspect of the proposal that concerned consultation with disability organizations on changes to disability training programs and related policies and procedures. A4A agreed

with the premise of the consultation proposal and notes that many member airlines have established accessibility advisory groups that work directly with the disability community to improve training and services. However, A4A also requested that airlines be allowed to consult with disability community experts that are not necessarily associated with a particular organization but have equal or higher qualifications. Spirit generally stated that the Department should not regulate which disability organizations the airline confers with and when.

Another point of contention for commenters was the NPRM's proposed definition of "hands-on training." Several disability organizations, including Colorado Cross-Disability Coalition, Access to Independence of Cortland County, and North Dakota Protection and Advocacy Project, commented that the Department's proposed definition is reasonable. Others, including PVA, Indiana Disability Rights, and the Amputee Coalition, objected to the proposed definition. PVA stated that the use of a life-sized model is not an accurate simulation of the realities of transferring individuals with disabilities, who may be of different sizes, weights, and needs. MDA asserted that individuals with disabilities should be active participants in training to ensure skills are transferable in a real-world setting.

Airline industry stakeholders and labor unions also provided mixed feedback. A4A commented that the proposed definition is mostly reasonable but that the Department needs to clarify what is meant by a "controlled/simulated environment." Allegiant found the Department's proposed definition to be reasonable. NACA cautioned that hands-on training should not be performed while on-the-job because of the importance of giving employees an opportunity to make mistakes and learn from them. Transport Workers Union of America (TWU) agreed with the Department's definition while Service Employees International Union (SEIU) did not find the language to be reasonable because it is too broad and urged the inclusion of supervised practicums with real people in the training.

Lastly, the NPRM asked whether the enhanced training requirements should apply to other types of airline employees and contractors such as reservation agents, ticket counter agents, and managers. Disability rights organizations and other stakeholders wanted more employees to be covered under the final rule, while airline industry stakeholders approved of the

NPRM's approach on this and opposed any expansion.

Disability rights organizations believed it would be beneficial for other frontline employees, including ticket counter agents and flight attendants, to also be covered by more comprehensive and frequent disability training requirements. They claimed these types of employees need to understand the full process of providing assistance to passengers with disabilities and could be called upon to provide ad-hoc assistance if no one else is available. Other stakeholders, including Open Doors and Able Americans of the National Center for Public Policy Research, shared comments like those of disability advocates. They generally viewed training for more frontline employees as a positive because of their view that the current standards are not sufficient.

Enhanced training for managers and supervisors was mentioned the most in comments from disability rights organizations. MDA stated, "While managers may not directly assist the traveling public [with physical assistance], they should also receive the same training so that they may effectively assist if any issues arise." Similarly, the United States Gender and Disability Justice Alliance stated, "Supervisors need to have the same training so they are more aware of the [enplaning] and deplaning of people with disabilities, so they are aware of problems when they arise, and can help solve challenges when they arise."

As mentioned, airline industry stakeholders approved of the NPRM's approach, which allowed for the training to be tailored around the respective duties of each employee. They did not believe that training requirements should apply solely based on an employee's job title. A4A gave the following examples: Ticket counter agents and service call center agents may be involved in the sharing or gathering of passenger information regarding accessibility requests, but they will never handle mobility aids or assist with transferring the passenger; and managers and supervisors may only have duties related to personnel management and may not have actual oversight over employees' performance or functions. In addition, airline industry stakeholders claimed that any expansion of the training requirements could have serious cost and labor implications that were not analyzed in the Department's NPRM.

Separately, the Department also asked whether airlines should be required to designate wheelchair experts and transfer experts who could be consulted

should a complex issue or problem arise while handling a passenger's personal wheelchair or while physically assisting a passenger with a disability. The Department received limited feedback on this idea. Generally, disability rights organizations approved of this. PVA stated that designated wheelchair and transfer experts can contribute significantly to resolving the complex issues that can occur when problems arise. PVA suggested that designated wheelchair and transfer experts should have advanced training, similar to a CRO, and serve as a peer leader that can provide meaningful assistance to ensure the passenger and their mobility device are safe throughout the air travel experience. On the other hand, airline industry stakeholders opposed any requirement on experts at this time. A4A argued that it is not clear what is meant by an "expert" and what type of training would be needed, what types of benefits such a position would result in, and how often "complex issues" even arise during transfers and wheelchair handling.

*DOT Response:* Based on the comments received in response to the NPRM and Congress's mandate in the 2024 FAA Act requiring a rulemaking on minimum training standards related to assistance to wheelchair users who board or deplane using an aisle chair or other boarding device[42] and stowage of wheelchairs and scooters used by passengers with disabilities on aircraft,[43] it is abundantly clear that the

[42] Section 542 of the 2024 FAA Act, titled "Improved Training Standards for Assisting Passengers Who Use Wheelchairs," requires the Department to issue a rulemaking to develop requirements for minimum training standards for airline personnel and contractors who assist wheelchair users who board or deplane using an aisle chair or other boarding device. The training standards, at a minimum, must require that they be able to successfully demonstrate skills on: (1) how to safely use the aisle chair, or other boarding device, including the use of all straps, brakes, and other safety features; (2) how to assist in the transfer of passengers to and from their wheelchair, the aisle chair, and the aircraft's passenger seat, either by physically lifting the passenger or deploying a mechanical device for the lift or transfer; and (3) how to effectively communicate with, and take instruction from, the passenger. Training on the availability of accessible lavatories and on-board wheelchairs and the right of a qualified individual with a disability to request an on-board wheelchair is also required.

[43] Section 543, titled "Training Standards for Stowage of Wheelchairs and Scooters," requires the Department to issue a rulemaking to develop requirements for minimum training standards related to stowage of wheelchairs and scooters used by passengers with disabilities on aircraft. The training standards, at a minimum, must require that they be able to successfully demonstrate skills on: (1) how to properly handle and configure, at a minimum, the most commonly used power and manual wheelchairs and scooters for stowage on
Continued

Department needs to enhance its current regulatory requirements in order to improve airline training on providing physical assistance to passengers with disabilities and handling passengers' wheelchairs and scooters. These two service areas continue to be a serious concern for disability advocates and individuals with disabilities. As noted in the NPRM, inadequate training of these employees and contractors can result in physical harm to passengers with disabilities and costly damages to passengers' wheelchairs and scooters. The Department is adopting the training requirements largely as proposed, with certain revisions discussed further below.

The Department considers training of carrier personnel or contractors who provide physical assistance to passengers with disabilities and handle passengers' wheelchairs or scooters as vital to good service to passengers and to compliance with the ACAA. While we recognize that carriers already have disability-related training programs, this final rule requires for the first time that airlines address specific topics in the training provided to those who physically assist passengers with disabilities and handle passengers' wheelchairs or scooters. In selecting these topics, the Department considered research carried out by Volpe, laws and guidance of foreign governments, IATA's guidance on wheelchair handling and assistance, and stakeholder comments received. These training topics are expected to better ensure that airline personnel and contractors provide safe and dignified assistance to persons with disabilities. Training received on required topics such as wheelchair disassembly and reassembly and proper loading and securement in the cargo compartment should reduce the likelihood of wheelchairs being damaged, delayed, or lost. Also, training on required topics such as safe and dignified transfer assistance and proper use of airline equipment should improve the overall service provided to persons who need physical assistance. The Department continues to believe that these topics are appropriate for the final rule and notes that the 2024 FAA Act requires these subjects to be covered.[44]

Also, we agree with the many commenters who believe that trainees must be able to show that they grasp the knowledge and concepts presented to them during training and can fully demonstrate tasks in front of an instructor. We acknowledge that this process is vital to a successful training program. As such, the Department is requiring employees and contractors who provide physical assistance to passengers with disabilities who use wheelchairs or scooters or handle passengers' wheelchairs or scooters to successfully demonstrate their knowledge but is not specifying how this must be done (e.g., competency assessments or certification exams). By requiring employees and contractors to demonstrate their knowledge, the Department is expanding upon DOT's existing requirement for airlines to ensure employees or contractors who deal with the traveling public are trained, as appropriate to the duties of each employee, to proficiency and addressing the concern of disability group commenters that some carrier personnel do not seem to have been trained to proficiency.

The Department is also making a few changes to the scope of the required training topics for employees and contractors who provide physical assistance to passengers with disabilities who use wheelchairs or scooters or handle passengers' wheelchairs or scooters in response to comments. First, the Department agrees with the dozens of commenters who stressed the importance of training on effective communications with passengers with mobility disabilities. As PIDS stated, "this training should include not only technical skills related to handling mobility aids but also emphasize the importance of respectful, person-centered interactions." [45] Communications training is also required under the 2024 FAA Act.[46] Accordingly, the Department is adding effective communications to the lists of required training topics noted in 14 CFR 382.141(a)(3)–(4). The Department encourages airlines to not only provide required training but also to consider teaching employees and contractors basic sign language or gestures as it provides a way to communicate with individuals with disabilities that may improve overall communication quality and promote inclusion.

Second, the Department also recognizes the calls from airlines for clarification in the regulation to allow for airlines to tailor the enhanced training around employees' duties and to limit the scope of such enhanced training to wheelchairs and scooters. Both recommendations are in line with the Department's original intent for the NPRM's training proposal. We are not requiring airline employees or contractors to undergo extensive training on topics and devices that are not relevant to their work. The Department has clarified in § 382.141(a)(3) that training is for employees and contractors who provide physical assistance to passengers using wheelchairs or scooters, as appropriate to the duties of each person, and clarified in § 382.141(a)(4) that training is for employees and contractors who handle passengers' wheelchairs or scooters, as appropriate to the duties of each person.

Regarding initial training on the new requirements, after carefully reviewing the comments, the Department is requiring airlines to ensure employees and contractors who provide physical assistance to passengers with disabilities or handle passengers' wheelchairs or scooters receive in-depth hands-on training as required by this final rule no later than June 17, 2026. Airline employees or contractors who are hired after June 17, 2026, must receive in-depth hands-on training as required by this final rule before they assume their duties. The Department believes that 18 months responds to industry concerns about the time it would take develop training programs and train employees and contractors.

As for the frequency of refresher training, the Department is adopting its proposal that refresher training be provided once every twelve months. Refresher training is intended to assist employees and contractors in maintaining proficiency, both by reminding them of ACAA requirements and their carriers' procedures for implementing them. All disability rights organizations were in favor of refresher training being required once a year or called for even stricter training frequencies. The Department was not persuaded by the comments received from airline industry stakeholders to retain the current regulatory standard of refresher training being provided every three years or to follow the 2024 FAA Act by setting a standard of an 18-month training cycle. The 2024 FAA Act states that the Department must require airlines to retrain these employees and contractors every 18 months, "at a minimum." Based on the statutory

each aircraft type operated by the air carrier or foreign air carrier; (2) how to properly review any wheelchair or scooter information provided by the passenger or the wheelchair or scooter manufacturer; and (3) how to properly load, secure, and unload wheelchairs and scooters, including how to use any specialized equipment for loading or unloading, on each aircraft type operated by the air carrier or foreign air carrier.

[44] The FAA Reauthorization Act of 2024, Public Law 118–63, Sec. 542, 543 (May 16, 2024).

[45] Comment from The Partnership for Inclusive Disaster Strategies (PIDS), https://www.regulations.gov/comment/DOT-OST-2022-0144-1472.

[46] See The FAA Reauthorization Act of 2024, Public Law 118–63, Sec. 542 (May 16, 2024).

language, the Department cannot allow refresher training to be less frequent than 18 months but is permitted to adopt more rigorous standards as it sees fit. In addition, recurring training at least every 12 months gives the airlines the ability to stagger training around busy seasons and major events as needed. Airlines do not need to wait until exactly the 12-month mark to commence the retraining for an employee.

The Department is also adopting a modified version of the NPRM's training consultation requirement, which stated that when developing disability training programs and related policies and procedures and when making changes to such training programs and related policies and procedures, airlines must consult with disability organizations that represent individuals who would be affected by those changes. Under the final rule, if a disability organization is not available for consultation, then the airline is permitted to work with other individuals with disabilities who are not associated with a particular organization representing individuals with disabilities. The Department recognizes that organizations may not always be readily available to assist the airlines on these training issues because of resource or other issues and understands from comments that certain airlines have established accessibility advisory groups that could step in under these circumstances. Regarding PVA's concerns that airlines may not consult with organizations that represent mobility device users when appropriate since the existing rule requires consultation with organizations representing individuals with disabilities generally, we don't expect for this to be the case because this final rule states, as did the proposal, that airlines "must consult with organizations representing individuals with disabilities who would be affected by those changes." As such, if training changes are made that impact wheelchair services, then airlines are required to work with representatives of wheelchair users.

The Department is also revising its definition for "hands-on training" in the final rule based on the comments received. The Department acknowledges that its original proposed definition may have been unclear in some respects. We addressed this potential lack of clarity in a subsequent publicly docketed document responding to questions raised by airline associations.[47] In that

document, we explained that while a "controlled/simulated" environment for hands-on training was not defined in the NPRM, the Department would consider a "controlled/simulated" environment in the context of hands-on training to mean in-person training that offers a safe and controlled environment by the trainer where employees can learn and practice real-life scenarios without the possibility of real-life consequences to passengers with disabilities. In the NPRM, the Department had made clear its view that it would be unsafe for airline employees and contractors to practice transfer assistance for the first time on-the-job while assisting passengers during their travel by suggesting use of a mannequin or a person such as an instructor for the hands-on training. The Department also explained that it does not consider a "controlled/simulated" environment to consist of virtual or online training where employees are not receiving hands-on practice. In the final rule, the Department is defining "hands-on training" to mean in-person training that is received by an employee or contractor where the employee or contractor can learn and practice real-life scenarios in a safe and controlled environment without the possibility of real-life consequences to passengers with disabilities and with the use of a suitable life-sized model or equipment, as appropriate. In the context of transfer assistance, training may include observation of an actual transfer of an individual with a disability through on-the-job shadowing. However, the Department is declining to mandate the approach mentioned in some disability advocate comments where trainees would practice assistance directly on passengers with disabilities. The Department continues to believe that this would be inappropriate as it poses a risk of harm and injury to the individual(s) with a disability.

The Department is declining to expand the scope of the enhanced training requirements beyond the types of employees and contractors who were covered under the NPRM's proposal—that is employees and contractors who provide physical assistance to passengers with disabilities who use wheelchairs and scooters and employees and contractors who handle passengers' wheelchairs and scooters. The Department considers these types of employees and contractors to include those providing physical assistance directly to passengers with

disabilities[48] or handling passengers' wheelchairs or scooters as well as managers, supervisors, and CROs that directly oversee the functions of personnel who provide physical assistance or handle passengers' wheelchairs or scooters or may be called on if an issue arises during these types of assistance. This clarification aligns with both disability advocate commenters who stated that managers and supervisors need enhanced training and airline commenters who called for tailored training based on job duties.

Finally, regarding a requirement for designated wheelchair experts and transfer experts, the Department is declining to take any action at this time given the limited amount of information and data provided on this in response to the NPRM. Also, the Department is of the view that CROs can provide this type of assistance since CROs are the carrier's "expert" in compliance with the requirements of the ACAA and part 382 and are required to be thoroughly familiar with the requirements of this part and the carrier's procedures with respect to passengers with a disability.[49]

### F. Improved Standards for On-Board Wheelchairs

*The NPRM:* In the NPRM, the Department proposed to require expanded use of on-board wheelchairs (OBWs) with improved safety and accessibility features. For background, OBWs are wheelchairs that are used to transport an individual with a mobility disability between an aircraft seat and an aircraft lavatory. In our 2023 accessible-lavatory final rule, we set new safety and accessibility standards for OBWs to be installed on new single-aisle aircraft with 125 or more passenger seats that are delivered on or after October 2, 2026.[50] We also stated that if a carrier *replaced* an OBW on *any* large single-aisle aircraft after October 2, 2026, then the replacement OBW must also meet the improved standards.[51] In short, our 2023 final rule required improved OBWs only in the context of large single-aisle aircraft.

---

[47] *See* Department Responses to Questions by Airline Associations Regarding Ensuring Safe Accommodations for Air Travelers with Disabilities Using Wheelchairs NPRM, *https://www.regulations.gov/document/DOT-OST-2022-0144-1318.*

[48] The Department considered but ultimately decided against requiring airlines to provide hands-on training to flight attendants because they do not physically assist persons with disabilities. Airlines are required to assist individuals with disabilities on board an aircraft with the use of the on-board wheelchair to enable the person to move to and from a lavatory but the assistance to a semi-ambulatory person in moving to and from the lavatory does not include lifting or carrying the person. See 14 CFR 382.111(c) and (d).

[49] See 14 CFR 382.151.

[50] See 14 CFR 382.65(e), which describes in detail the improved OBW standards.

[51] 14 CFR 382.65(h).

In the NPRM, we proposed to further expand the use of improved OBWs in several different ways. First, we proposed that if carriers purchase an OBW after October 2, 2026, then it must meet the Department's new standards. We reasoned that because improved OBWs will be available on the market at that time, then those OBWs should be selected if airlines choose to purchase an OBW for any reason. Second, we proposed that any aircraft with 60 or more passenger seats and an accessible lavatory (*e.g.,* twin-aisle aircraft) [52] that are delivered after October 2, 2026, must be equipped with an improved OBW. This proposal would ensure that new twin-aisle aircraft are equipped with improved OBWs, just like new large single-aisle aircraft. Finally, we proposed that, by October 2, 2031, *all* OBWs for use on aircraft with 60 or more seats must meet the Department's new safety and accessibility standards. We reasoned that it is important to have a date certain for all OBWs to meet the improved standards.

We recognize that OBWs are manufactured by third parties, not by airlines; therefore, airlines cannot guarantee that an OBW meeting all the DOT's safety and accessibility features will be available on the market by October 2, 2026. Thus, we proposed that carriers must acquire OBWs that comply with as many of the new safety and accessibility requirements as are available on the market; if a specific safety or accessibility feature is unavailable, then carriers must inform the Department of that fact. This proposal tracked the protocol that we adopted in the 2023 accessible lavatories final rule.[53] Finally, in the NPRM, we asked questions about whether airlines should expand the interior stowage space in aircraft to accommodate improved OBWs.[54]

*Comments Received:* Disability organizations, including PVA et al., generally support the NPRM as proposed; however, they urged DOT to adopt October 2026 rather than October 2031 as the compliance date for universal adoption. They contend that "there are currently OBWs on the market that advertise themselves as being compliant" with the 2023 standards, and therefore there is no reason to include an additional five years for universal adoption, because a marketplace solution already exists.[55] They also asked the Department to adopt information and training requirements for OBWs. Approximately 35 individuals offered comments on this proposal; all were generally supportive.

A4A and IATA suggested that the Department adopt compliance deadlines that are tied to the effective date of the final rule, rather than the proposed fixed dates. Specifically, they recommended that any requirement for an improved OBW when airlines choose to purchase an OBW or when airlines install an OBW on new twin-aisle aircraft have a compliance date of two years from the effective date of this final rule. A4A and IATA recommended five years from the effective date of this final rule for universal compliance with improved OBW standards. They assert that fully-compliant OBWs are not yet available on the market, and that the extra time will allow airlines to avoid contractual/supply chain difficulties, especially when OBWs are almost never used on smaller aircraft. A4A and IATA also expressed concerns about airlines being required to continually purchase upgraded OBWs over time as newer OBWs meeting more safety and accessibility features are made available in the market.

Regarding stowage space for OBWs, A4A, IATA, and RAA state that there is no basis for requiring expansion of OBW stowage space, particularly since the dimensions of improved OBWs are currently unknown. Carriers state that they will find appropriate stowage space on the aircraft for the OBW without a DOT rule requiring expansion of a dedicated stowage space. RAA expressed concerns about requiring carriers to install improved OBWs onboard the aircraft, as opposed to simply making them available for use.

*DOT Response:* We are adopting the final rule as proposed with respect to improved OBW standards. In our view, it is reasonable to require the safety and accessibility features of improved OBWs in cases where carriers *voluntarily* purchase new OBWs after October 2026, and where carriers purchase new OBWs after that date to install on new twin-aisle aircraft. Because improved OBWs will be on the market by that time for installation on new large *single*-aisle aircraft, it is also reasonable to require those same improved OBWs within the same time frame on new *twin*-aisle aircraft and for voluntarily purchased OBWs.[56] Finally, the Department continues to be of the view that it is reasonable to set an October 2031 deadline for universal adoption of improved OBWs for use on all aircraft with more than 60 seats. In our view, this deadline provides manufacturers appropriate additional time both to innovate (to produce OBWs with more safety and accessibility features) and to produce a sufficient supply of improved OBWs for use throughout airline systems. Similarly, the October 2031 deadline provides airlines additional flexibility to address any contracting and supply-chain issues they may experience in the process of purchasing new OBWs and replacing older OBWs throughout their system.

Despite industry comments to the contrary, nothing in the proposal or this rule requires airlines to continuously purchase new models of improved OBWs every time a new safety or accessibility feature becomes available. If an airline purchases a compliant OBW with as many safety and accessibility features as are available in October 2026, then it will be deemed to be in compliance until October 2031. By October 2031, however, airlines are expected to acquire OBWs with as many safety and accessibility features as are available in the market at that time. We agree with commenters that there is no need to specifically mandate an expansion of dedicated OBW space onboard aircraft, given that the dimensions of any new OBW are currently unknown, and given airlines' assurance that they will find appropriate stowage space. Finally, with regard to advocates' request for information and training requirements, we find that they are not necessary because of existing requirements. The Department already requires airlines to train flight attendants to proficiency, by October 2, 2026, to provide assistance in transporting persons with disabilities to and from lavatory from the aircraft seat, including training on use of OBWs. The Department also already requires airlines to provide information on request and post information on their

---

[52] See 14 CFR 382.65(a), which specifies that aircraft with more than 60 seats and an accessible lavatory must have an OBW. See also 14 CFR 382.65(b), which specifies that aircraft with more than 60 seats and no accessible lavatory must still have an OBW if a passenger requests one.

[53] 14 CFR 382.65(g).

[54] For new single-aisle aircraft over 125 seats that are delivered after October 2, 2026, carriers are not required to expand the existing FAA-certificated on-board wheelchair stowage space of the aircraft, or modify the interior arrangement of the lavatory or the aircraft, in order to stow the improved OBW. However, if the OBW does not fit within the original stowage space, and another space exists (*e.g.,* an overhead compartment) where it could fit consistent with FAA safety standards, then the carrier must stow it in that space and must request any necessary FAA approval to do so. 14 CFR 382.65(f).

[55] *See* Comment of PVA et al. at 50; *see also* Comment of The Arc at 45 (both with no examples provided).

[56] Given the relatively small number of new twin-aisle aircraft being delivered to airlines, compared to new large single-aisle aircraft, we believe the incremental cost to airlines will be both minimal and cost-justified for the reasons stated in our accessible lavatories final rule.

websites regarding the accessibility features of aircraft lavatories by October 2, 2026.[57]

### G. Size Standard for Lavatories on Twin-Aisle Aircraft

*The NPRM:* In the NPRM, the Department sought comment on whether it should require airlines to expand the size of lavatories on twin-aisle aircraft. We noted that in 2023, we set new size standards for lavatories on large *single*-aisle aircraft.[58] Specifically, new single-aisle aircraft with an FAA-certificated maximum seating capacity of 125 seats or more in which lavatories are provided, must include at least one lavatory of sufficient size to permit a qualified individual with a disability equivalent in size to a 95th-percentile male to approach, enter, maneuver within as necessary to use all lavatory facilities, and leave, by means of the aircraft's on-board wheelchair, in a closed space that affords privacy equivalent to that afforded to ambulatory users. The lavatory must also be large enough to permit an assistant equivalent in size to a 95th-percentile male to assist the individual with a disability.[59] This ''95/95 standard'' applies to new single-aisle aircraft originally ordered after October 3, 2033, or delivered after October 2, 2035, or are part of a new type-certificated design filed with the FAA or a foreign carrier's safety authority after October 2, 2024.[60]

In the NPRM, we noted that the 95/95 standard for new single-aisle aircraft is likely *larger* than the standard for twin-aisle aircraft lavatories. Part 382 requires twin-aisle aircraft to include at least one lavatory of sufficient size to permit a qualified individual with a disability to enter, maneuver within as necessary to use all lavatory facilities, and leave, by means of the aircraft's on-board wheelchair, while affording privacy equivalent to that afforded ambulatory users.[61] The twin-aisle standard does not specifically reference attendants, and does not specifically reference the size of either the passenger or the attendant.

We sought comment on whether to apply the 95/95 standard to twin-aisle aircraft, particularly because twin-aisle aircraft are typically used for even longer flights than single-aisle aircraft.[62] While we did not propose specific rule text, we asked extensive questions about the size and accessibility of twin-aisle aircraft lavatories today, as well as the costs and benefits of adopting a larger size standard. We requested, but did not receive, significant data on these questions during the previous rulemaking on accessible lavatories.

*Comments Received:* Most disability organizations, including PVA et al., recommended adopting the 95/95 standard for twin-aisle aircraft to ensure consistency across long-haul flights.[63] They cited anecdotes from passengers with disabilities, and PVA survey data, indicating that passengers' experience with current twin-aisle lavatories is ''varied,'' with some lavatories reported to be too dangerous and/or too small. A minority of advocates urged DOT to require even larger lavatories (*e.g.,* large enough to accommodate two attendants and/or an adult changing table). Approximately 30 individuals offered comments specifically on this proposal. All were supportive, with most expressing concern about the size of lavatories generally.

Airline industry stakeholders, particularly A4A and IATA, urged the Department to further study the issue via the ACAA Advisory Committee, or via a full notice and comment process with proposed regulatory text, and seek input from lavatory manufacturers, before adopting any rule. They argued that the Department has no basis for calculating costs or benefits, given the lack of data on whether current lavatories are effective and/or meet the 95/95 standard. For similar reasons, they were not in favor of the Department setting an implementation period. Two airlines supported the 95/95 standard for twin-aisle aircraft in conjunction with further study/cooperation with advocates. Boeing indicated that they did not know the precise parameters of what would meet the 95/95 standard. The aircraft manufacturer urged further

study, including study of transfer training and on-board wheelchair (OBW) size. Boeing did not provide any data on whether lavatories today meet the 95/95 standard. They suggested that their twin-aisle lavatories meet non-binding 1992 guidelines, which called for a 97.5th-percentile-male standard.[64] We received no comments from other manufacturers of aircraft or aircraft lavatories.

*DOT Response:* Despite our efforts through this NPRM and the prior rulemaking on accessible lavatories, the Department has not received adequate data from which to assess the costs and benefits of a requirement to adopt a 95/95 standard for lavatories on twin-aisle aircraft. We believe it is generally reasonable to assume that a lavatory meeting the 95/95 standard would be as large as, or larger than, the typical baseline accessible lavatory found on twin-aisle aircraft today.[65] However, it is not clear how much larger a 95/95 lavatory would be, and it is also not clear whether any incremental benefits of a 95/95 lavatory would justify the costs of a requirement to install them. For this reason, the Department is deferring for a later rulemaking the determination of whether to apply the 95/95 standard to twin-aisle aircraft. Meanwhile, the Department plans to examine how best to obtain sufficient data and information so as not to delay action in this area. This issue remains an area of interest for the Department given twin-aisle aircraft are typically used for even longer flights than single-aisle aircraft.

### III. Compliance Periods

Carriers must comply with the provisions in this final rule by January 16, 2025, with some exceptions.

On or after March 17, 2025, airlines must offer passengers the option of either the carrier handling the prompt repair or replacement of the passengers' wheelchairs/scooter or the passenger arranging for the repair or replacement of the device through his or her preferred vendor. Carriers also have until that date to comply with the requirement to notify in writing passengers whose wheelchairs or scooters have been mishandled of their rights, including their right to choose a preferred vendor, if desired, for device

---

[57] See 14 CFR 382.63(h). We also note that Section 551 of 2024 FAA Act requires airlines to inform passengers about the rights and responsibilities of both passengers and airlines regarding the use of OBWs. This information must be provided: (1) on airline websites; and (2) when individuals book a ticket on a ''covered aircraft'' and inform an air carrier or foreign air carrier that they require the use of any wheelchair. A ''covered aircraft'' is any aircraft that is required to be equipped with an OBW pursuant to § 382.65.

[58] Accessible Lavatories on Single-Aisle Aircraft, 88 FR 50020 (August 1, 2023).

[59] 14 CFR 382.64(a)(1–2).

[60] 14 CFR 382.64(c).

[61] 14 CFR 382.63(a)(1–2).

[62] Analysis of Bureau of Transportation Statistics T–100 All Segment data. Data retrieved in Aug. 2023.

[63] Opinions were mixed on a recommended implementation date. Most advocates supported implementation for twin-aisle aircraft ordered one year after the effective date of the final rule, or delivered two years after the effective date of the final rule. Others suggested a similar 10–12 year implementation timeframe as we adopted in the 2023 rulemaking; others urged action as soon as possible.

[64] See *https://www.transportation.gov/sites/ dot.gov/files/docs/ATA%20Guidelines %20Lavatories1.pdf.* In 1992, a 97th-percentile male weighed 240 pounds; in 2024; a 95th-percentile male weighs 280 pounds.

[65] As noted above, the 95/95 standard explicitly calls for a lavatory large enough to accommodate both a large passenger and a large attendant, while the twin-aisle lavatory standard is silent regarding the size of the passenger or the attendant.

repairs or replacement. The requirement for airlines to reimburse passengers the difference between the fare on a flight a wheelchair or scooter user took and the fare on a flight that the wheelchair or scooter user would have taken if his or her wheelchair had fit is also March 17, 2025.

Beginning on June 16, 2025, carriers must transport a delayed wheelchair or scooter to the passenger's final destination within 24 hours of the passenger's arrival for domestic flights and short international flights and within 30 hours of the passenger's arrival for long international flights.

On or after December 17, 2025, carriers must comply with the requirement to notify passengers whether their wheelchairs or scooters have been loaded onto their flights (including whether their device could not fit on the passenger's scheduled flight because of its size or weight) before the aircraft cabin door closes and the requirement to notify passengers with disabilities before they deplane when their wheelchairs or scooters have been unloaded from the cargo compartments of their flights upon arrival. Carriers also have until that date to establish and provide, after consultation with disability rights organizations, safe and adequate seating accommodation(s) to be used by a person with a disability when waiting for a delayed personal wheelchair or waiting for a loaner wheelchair after a passenger's wheelchair or scooter is mishandled by the carrier and cannot be promptly returned.

No later than June 17, 2026, carriers must have provided or ensured initial training on the new requirements for all employees and contractors who provide physical assistance to passengers with mobility disabilities or handle passengers' wheelchairs or scooters, including in-depth hands-on training. Relevant airline employees or contractors who are hired after June 17, 2026, must receive in-depth hands-on training as required by this final rule before they assume their duties.

## IV. Severability

The overall purpose of this final rule is to increase access to safe and dignified air travel for individuals with disabilities. Some of the provisions of this final rule clarify the Department's existing interpretation of the ACAA by specifying when safe, adequate, and prompt assistance is required to be provided by airlines. Other provisions improve accommodations for individuals with disabilities in the event of a wheelchair mishandling by an airline. Such provisions include

notifying passengers when their wheelchairs have been loaded onto and off of the aircraft, strict timeframes for the return of a delayed wheelchair, improved options for passengers when coordinating wheelchair repairs and replacements, new requirements for loaner wheelchairs, and provisions for reimbursing passengers for costs related to mishandlings. Separately, the rule requires airline personnel that provide physical assistance to individuals with disabilities and that handle passengers' personal wheelchairs to receive annual hands-on training. Finally, the rule requires an expanded rollout of OBWs with improved safety and accessibility features.

This entire suite of measures is designed to ensure accessibility and equality in air travel for individuals with disabilities and to address the ongoing and serious difficulties that wheelchair users experience today when traveling, including wheelchair damage and personal injuries. However, the Department finds that these proposals can operate independently from each other, if necessary, and are intended to operate as such. For example, the requirement that service must be safe and dignified (as defined in this rule) is intended to operate separately from the requirement that assistance must be prompt. Updated training standards can operate separately and are not related to requirements to reimburse passengers with disabilities the difference between the fare on a flight taken by a passenger who uses a wheelchair and the fare on a flight that the passenger would have taken if his or her wheelchair had been able to fit in the cabin or cargo compartment of the aircraft. Likewise, the new rule text regarding a rebuttable presumption of a violation set forth the specific metric by which the Department measures violations of the ACAA for enforcement purposes is separate and unrelated from requirements regarding standards for on-board wheelchairs. Even the notification provisions can stand separately from each other because they relate to distinct and independent duties to notify passengers of their rights before the flight, during the journey, and after the flight. In general, in the event that a court were to invalidate one or more of this final rule's provisions as finalized, the Department's intent is that the remaining provisions should remain in effect to the greatest extent possible.

## V. Regulatory Analyses and Notices

### A. Executive Order 12866 ("Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures

Executive Order 12866 ("Regulatory Planning and Review"), supplemented by Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs Federal agencies to propose or adopt a regulation only after making a reasoned determination that the benefits of the intended regulation justifies its costs. The Office of Management and Budget (OMB) has determined that this final rule is a significant regulatory action under Executive Order 12866 and requires an assessment of potential benefits and costs. Accordingly, the Department has prepared a regulatory impact analysis (RIA) for the final rule, summarized in this section and available in the docket. Table 1 below provides a summary of the costs and benefits of this proposed rulemaking.

The rule is expected to reduce injuries, including fatalities, sustained by passengers with disabilities while receiving physical assistance from airline staff (this physical assistance is usually provided when transferring between different types of wheelchairs and between wheelchairs and airplane seats). Benefits of avoided injuries and fatalities due to improved transfer assistance are discussed qualitatively but were not quantified due to uncertainty related to baseline rate of fatality or injury per enplanement from poor transfer assistance, the effectiveness of the final rule in preventing such injuries and fatalities, and the typical social cost of such injuries. Additional unquantified benefits from the final rule include the avoidance of potentially embarrassing or undignified experiences from poor transfer assistance that include being treated disrespectfully, being dropped, or having clothing disarrayed and body parts exposed.

The rule is also expected to reduce the frequency and degree of damages to wheelchairs and scooters and the impacts to passengers due to damaged wheelchairs and scooters. Wheelchair and scooter mishandlings can make them inoperable, which is an undignified situation and has an immediate and severe impact on passengers' personal mobility. It can also lead to passengers suffering injuries from using a temporary wheelchair or scooter that is not customized to their needs while their personal wheelchair or scooter is being repaired or replaced. Passengers who use OBWs conforming

to the new performance standards will benefit from the increased safety and accessibility features of the wheelchairs, leading to reduced injury during use of the OBW during flight. The greater safety, convenience, and accessibility provided by these provisions could lead passengers with disabilities to increase their use of air travel, either by switching from slower modes of travel or by making more long-distance trips.

The potential increase in travel and the associated increase in consumer surplus have not been quantified in this analysis.

Under the final rule, the additional training requirement will increase costs for carriers in the form of additional labor hours for personnel who will receive training, labor hours for trainers, and in some cases additional cost to acquire and maintain equipment used in the training. Carriers will have flexibility in terms of how they manage the trainings and how they are performed, but the final rule requires certain topics be covered. Some of the provisions of the final rule are expected to have costs but have not been estimated quantitatively. These impacts have been summarized in tables 1 and 2 below.

BILLING CODE P

Table 1: Total Benefits and Costs for Quantified Provisions (2025-2044) (millions)

| Final Rule Provision | Costs/Benefits | Total 20-year Value Discounted at 2 percent | Annualized Value, Discounted at 2 Percent | Unquantified Impacts |
|---|---|---|---|---|
| § 382.141 Enhanced Training Requirements for Certain Airline Personnel and Contractors | Costs | -$292.7 | -$14.7 | N/A |
| | *Benefits* | *$221.2* | *$11.1* | Avoided Loss of Mobility; Improved Passenger Dignity; Avoided Fatalities and Injuries |
| *§ 382.141 Enhanced Wheelchair Handling Training Component* | *Costs* | -$149.6 | -$7.5 | *N/A* |
| | *Benefits* | *$221.2* | *$11.1* | *Avoided Loss of Mobility; Avoided Fatalities and Injuries* |
| *§ 382.141 Enhanced Physical Assistance Training Component* | *Costs* | -$143.1 | -$7.2 | *N/A* |
| | *Benefits* | Not quantified | Not quantified | *Improved Passenger Dignity; Avoided Fatalities and Injuries* |
| § 382.65 Onboard Wheelchair Performance Requirements | Costs | -$18.0 | -$0.9 | N/A |
| | Benefits | Not quantified | Not quantified | Avoided Injuries, and Lavatory Accessibility |
| Total Costs | | -$310.7 | -$15.6 | *N/A* |
| Total Benefits | | $221.2 | *$11.1* | *N/A* |
| Net Benefits | | -$89.5 | -$4.5 | *N/A* |

Table 2: Impacts for Unquantified Provisions

| Final Rule Provision | Costs/Benefits | Impacts |
|---|---|---|
| Safe and Dignified Assistance for Passengers with Disabilities (§ 382.11(b) and § 382.3) | Benefits | Clarifies Existing Requirements |
| | Costs | Potentially additional staffing in some circumstances |
| | Transfers | N/A |
| Prompt Boarding, Deplaning, and Connecting Assistance for Passengers with Disabilities (§ 382.89(a) and § 382.89(b)) | Benefits | Clarifies existing requirements |
| | Costs | Potential additional staffing in some circumstances |
| | Transfers | N/A |
| Wheelchair Handling Requirements (§ 382.130(a-b)) | Benefits | Clarifies existing requirements |
| | Costs | N/A |
| | Transfers | N/A |
| | Benefits | Passengers have critical information |
| | Costs | Development and operation costs for airlines |

| Final Rule Provision | Costs/Benefits | Impacts |
|---|---|---|
| Passenger Notifications (§382.41(b), § 382.125, § 382.130) | Transfers | N/A |
| Prompt Return of Delayed Wheelchairs or Scooters (§ 382.130(c)(1–5)) | Benefits | Avoided fatalities and injuries; mobility |
| | Costs | Potentially high incremental costs for returning delayed wheelchairs in some circumstances. |
| | Transfers | Carriers incur ground transportation cost reimbursement dollar for dollar, and passengers receive benefit of reimbursement dollar for dollar. |
| Prompt Repair or Replacement of Damaged Wheelchairs or Scooters (§ 382.130(d)) | Benefits | Avoided fatalities and injuries; mobility |
| | Costs | Development and operation costs for airlines. |
| | Transfers | |
| Loaner Wheelchair Accommodations (§ 382.130(e) and 382.130(c)(4)) | Benefits | Avoided fatalities and injuries; mobility while passenger's chair is being repaired |
| | Costs | Potential costs for new terminal seating |
| | Transfers | - |
| Fare Difference Reimbursement and Rebooking Requirements (§ 382.132 and 382.125(f)(2)) | Benefits | Increased accessibility for preferred routes and times. Avoided delayed wheelchair and safety and mobility; avoided final destination delivery costs for delayed wheelchairs |
| | Costs | Development and operation costs for airlines. |
| | Transfers | Carriers incur cost of reimbursement dollar for dollar, and passengers receive benefit of reimbursement dollar for dollar. |
| All Provisions | Benefits | New trips taken by people with disabilities; generalized cost reduction for passengers with disabilities switching to air travel from other modes. |
| | Costs | Potential increased average cost per seat due to increase in share of passengers using wheelchairs |
| | Transfers | - |

BILLING CODE C

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires an agency to review regulations to assess their impact on small entities unless the agency determines that a rule is not expected to have a significant economic impact on a substantial number of small entities. A direct air carrier or foreign air carrier is a small business if it provides air transportation only with small aircraft (*i.e.*, aircraft with up to 60 seats/18,000-pound payload capacity).[66] In 2024, 29

air carriers meeting these criteria reported passengers traffic data to the Bureau of Transportation Statistics.[67] As described in the Final Regulatory Flexibility Analysis (FRFA), the primary regulatory initiatives discussed in this final rule would apply to carriers that operate aircraft with FAA-certificated maximum capacity of 19 or more seats.

This group of impacted air carriers includes small businesses. There would be an impact on those carriers due to proposed increased training requirements for personnel who provide physical assistance and perform wheelchair handling. The RIA estimates that the final rule would require two additional hours of training per year for personnel performing physical assistance or performing wheelchair handling (§ 382.141), as well as costs related to trainers and materials. However, the cost of two additional hours of wages per year per employee is expected to be nonsignificant. Assuming

[66] 14 CFR 298.2.

[67] Bureau of Transportation Statistics. No date. "Aviation Support Tables: Carrier Decode" *https://www.transtats.bts.gov/DL_SelectFields.aspx?gnoyr_VQ=GDH&QO_fu146_anzr=N8vn6v10%20f722146%20gnoyr5*. To access the data, download all field names, filter to only show "Carrier_Group_New" code 5, sort by End_Date, and count entries with no End_Date value.

relevant personnel work 2,000 hours per year on average (40 hours per week times 50 weeks per year), a two-hour increase is just a 0.1% increase in labor costs for the impacted roles which would be a much smaller percentage of all labor costs and an even smaller percentage of all operating costs. The other provisions of the rule either apply only to carriers that operate at least one aircraft with more than 60 seats and are therefore not small businesses, or do not impose costs. Accordingly, the Department does not believe that the final rule would have a significant impact on a substantial number of small entities.

One regulatory alternative which would reduce impacts on small businesses due to the rule is to require enhanced training only for carriers that operate any aircraft with more than 60 seats. The Department has concluded that this alternative does not meet the objectives of the rulemaking. Employees and contractors of carriers that qualify as small entities should also be sufficiently trained to ensure that passengers who use wheelchairs, including those who live in smaller communities of the country, receive safe, prompt, and dignified assistance during air travel.

### C. Executive Order 13132 (Federalism)

This final rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism"). This final rule does not (1) have substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government; (2) impose substantial direct compliance costs on State and local governments; or (3) preempt State law. States are already preempted from regulating in this area by the Airline Deregulation Act, 49 U.S.C. 41713. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

### D. Executive Order 13175

This final rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13175 ("Consultation and Coordination with Indian Tribal Governments"). Because this final rule will not significantly or uniquely affect the communities of the Indian Tribal governments or impose substantial direct compliance costs on them, the funding and consultation requirements of Executive Order 13175 do not apply.

### E. Paperwork Reduction Act

This final rule adds new collections of information that would require OMB approval under the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. 3501 *et seq.*) (PRA).

The rule requires carriers to notify passengers in writing when they are checking their wheelchairs or scooters that if their wheelchair or scooter is mishandled, they have the right to contact a CRO and a right to file a claim with the carrier.

The rule requires carriers to notify passengers whether their wheelchairs or scooters have been loaded onto their flights (including whether their device could not fit on the passenger's scheduled flight because of its size or weight) before the aircraft cabin door closes. The rule also requires carriers to notify passengers, before they deplane, when their wheelchairs or scooters have been unloaded from the cargo compartment of their flights.

Next, the rule requires airlines to notify passengers whose wheelchairs or scooters have been mishandled in writing of their rights: (1) to file a claim with the airline, (2) to receive a loaner wheelchair from the airline with certain customizations, (3) to choose a preferred vendor, if desired, for device repairs or replacement, and (4) to have a CRO available and be provided information on how to contact the CRO.

The rule also requires airlines to provide status update notifications to passengers on their delayed wheelchairs or scooters when there is a status change. Carriers must also publish information in a prominent and easily accessible place on their public-facing websites describing the relevant dimensions and other characteristics of the cargo holds of all aircraft types operated by the carrier, including the dimensions of the cargo hold entry, that would limit the size, weight, and allowable type of cargo.

In addition, the rule requires airlines to disclose on their websites information on the documentation required from the passengers related to reimbursements of the fare difference when passengers who use wheelchairs or scooters cannot book their preferred flight because their wheelchairs or scooters cannot fit in the cabin or cargo compartment of the aircraft of their preferred flights, and the passengers must book more expensive flights that can accommodate their wheelchairs or scooters.

Notifications must be provided in an accessible format for individuals with disabilities. A carrier is defined as a U.S. citizen or foreign citizen that undertakes, directly or indirectly, or by a lease or any other arrangement, to engage in air transportation. Under the PRA, before an agency submits a proposed collection of information to OMB for approval, it must first publish a document in the **Federal Register** providing notice of the proposed information collection and a 60-day comment period, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information. The Department has not yet published a notice of the proposed information collection.

### F. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (UMRA) requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. As described elsewhere in the preamble, this final rule will have no such effect on State, local, and Tribal governments or on the private sector. Therefore, the Department has determined that no assessment is required pursuant to UMRA.

### G. National Environmental Policy Act

The Department has analyzed the environmental impacts of this final action pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*) and has determined that it is categorically excluded pursuant to DOT Order 5610.1C, Procedures for Considering Environmental Impacts (44 Fed. Red. 56420, Oct. 1, 1979). Categorical exclusions are actions identified in an agency's NEPA implementing procedures that do not normally have a significant impact on the environment and therefore do not require either an environmental assessment (EA) or environmental impact statement (EIS).[68] In analyzing the applicability of a categorical exclusion, the agency must also consider whether extraordinary circumstances are present that would warrant the preparation of an EA or EIS.[69] Paragraph 4.c.6.i of DOT Order 5610.1C categorically excludes "[a]ctions relating to consumer protection, including regulations." This rulemaking concerns consumer and civil rights protection for individuals with disabilities. The Department does

---

[68] *See* 40 CFR 1508.4.
[69] *Id.*

not anticipate any environmental impacts, and there are no extraordinary circumstances present in connection with this rulemaking.

### List of Subjects in 14 CFR Part 382

Air carriers, Civil rights, Consumer protection, Individuals with Disabilities, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, the Department of Transportation proposes to amend 14 CFR part 382 as follows:

## PART 382—NONDISCRIMINATION ON THE BASIS OF DISABILITY IN AIR TRAVEL

■ 1. Amend the authority citation for part 382 to read as follows:

**Authority:** 49 U.S.C. 41702 and 41705, Pub. L. 115–254, and Pub. L. 118–63.

### Subpart A—General Provisions

■ 2. Amend § 382.3 by adding in alphabetical order definitions for ''Custody'', ''Dignified'', ''Hands-on training'', ''Mishandled'', and ''Safe'' to read as follows:

### § 382.3 What do the terms in this rule mean?

\* \* \* \* \*

*Custody* means the time period when a passenger has checked a wheelchair, scooter, or other assistive device with a carrier and the carrier has control of a passenger's wheelchair, scooter, or other assistive device.

(1) An airline's custody begins when the passenger hands the device to an airline's representative or agent or leaves the wheelchair, scooter, or other assistive device at a location as instructed by the airline.

(2) An airline's custody ends when the passenger, or someone acting on behalf of the passenger, or another airline takes physical possession of the wheelchair, scooter, or other assistive device.

\* \* \* \* \*

*Dignified* means assistance provided in a manner that respects a passenger's independence, autonomy, and privacy, which includes but is not limited to: airline personnel providing transfer assistance in a manner that ensures the passenger's clothing is not removed; airline personnel not unduly delaying requests for access to a restroom such that the individual soils himself or herself; and, to the maximum extent possible, airline personnel communicating directly with the individual with disability (*e.g.,* rather than his or her companion or another

individual) when the individual with disability is interacting with them.

\* \* \* \* \*

*Hands-on training* means in-person training that is received by an employee or contractor where the employee or contractor can learn and practice real-life scenarios in a safe and controlled environment without the possibility of real-life consequences to passengers with disabilities and with the use of a suitable life-sized model or equipment, as appropriate.

\* \* \* \* \*

*Mishandled* means lost, delayed, damaged, or pilfered.

\* \* \* \* \*

*Safe* means assistance provided to individuals with disabilities that does not put them at heightened risk of bodily injury, which may include loss or damage to wheelchairs and other assistive devices that result in bodily injury.

\* \* \* \* \*

### Subpart B—Nondiscrimination and Access to Services and Information

■ 3. In § 382.11, redesignate paragraph (b) as paragraph (c) and add new paragraph (b) to read as follows:

### § 382.11 What is the general nondiscrimination requirement of this part?

\* \* \* \* \*

(b) As a carrier or an indirect carrier, the assistance you provide with respect to this part must be performed in a safe and dignified manner.

\* \* \* \* \*

### Subpart C—Information for Passengers

■ 4. Revise § 382.41 to read as follows:

### § 382.41 What flight-related information must carriers provide to qualified individuals with a disability?

(a) As a carrier, you must provide the following information, on request, to qualified individuals with a disability or persons making inquiries on their behalf concerning the accessibility of the aircraft expected to make a particular flight. The information you provide must be specific to the aircraft you expect to use for the flight unless it is unfeasible for you to do so (*e.g.,* because unpredictable circumstances such as weather or a mechanical problem require substitution of another aircraft that could affect the location or availability of an accommodation). The required information is:

(1) The specific location of seats, if any, with movable armrests (*i.e.,* by row and seat number);

(2) The specific location of seats (*i.e.,* by row and seat number) that the carrier, consistent with this part, does not make available to passengers with a disability (*e.g.,* exit row seats);

(3) Any aircraft-related, service-related or other limitations on the ability to accommodate passengers with a disability, including limitations on the availability of level-entry boarding to the aircraft at any airport involved with the flight. You must provide this information to any passenger who states that he or she uses a wheelchair for boarding, even if the passenger does not explicitly request the information.

(4) Any limitations on the availability of storage facilities, in the cabin or in the cargo bay, for mobility aids or other assistive devices commonly used by passengers with a disability, including storage in the cabin of a passenger's wheelchair as provided in §§ 382.67 and 382.123;

(5) Information regarding accessibility of lavatories (*see* § 382.63(h)); and

(6) The types of services to passengers with a disability that are or are not available on the flight.

(b) As a carrier, you must publish information in a prominent and easily accessible place on your public-facing website(s) describing the relevant dimensions and other characteristics of the cargo holds of all aircraft types you operate, including the dimensions of the cargo hold entry, that would limit the size, weight, and allowable type of cargo.

### Subpart E—Accessibility of Aircraft

■ 5. In § 382.65, revise paragraph (h) to read as follows:

\* \* \* \* \*

(h)(1) If you replace an on-board wheelchair supplied on aircraft with an FAA-certificated maximum seating capacity of 125 or more after October 2, 2026, then you must replace it with an on-board wheelchair that meets the standards set forth in paragraph (e) of this section.

(2) After October 2, 2026, if you purchase or otherwise obtain a new on-board wheelchair for use on aircraft with more than 60 passenger seats, it must meet the standards set forth in paragraph (e) of this section.

(3) Any on-board wheelchair supplied on aircraft with an FAA-certificated maximum seating capacity of more than 60 passenger seats and that has an accessible lavatory and that was delivered after October 2, 2026, must meet the standards set forth in paragraph (e) of this section.

(4) After October 2, 2031, any on-board wheelchair that you provide for

passengers' use on aircraft with more than 60 passenger seats must meet the standards set forth in paragraph (e) of this section.

(5) For purposes of paragraphs (h)(2) through (4) of this section, you must acquire OBWs that comply with as many of the safety and accessibility requirements in paragraph (e) of this section as are available. You must inform the Department at the address cited in 14 CFR 382.159 that an on-board wheelchair meeting that requirement is unavailable, if that is the case.

## Subpart G—Boarding, Deplaning, and Connecting Assistance

■ 6. Section 382.89 is added to subpart G to read as follows:

### § 382.89 How timely must the service required under this Subpart be provided by carriers to passengers with disabilities?

(a) As a carrier, the assistance you provide with respect to this subpart must be performed in a prompt manner.

(b) Whether the assistance is prompt is dependent on the totality of the circumstances, except, for as set forth in paragraph (c) of this section.

(c) Prompt assistance for a person who uses a boarding chair (*i.e.,* aisle chair) in deplaning means:

(1) Personnel and boarding chair must be available to deplane the passenger when the last passenger who did not request deplaning assistance departs the aircraft;

(2) The passenger's personal wheelchair must be available as close as possible to the door of the aircraft to the maximum extent possible, except:

(i) Where this practice would be inconsistent with Federal regulations governing transportation security or the transportation of hazardous materials; or

(ii) When the passenger requests the wheelchair be returned at a location other than the door of the aircraft; and

(3) When a passenger's personal wheelchair is not available at the door of the aircraft for the reasons set forth in paragraph (c)(2) of this section, an airport wheelchair must be available as close as possible to the door of the aircraft for the passenger's use.

■ 7. In § 382.95, revise paragraph (a) to read as follows:

### § 382.95 What are carriers' general obligations with respect to boarding and deplaning assistance?

(a) As a carrier, you must provide or ensure the provision of assistance requested by or on behalf of passengers with a disability, or offered by carrier or airport operator personnel and accepted by passengers with a disability, in

enplaning and deplaning. This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.

\* \* \* \* \*

## Subpart I—Stowage of Wheelchairs, Other Mobility Aids, and Other Assistive Devices

■ 8. In § 382.125, add paragraphs (e) and (f) to read as follows:

### § 382.125 What procedures do carriers follow when wheelchairs, other mobility aids, and other assistive devices must be stowed in the cargo compartment?

\* \* \* \* \*

(e) You must notify passengers in writing when they check wheelchairs or scooters to be stowed in the baggage compartment that they have the right to contact a CRO, how they can contact a CRO, and the right to file a claim with the airline if their wheelchairs or scooters are mishandled while in your custody. You must provide this notification in an accessible format for individuals with disabilities.

(f)(1) You must notify passengers with disabilities, before the aircraft cabin door closes, whether their wheelchairs or scooters have been loaded in the cargo compartments of their flights, including whether their device could not fit on the passenger's scheduled flight because of its size or weight.

(2) If a passenger's wheelchair or scooter is not loaded on his or her scheduled flight for whatever reason, you must offer to disembark the passenger and rebook them at no additional cost on the next available flight operated by you or a partner carrier. In addition, when you become aware that a passenger's wheelchair or scooter does not fit on the passenger's scheduled flight, if that is the case, you must offer to rebook the passenger at no additional cost on the next available flight operated by you or a partner carrier where the wheelchair or scooter will fit, if such an aircraft is available.

(3) You must notify passengers with disabilities, before they deplane, when their wheelchairs or scooters have been unloaded from the cargo compartments of their flights upon arrival.

(4) You must provide the notifications required by paragraphs (f)(1) and (3) of this section in an accessible format for individuals with disabilities.

■ 9. Section 382.130 is added to read as follows:

### § 382.130 What are the handling requirements for wheelchairs, scooters, other mobility aids, and other assistive devices and what obligations apply when wheelchairs or other assistive devices are mishandled?

(a) You must return checked wheelchairs, scooters, other mobility aids, and other assistive devices to the passenger in the condition in which you received them. Whenever a passenger's checked wheelchair, scooter, other mobility aid, or other assistive device that was in your custody is not returned to the passenger in the same condition it was received, there is a rebuttable presumption that you mishandled the passenger's wheelchair, scooter, other mobility aid, or other assistive device in violation of the ACAA.

(1) The presumption of a violation in this paragraph (a) can be overcome if you can successfully demonstrate that the alleged mishandling of the wheelchair, scooter, other mobility aid, or other assistive device did not occur while the wheelchair, scooter, other mobility aid, or assistive device was in your control and custody (*e.g.,* the damage occurred before the passenger checked the wheelchair, scooter, other mobility aid, or assistive device; the damage occurred after you returned the wheelchair, scooter, other mobility aid, or assistive device to the passenger) or that the passenger's claim is false or fraudulent.

(2) The presumption of a violation in this paragraph (a) cannot be overcome by demonstrating that the mishandling of a checked wheelchair, scooter, other mobility aid, or other assistive device is the result of "an act of God" or other circumstances beyond the control of the airline.

(b) When you become aware that a passenger's wheelchair or scooter has been mishandled (*i.e.,* your personnel notices that the wheelchair or assistive device has been mishandled or the passenger notifies airline personnel of the mishandling of the wheelchair or assistive device, whichever occurs first), you must immediately notify the impacted passenger in writing of his or her rights to file a claim with the carrier, to receive a loaner wheelchair or scooter from the carrier with certain customizations described in paragraph (e) of this section, to choose a preferred vendor for repairs or replacement of the device, and to have a Complaints Resolution Official (CRO) available and be provided information on how to contact the CRO. You must provide this notification in an accessible format for individuals with disabilities.

(c)(1) When a passenger's checked wheelchair or scooter has been delayed

while in your custody, you must ensure that the device is transported to the passenger's final destination within 24 hours of the passenger's arrival for domestic flights and short international flights between the United States and a foreign point that is 12 hours or less in duration and within 30 hours of the passenger's arrival for long international flights between the United States and a foreign point that is more than 12 hours in duration. You must transport the delayed device by whatever means are available to safely do so.

(2) You must provide passengers a choice between picking up the delayed wheelchair or scooter at the passenger's final destination airport or having the delayed wheelchair or scooter delivered to a reasonable location requested by the passenger, such as the passenger's home or hotel. Depending on the passenger's choice, the delayed wheelchair or scooter is considered to be provided to the passenger either when the passenger or another person authorized to act on behalf of the passenger picks up the delayed wheelchair or scooter at his or her destination airport or when you deliver the delayed wheelchair or scooter to the passenger or another person authorized to act on behalf of the passenger at a reasonable location requested by the passenger, such as the passenger's home or hotel.

(3) If a passenger files a claim with you for a delayed wheelchair or scooter, you must provide them updates when there is a status change for the delayed device.

(4) In consultation with disability rights organizations, you must establish and provide safe and adequate seating accommodations at the airport to be used by individuals with disabilities who are waiting for delayed personal wheelchairs or scooters or waiting for loaner wheelchairs or scooters after a passenger's wheelchair or scooter is mishandled by you and cannot be promptly returned.

(5) You must reimburse passengers for the cost(s) of any transportation to or from the airport that the passenger incurred as a direct result of you delaying the passenger's wheelchair or scooter. You may require passengers to submit documentation that substantiates the cost(s), such as receipts or invoices, to receive reimbursement.

(d) When a passenger's checked wheelchair or scooter has been lost, damaged, or pilfered while in your custody, you must:

(1) Provide the passenger a reasonable timeframe to inspect the wheelchair or scooter and to file a claim with the carrier for the mishandling;

(2) Provide the passenger the following options if repair or replacement is needed:

(i) The passenger may file a claim with you and elect for the carrier to handle the repair or replacement of the wheelchair or scooter. If the passenger selects this option, you must promptly repair or replace the wheelchair or scooter, with a device of equivalent or greater function and safety, and pay the cost of repair or replacement; or

(ii) The passenger may file a claim with you and elect to use the passenger's preferred vendor to repair or replace the wheelchair or scooter. If the passenger selects this option, you are responsible for promptly transporting the passenger's wheelchair or scooter to the passenger's preferred vendor, unless the passenger has indicated that he or she will arrange for the transport themselves, and for directly paying the cost of transport and repair or replacement, with a device of equivalent or greater function and safety; and

(3) Promptly review all claims received within a reasonable time of the repaired or replaced wheelchair or scooter being returned to the passenger alleging that the provided repairs were not sufficient. If the passenger's claim is warranted and the initial repairs were insufficient, then you must promptly repair or replace the device to the passenger's satisfaction.

(e) While the passenger is waiting for his or her mishandled personal wheelchair or scooter to be returned, repaired, or replaced, you must use your best efforts to work with the passenger and to provide an adequate loaner wheelchair or scooter that meets the passenger's functional, mobility-related and safety-related needs, to the maximum extent possible. You must pay for the cost of the loaner wheelchair or scooter. If the loaner wheelchair or scooter you offer does not meet the passenger's functional and safety-related needs as well as the passenger's existing device, the passenger may find and secure an alternative loaner wheelchair or scooter that is better than the one you offered, and you must reimburse the passenger for the cost of that loaner within 30 days of the passenger's request. You may require the passenger to provide documentation substantiating the cost, such as receipts or invoices, to receive the reimbursement.

(f) The liability limits for carriers under the Montreal Convention will apply if the wheelchair or scooter mishandling occurs on an international flight.

■ 10. Section 382.132 is added to read as follows:

**§ 382.132   What requirements apply when a passenger who uses a wheelchair or scooter cannot purchase a certain flight because his or her wheelchair or scooter will not fit in the cabin or cargo compartment of the aircraft for that flight?**

(a) As part of your obligation under § 382.11 to not exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons, to the extent a passenger who uses a wheelchair or scooter cannot book his or her preferred flight because his or her wheelchair or scooter cannot fit in the cabin or cargo compartment of the aircraft of the preferred flight, and the passenger must book a more expensive flight that can accommodate the passenger's wheelchair or scooter, you must, upon request, reimburse the passenger the difference between the more expensive flight the passenger purchased and had to take and the preferred flight that the passenger would have purchased and taken if his or her wheelchair or scooter had been able to fit.

(b) As a condition for issuing reimbursements in paragraph (a) of this section, you may require the following from passengers with disabilities:

(1) The preferred flight and the more expensive flight are on the same airline;

(2) The preferred flight and the more expensive flight are on the same day;

(3) The preferred flight and the more expensive flight have the same origin and destination;

(4) Reasonable documentation to verify: the dimensions of the passenger's wheelchair or scooter; the cost of the passenger's preferred flight that could not accommodate the passenger's wheelchair or scooter; and the cost of the more expensive flight the passenger purchased and had to take.

(c) You must provide the reimbursement required by paragraph (a) of this section within 30 days of receiving a request and the reasonable documentation permitted in paragraph (b) of this section, if you require such documentation.

(d) You must disclose on your website accurate information on the documentation you require from the passenger to support a reimbursement claim.

## Subpart J—Training and Administrative Provisions

■ 11. Revise § 382.141 to read as follows:

**§ 382.141 What training are carriers required to provide for their personnel (*i.e.*, employees and contractors)?**

(a) As a carrier that operates aircraft with 19 or more passenger seats, you must ensure training, meeting the requirements of this paragraph, for all personnel who interact with the traveling public or who handle passengers' assistive devices, as appropriate to the duties of each employee or contractor.

(1) *General.* You must ensure training to proficiency concerning:

(i) The requirements of this part and other applicable Federal regulations affecting the provision of air travel to passengers with a disability;

(ii) Your procedures, consistent with this part, concerning the provision of air travel to passengers with a disability, including the proper and safe operation of any equipment used to accommodate passengers with a disability; and

(iii) Your procedures that safeguard the safety and dignity of passengers with disabilities when providing service required under this part.

(2) *Communication.* You must ensure employees and contractors who interact with the traveling public are trained with respect to awareness of different types of disabilities, including how to distinguish among the differing abilities of individuals with disabilities.

(i) You must ensure such employees and contractors are trained on appropriate ways to communicate and interact with passengers with disabilities, including persons with physical, sensory, speech, mental, intellectual, or emotional disabilities (*e.g.*, communicating directly with the individual with a disability instead of to the travel companion/interpreter).

(ii) You must also ensure such employees and contractors are trained to recognize requests for effective communication accommodation from individuals who have disabilities impacting communication (*e.g.*, hearing or vision impaired individuals, non-verbal individuals), and to use the most common methods for communicating with these individuals that are readily available, such as writing notes or taking care to enunciate clearly, for example. Training in sign language is not required. You must also train these employees to recognize requests for communication accommodations from deaf-blind passengers and to use established means of communicating with these passengers when they are available, such as passing out Braille cards if you have them, reading an information sheet that a passenger provides, or communicating with a passenger through an interpreter, for example.

(3) *Physical assistance.* You must ensure that employees and contractors who provide physical assistance to passengers with disabilities who use wheelchairs or scooters are trained in the matters listed in paragraphs (a)(1) and (2) of this section, and the following, as appropriate to the duties of each person:

(i) Hands-on training concerning safe and dignified physical assistance, including: transfers to and from personal or airport wheelchairs, aisle chairs, and aircraft seats; proper lifting techniques to safeguard passengers; how to troubleshoot common challenges in providing physical assistance; and proper use of equipment used to physically assist passengers with disabilities; and

(ii) Other training concerning the collecting and sharing of passenger information, such as Special Service Request (SSR) codes, needed to ensure safe, dignified, and prompt physical assistance, and effective communications with passengers with mobility disabilities, or their companion if direct communication with the individual with a disability is not possible.

(iii) As part of this training, the employees and contractors must be able to successfully demonstrate their knowledge on the matters listed in paragraphs (a)(3)(i) and (ii) of this section (*e.g.*, competency assessments or certification exams).

(4) *Handling of wheelchairs and scooters.* You must ensure that employees and contractors who handle passengers' wheelchairs or scooters are trained in the matters listed in paragraphs (a)(1) and (2) of this section, and the following, as appropriate to the duties of each person:

(i) Hands-on training concerning common types of wheelchairs and scooters and their features, airport and airline equipment used to load and unload wheelchairs and scooters, and methods for safely moving and stowing wheelchairs, including lifting techniques, wheelchair disassembly, reconfiguration, and reassembly, and securement in the cargo compartment of the aircraft; and

(ii) Other training concerning the collecting and sharing of information regarding a passenger's wheelchair or scooter, including using any airline wheelchair handling form(s) that may exist, to ensure the safe and proper handling of such assistive devices, and effective communications with passengers with mobility disabilities, or their companion if direct communication with the individual with a disability is not possible.

(iii) As part of this training, the employees and contractors must be able to successfully demonstrate their knowledge on the matters listed in paragraphs (a)(4)(i) and (ii) of this section (*e.g.*, competency assessments or certification exams).

(5) *Consulting with disability rights organizations.* You must consult with organizations representing individuals with disabilities in your home country when developing your training program and your policies and procedures. When making changes to such training programs and related policies and procedures that will have a significant impact on assistance provided to individuals with disabilities, you must consult with organizations representing individuals with disabilities who would be affected by those changes. If such organizations are not available in your home country, you must consult with individuals with disabilities and/or international organizations representing individuals with disabilities.

(6) *Training frequency.* You must ensure that all personnel who are required to receive training receive refresher training on the matters covered by this section, as appropriate to the duties of each employee and contractor, as needed to maintain proficiency. The training program must describe how proficiency will be maintained.

(i) All personnel who provide physical assistance to passengers with disabilities must receive initial training described in paragraph (a)(3) of this section by June 17, 2026, and at least once every twelve months thereafter. All personnel who provide physical assistance to passengers with disabilities hired after June 17, 2026, must receive initial training described in paragraph (a)(3) of this section prior to assuming their duties and at least once every twelve months thereafter.

(ii) All personnel who handle passengers' wheelchairs or scooters must receive initial training described in paragraph (a)(4) of this section by June 17, 2026, and at least once every twelve months thereafter. All personnel who handle passengers' wheelchairs or scooters hired after June 17, 2026, must receive initial training described in paragraph (a)(4) of this section prior to assuming their duties and at least once every twelve months thereafter.

(iii) All other personnel must receive training prior to assuming their duties and at least once every three years thereafter.

(7) *Contractors.* You must provide, or ensure that your contractors receive, training concerning travel by passengers

with disabilities. This training is required only for those contractors who interact directly with the traveling public or who handle passengers' assistive devices, and it must be tailored to the employees' functions. Training for contractors must meet the requirements of paragraphs (a)(1) through (6) of this section.

(8) *Complaint Resolution Officials (CROs).* The employees you designate as CROs, for purposes of § 382.151 of this part, must receive training concerning the requirements of this part, including the training described in paragraphs (a)(3) and (4) of this section and the duties of a CRO prior to assuming their duties as a CRO and at least once every twelve months thereafter.

(b) If you are a carrier that operates only aircraft with fewer than 19 passenger seats, you must ensure that your employees and contractors who directly interact with the traveling public are trained, as appropriate to their duties, to ensure that they are familiar with the matters listed in paragraph (a)(1) of this section, as well as to ensure they are knowledgeable on how to communicate with individuals with differing disabilities, how to physically assist individuals with mobility disabilities, and how to properly handle passengers' wheelchairs and scooters.

Issued this 12th day of December, 2024, in Washington, DC.

**Peter Paul Montgomery Buttigieg,**

*Secretary.*

[FR Doc. 2024–29731 Filed 12–16–24; 8:45 am]

**BILLING CODE P**